FEDERAL TRADE COMMISSION,

Plaintiff,

v.

NOVANT HEALTH, INC.,

and

COMMUNITY HEALTH SYSTEMS, INC.,

Defendants.

Case No. _5:24-cv-00028_

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

## COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT

Plaintiff Federal Trade Commission ("FTC" or "Commission") petitions this Court to enter a stipulated temporary restraining order and grant a preliminary injunction enjoining Defendants Novant Health, Inc. ("Novant") and Community Health Systems, Inc. ("CHS"), including their agents, divisions, parents, subsidiaries, affiliates, partnerships, and joint ventures, from consummating their proposed acquisition. Novant and CHS entered into an Asset Purchase Agreement dated February 28, 2023, whereby Novant will acquire Lake Norman Regional Medical Center ("Lake Norman Regional"), Davis Regional Medical Center ("Davis"), and related assets in North Carolina for $320 million (the "Proposed Transaction"). The Proposed Transaction would significantly increase concentration in an already highly concentrated market. The Proposed Transaction also threatens to eliminate substantial head-to-head competition between CHS's Lake Norman Regional and Novant, most notably Novant's Huntersville Medical Center ("Novant Huntersville"). Eliminating this competition would raise prices for

1

commercial insurers and their health plan members and reduce the incentive to invest in quality and innovation. Absent this Court's action, Defendants can complete the Proposed Transaction after 11:59 p.m. Eastern Standard Time on January 30, 2024. Plaintiff seeks this provisional relief under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b).

The FTC requires the aid of this Court to pause Defendants' Proposed Transaction until the Commission has had the chance to review the transaction's legality in an already-pending administrative proceeding. The Commission initiated that administrative proceeding pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45, by filing an administrative complaint on January 25, 2024. The administrative merits hearing will begin on June 26, 2024. This administrative proceeding will determine the legality of the Proposed Transaction and will provide all parties a full opportunity to conduct discovery and present testimony and other evidence on the likely competitive effects of the Proposed Transaction. The pause the FTC seeks from this Court is necessary to maintain the status quo and prevent interim harm during the pendency of the Commission's administrative proceeding.

## I. NATURE OF THE CASE

1.      Novant, one of the largest hospital systems in the southeastern United States and in North Carolina, seeks to acquire CHS's Lake Norman Regional and Davis hospitals in North Carolina. If allowed to proceed, the Proposed Transaction threatens to substantially lessen competition for critical healthcare services in the "Eastern Lake Norman Area," which primarily includes Iredell County and northern Mecklenburg County. The loss of competition would likely result in millions of dollars in increased healthcare costs.

2

2.     Today, Novant operates Novant Huntersville, which serves more patients than any other hospital in the Eastern Lake Norman Area. The Proposed Transaction would permit Novant to enhance and entrench its strong position by acquiring a significant competitor in the Eastern Lake Norman Area. That hospital, CHS's Lake Norman Regional, sits roughly 11 miles north of Novant Huntersville. If the Proposed Transaction is completed, only two other acute-care hospitals would remain in the Eastern Lake Norman Area: Iredell Memorial Hospital ("Iredell Memorial") and, assuming it opens as anticipated in mid-2025, the planned Atrium Health Lake Norman hospital ("Atrium Lake Norman").

3.     The Proposed Transaction is unlawful for at least three independent reasons. First, the Proposed Transaction is presumptively illegal because it would significantly increase concentration in the already highly concentrated market for inpatient general acute care ("GAC") services sold to commercial insurers and their health plan members in the Eastern Lake Norman Area. If the Proposed Transaction is consummated, Novant would control a significant percentage of the Eastern Lake Norman Area market. Indeed, the most appropriate measures indicate that the post-merger Novant would control approximately █ percent of the Eastern Lake Norman Area market. An array of ordinary course documents, witness testimony, and economic analysis confirms this strong presumption of illegality. Even looking far broader than the Eastern Lake Norman Area, the Proposed Transaction would produce presumptively illegal levels of concentration.

4.     Second, the Proposed Transaction would eliminate price competition between CHS and Novant that constrains reimbursement rates for hospital services in the Eastern Lake Norman Area. ███████████████████████████████████████████████
███████████████████████████████████████████████████████████

3

[REDACTED]

[REDACTED]

5.      If Novant is permitted to acquire Lake Norman Regional, insurers would have fewer competing alternatives for inpatient GAC services in the Eastern Lake Norman Area. The Proposed Transaction would eliminate the primary competitive constraint on Lake Norman Regional, a lower-priced alternative. As a result of the merger's substantial lessening of competition, Novant would be able to demand higher reimbursement rates from insurers for the combined entity's services due to an increase in its bargaining leverage in rate negotiations. [REDACTED] In an email shortly following the announcement of the Proposed Transaction, he predicted: [REDACTED] [REDACTED] Moreover, in a negotiation with an insurer shortly after the Proposed Transaction was announced, [REDACTED] [REDACTED] [REDACTED] Higher reimbursement rates would lead to increased out-of-pocket costs, such as higher insurance premiums, co-pays, co-insurance, and deductibles—or reduced benefits—for commercial health plan members.

6.      Third, the Proposed Transaction would eliminate head-to-head non-price competition between Lake Norman Regional and Novant Huntersville, constituting another independent basis for the merger's illegality. Today, the two hospitals vigorously compete to attract patients by improving their quality, service offerings, and facilities. For example, [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

4

█████████████████████████ This non-price competition, and the investment it

drives, benefits all patients that use these hospitals regardless of whether they are commercially

insured, use a government payment program such as Medicaid or Medicare, or are uninsured.

The Proposed Transaction would immediately eliminate this competition, likely reducing

healthcare investment and improvements to quality of care in the Eastern Lake Norman Area.

7.      On January 25, 2024, the Commission found reason to believe that the Proposed

Transaction may substantially lessen competition or tend to create a monopoly in violation of

Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45, or

constitutes an unfair method of competition in violation of Section 5 of the FTC Act. On the

same day, the Commission initiated an administrative proceeding to determine the antitrust

merits of the Proposed Transaction. The ongoing administrative proceeding provides a forum for

all parties to conduct discovery, followed by a hearing before an Administrative Law Judge with

up to 210 hours of live testimony. After reviewing the recommended decision of the

Administrative Law Judge, the Commission will issue a decision, which is then subject to review

in a United States Court of Appeals.

8.      The parties have stipulated to entry of a temporary restraining order to preserve

the status quo and protect competition while the Court considers the FTC's application for a

preliminary injunction. Under this temporary restraining order, Defendants cannot consummate

the Proposed Transaction until the fifth business day after the Court rules on the FTC's request

for a preliminary injunction or until after the date set by the Court, whichever is later.

9.      Preliminary injunctive relief is necessary to preserve the status quo and protect

competition during the Commission's ongoing administrative proceeding. Allowing the

Defendants to consummate the Proposed Transaction before the Commission assesses the

Proposed Transaction's potential anticompetitive effects is problematic for several reasons. It would frustrate the Commission's ability to remedy the anticompetitive effects of the Proposed Transaction if it is found unlawful after a full trial on the merits and any subsequent appeals, would permit competitive harm to begin immediately in the interim period prior to the Commission's decision, and would undermine the public's interest in effective enforcement of the antitrust laws.

## II. JURISDICTIONAL STATEMENT

### A. Jurisdiction

10. The Court has jurisdiction under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and under 28 U.S.C. §§ 1331, 1337, and 1345. This is a civil action arising under the Acts of Congress protecting trade and commerce against restraints and monopolies and is brought by an agency of the United States authorized to bring this suit.

11. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

Whenever the Commission has reason to believe—

(1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond . . . .

12. The Proposed Transaction constitutes an acquisition subject to Section 7 of the Clayton Act, 15 U.S.C. § 18.

6

13.     Defendants and their relevant operating entities and subsidiaries are, and at all relevant times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12. Defendants are, and at all relevant times have been, engaged in commerce in the State of North Carolina.

**B. Venue**

14.     Defendants transact business in the Western District of North Carolina. The FTC Act, 15 U.S.C. § 53(b), also authorizes nationwide service of process, rendering Defendants subject to personal jurisdiction in the Western District of North Carolina, Fed. R. Civ. P. 4(k)(1)(C). Venue, therefore, is proper in the Western District of North Carolina under 28 U.S.C. § 1391(b) and (c), as well as under 15 U.S.C. § 53(b).

**C. Divisional Assignment**

15.     Assignment to the Statesville Division is proper. This action arises in Iredell County because a substantial portion of the assets that Novant seeks to acquire are located in Iredell County.

## III. THE PARTIES

16.     Plaintiff Federal Trade Commission is an administrative agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq.*, with its principal offices in Washington, D.C. The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

17.     Defendant Novant is a multi-state non-profit healthcare provider that operates one of the largest hospital systems in North Carolina. It is headquartered in Winston-Salem, North Carolina. Novant's annual revenue in 2022 was $7.6 billion.

18.     Novant operates 16 GAC hospitals in North Carolina, as well as more than 800 outpatient facilities and physician offices across North Carolina and South Carolina. Six of Novant's GAC hospitals are in Charlotte or its surrounding suburbs. One of those hospitals is in the Eastern Lake Norman Area: Novant Huntersville, a 151-bed community hospital located in Mecklenburg County, approximately 14 miles north of center-city Charlotte.

19.     Novant grew to its current size through a decades-long series of mergers in North Carolina. Shortly after acquiring one of the largest hospitals in the state in 2021, Novant accelerated its campaign of consolidation. Including the Proposed Transaction, ███████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████

20.     Defendant CHS is a for-profit healthcare system that operates 71 hospitals and thousands of sites of care, including physician practices and outpatient facilities, across 15 states. It is incorporated in Delaware and headquartered in Franklin, Tennessee. CHS's annual revenue in 2022 was $12.2 billion.

21.     CHS operates two hospitals in North Carolina: Lake Norman Regional and Davis. Both hospitals are in the Eastern Lake Norman Area. Lake Norman Regional is a ████████ ████████ 123-bed community hospital in Mooresville, roughly 25 miles north of center-city Charlotte. Davis is in Statesville, equidistant between Charlotte and Winston-Salem. In 2022, CHS ceased offering inpatient GAC services at Davis and converted the facility to a dedicated behavioral health hospital.

## IV. THE PROPOSED TRANSACTION

22.     On February 28, 2023, Novant and CHS executed an Asset Purchase Agreement in which Novant agreed to pay CHS $320 million to acquire Lake Norman Regional, Davis, and

8

related assets, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

23.     Under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a, and a timing agreement between Defendants and FTC staff, unless this Court grants the FTC's requested relief, Defendants will be free to consummate the Proposed Transaction after 11:59 p.m. Eastern Standard Time on January 30, 2024.

## V. THE PROPOSED TRANSACTION WOULD SIGNIFICANTLY INCREASE CONCENTRATION IN A HIGHLY CONCENTRATED MARKET

24.     The Proposed Transaction would significantly increase concentration in the already concentrated market for inpatient GAC services sold to commercial insurers and their members in the Eastern Lake Norman Area. The increased concentration in this market establishes a prima facie case that the Proposed Transaction is unlawful and is a basis to preliminarily enjoin the Proposed Transaction pending merits proceedings before the Commission.

### A. Relevant Service Market: Inpatient GAC Services Sold to Commercial Insurers and Their Members

25.     Inpatient GAC services sold to commercial insurers and their members is a relevant service market in which to assess the Proposed Transaction's competitive effects.

26.     Inpatient GAC services include a broad cluster of hospital services—medical, surgical, and diagnostic services requiring an overnight hospital stay—for which competitive conditions are substantially similar. In this case, inpatient GAC services cover all such services that both CHS's Lake Norman Regional and Novant Huntersville offer. Non-overlapping services are not included in the relevant service market, as the Proposed Transaction is not likely to affect competition for those services.

9

27.     Examples of inpatient GAC services include childbirth, complex surgeries such as cardiac surgery, treatment of serious illnesses and infections, and some emergency care. Inpatient GAC services are required by distinct customers: individuals who need medical, surgical, and diagnostic services that necessitate an overnight hospital stay. Inpatient GAC services are provided by specialized providers—GAC hospitals.

28.     Due to the specialized facilities, regulatory and licensing requirements, and high level of care involved, inpatient GAC services have distinct prices that are relatively insensitive to price changes for other medical services, such as outpatient services. Industry participants, including Defendants, recognize inpatient GAC services as a distinct category of services in the ordinary course of their business.

29.     Although the Proposed Transaction's likely effects could be analyzed separately for each of the hundreds of individual inpatient acute-care services Defendants both offer, it is appropriate to assess competitive effects and calculate market concentration for inpatient GAC services as a cluster of services. These services are offered in the Eastern Lake Norman Area under substantially similar competitive conditions. Grouping the hundreds of individual inpatient acute care services into a cluster for analytical convenience enables the efficient evaluation of competitive effects and reflects commercial and competitive realities.

30.     Outpatient services, which are typically less intensive than inpatient services and do not require an overnight hospital stay, are excluded from the cluster market for inpatient GAC services. Examples of outpatient services include minor surgeries, MRI scans, and mammograms. The decision whether to treat a patient with an outpatient or inpatient service is a medical determination based on that patient's specific clinical need. Commercial insurers and their members generally cannot substitute an outpatient service for an inpatient service in

response to a price increase, degradation of quality, or other exercise of market power with respect to inpatient GAC services. Additionally, outpatient services are offered in the Eastern Lake Norman Area by a broader set of providers under different competitive conditions and in a wider variety of settings, such as ambulatory surgery centers and physician offices.

31.     The relevant service market does not include other services that are neither substitutes for nor offered under similar competitive conditions as inpatient GAC services. For example, the relevant service market does not include pediatric hospital services or inpatient psychiatric, substance abuse treatment, or rehabilitation services.

32.     The hypothetical monopolist test is a quantitative tool that courts and federal agencies use to assist in determining relevant markets in antitrust cases. The test involves examining whether a hypothetical monopolist of a candidate market could profitably impose a small but significant and non-transitory increase in price or other worsening of terms. If a hypothetical monopolist could impose such an increase or other worsening of terms, that candidate market is a valid market for antitrust analysis.

33.     A hypothetical monopolist of inpatient GAC services sold to commercial insurers and their members could profitably impose a small but significant and non-transitory increase in the price or other worsening of terms of those services. The market for inpatient GAC services sold to commercial insurers and their members therefore satisfies the hypothetical monopolist test.

**B. Relevant Geographic Market: The Eastern Lake Norman Area**

34.     An appropriate relevant geographic market in which to analyze the competitive effects of the Proposed Transaction is the Eastern Lake Norman Area, which chiefly includes Iredell County and northern Mecklenburg County. The Eastern Lake Norman Area is the primary area in which Lake Norman Regional and Novant Huntersville compete.

11

35.     The Eastern Lake Norman Area is a rapidly growing suburban community north of Charlotte. Its population of more than 335,000 residents is centered in Mooresville, Davidson, Cornelius, Huntersville, and Statesville. These municipalities form a narrow corridor along Interstate 77 ("I-77"), a significant north-south thoroughfare.

36.     The Eastern Lake Norman Area is a distinct community, as recognized by residents, business leaders, and market participants. On its south, the Eastern Lake Norman Area is bordered by Interstate 485, which divides the city of Charlotte from its outer suburbs. Lake Norman forms a ███████████████ near the western side of the relevant geographic market, creating a physical impediment to east-west travel and a preference among residents to receive healthcare services on their side of the lake. The north and east ends of the Eastern Lake Norman Area are more sparsely populated areas along the Iredell and Mecklenburg county lines. Residents of the Eastern Lake Norman Area are highly attuned to traffic congestion and driving times to center-city Charlotte, which dissuade many from traveling to Charlotte for healthcare services.

37.     Patients in the Eastern Lake Norman Area prefer to receive inpatient GAC services close to their homes. Many patients do not view hospitals outside the Eastern Lake Norman Area as viable alternatives, and most patients from the Eastern Lake Norman Area stay within the area to receive inpatient GAC services. Employers contracting for commercial insurance seek health plans with a provider network that is satisfactory for a broad set of their employees. For these reasons, insurers do not believe they could successfully market health plans in the Eastern Lake Norman Area if their provider networks did not include a GAC hospital in the Eastern Lake Norman Area. Additionally, federal time-and-distance requirements applicable

to some commercial health plans can be satisfied only by including at least one of the Eastern Lake Norman Area hospitals in-network.

38.     The following map shows the Eastern Lake Norman Area and the locations of the four GAC hospitals located therein: CHS's Lake Norman Regional, Novant Huntersville, Iredell Memorial, and the planned Atrium Lake Norman.



39.     The Eastern Lake Norman Area is an important market for commercial insurers because of its fast-growing population and the high proportion of its residents covered by employer-based commercial insurance. An insurer would incur significant financial harm if it could not offer a marketable provider network to employers with workers who reside in the Eastern Lake Norman Area.

13

40.     Novant and CHS both assess competitive dynamics in the Eastern Lake Norman Area and execute strategic initiatives tailored to the area. They also focus competitive intelligence on hospitals within the relevant geographic market. ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████

41.     Defendants track market shares in geographies that closely correspond to the Eastern Lake Norman Area. Lake Norman Regional, Novant Huntersville, and Iredell Memorial ████████████████████████████████████████████ and Atrium Lake Norman would likely draw its patients from this area presuming it opens.

42.     Evidence of existing intense head-to-head competition further demonstrates that the Eastern Lake Norman Area is a relevant geographic market. ████████████████████████

████████████████████████████████████████

████████████████████████████████ The competition between Lake Norman Regional and Novant Huntersville supports a geographic market in which they are the market leaders. Additionally, the hospitals' competitive focus on Iredell Memorial and

14

Atrium Lake Norman indicates that a well-defined geographic market will encompass those facilities.

43.     Quantitative analysis confirms this commercial reality. A hypothetical monopolist of inpatient GAC services sold to commercial insurers and their members in the Eastern Lake Norman Area could profitably impose a small but significant and non-transitory increase in price or other worsening of terms of those services. The Eastern Lake Norman Area therefore satisfies the hypothetical monopolist test.

44.     In the alternative—although less illuminative of the competitive effects of the Proposed Transaction—the broader Center City/Northern Charlotte Region also constitutes a relevant geographic market. Alongside the Eastern Lake Norman Area, this geographic area adds center-city Charlotte, the northern and northeastern sections of Charlotte, and the western portion of Cabarrus County. This broader area encompasses the four GAC hospitals in the Eastern Lake Norman Area and several others, including Novant's Presbyterian Medical Center, Atrium Health Carolinas Medical Center, Atrium Health Mercy, Atrium Health University City, and Atrium Health Cabarrus. It would be very difficult for a commercial insurer to successfully market a health plan to Center City/Northern Charlotte Region employers and residents if its provider network excluded all GAC hospitals from that area.

45.     A hypothetical monopolist of inpatient GAC services across the entire Center City/Northern Charlotte Region could profitably impose a small but significant and non-transitory increase in price or other worsening of terms on commercial insurers that sell health plans in the Center City/Northern Charlotte Region.

## C. The Proposed Transaction Would Lead to a Presumptively
## Illegal Increase in Concentration

46.     The Proposed Transaction is presumptively illegal because it significantly increases concentration and results in a highly concentrated market for inpatient GAC services sold to commercial insurers and their members in the Eastern Lake Norman Area. The impact of the Proposed Transaction on market concentration is sufficient to establish a prima facie case that the Proposed Transaction violates the antitrust laws.

47.     Courts, federal and state agencies, and economists commonly employ market shares and a metric known as the Herfindahl-Hirschman Index ("HHI") to measure market concentration. The HHI for a given market is calculated by summing the squares of the individual firms' market shares. HHIs range from a number approaching zero (in the case of an atomistic market) to 10,000 (in the case of a pure monopoly). A market is considered highly concentrated if it has an HHI of more than 1,800.

48.     An acquisition is presumptively illegal if it increases the HHI of a relevant market by more than 100 points and either (a) produces a post-acquisition HHI greater than 1,800 points or (b) creates a combined firm with a market share greater than 30 percent.

49.     The Proposed Transaction's impact on market concentration far exceeds the levels that trigger a presumption of illegality, increasing the HHI in the Eastern Lake Norman Area by well over 1,000 points, leading to a post-acquisition HHI significantly above 3,500 points and a post-acquisition market share for Novant of considerably more than 30 percent. Indeed, the most appropriate measures indicate that the Proposed Transaction would increase the HHI in the market by more than ███ resulting in a (a) post-acquisition HHI of more than ███ and (b) market share for Novant of approximately █ percent. These post-transaction concentration

16

estimates assume Atrium Lake Norman is currently a market participant, despite Atrium's projection that the facility will become operational only in mid-2025.

50.     Assuming an operational Atrium Lake Norman, the Proposed Transaction would reduce the number of healthcare providers offering inpatient GAC services in the Eastern Lake Norman Area from four to three. Moreover, without preliminary injunctive relief, the competitive harm would be even more severe during the period while merits proceedings are ongoing before the Commission. Before the planned opening of Atrium Lake Norman in mid-2025, the Proposed Transaction would leave only two competing providers in the Eastern Lake Norman Area: Novant and Iredell Memorial. Without preliminary injunctive relief, the competitive harm during this period would be particularly acute.

51.     The presumption of anticompetitive harm from the Proposed Transaction does not depend on a market defined around the Eastern Lake Norman Area. Even if the hospitals in the Center City/Northern Charlotte Region are included in the geographic market, the Proposed Transaction would still produce presumptively illegal market concentration levels and increases in market concentration. Including these hospitals—although less reflective of competitive realities—shows the Proposed Transaction would still increase the HHI by more than ██ points, resulting in a post-acquisition HHI of over ███ points and a post-merger market share of more than ██ percent for Novant. The Proposed Transaction, therefore, remains presumptively illegal even if analyzed in a broader region than the Eastern Lake Norman Area.

## VI. THE PROPOSED TRANSACTION WOULD ELIMINATE HEAD-TO-HEAD COMPETITION BETWEEN LAKE NORMAN REGIONAL AND NOVANT HUNTERSVILLE

52.     CHS's Lake Norman Regional and Novant Huntersville currently compete closely to provide inpatient GAC services to commercial insurers and their members. This competition creates numerous benefits for patients in the Eastern Lake Norman Area, driving Defendants to

offer more competitive reimbursement rates and to invest in improving the quality of their healthcare services. The Proposed Transaction would immediately eliminate this important head-to-head competition. It would combine what is currently ██████████████████ for inpatient GAC services in the Eastern Lake Norman Area with ██████████████████████ hospital systems. The anticompetitive effects of the Proposed Transaction would likely burden employers and residents in the Eastern Lake Norman Area with higher healthcare costs and hospitals that face a reduced incentive to invest in innovative, accessible, and high-quality care.

53.    The Proposed Transaction would eliminate substantial competition between Lake Norman Regional and Novant Huntersville to sell inpatient GAC services to commercial insurers and their members. The loss of this substantial competition renders the Proposed Transaction unlawful and provides an additional and independent basis to preliminarily enjoin the Proposed Transaction pending merits proceedings before the Commission.

### A. Competition Between Hospitals Benefits Consumers

54.    Hospital competition to provide healthcare services to commercially insured patients occurs in two distinct but related stages. First, hospitals compete for inclusion in commercial insurers' health plan provider networks. Second, in-network hospitals compete to attract patients.

55.    In the first stage of hospital competition, hospitals compete to be included in the provider networks for commercial insurers' health plans. To become an in-network provider in a health plan, a hospital negotiates with an insurer and enters into a contract if it can agree on terms with the insurer. The reimbursement rates for services rendered to a health plan's members are a central component of these negotiations. This is true regardless of whether reimbursements are tied to fee-for-service contracts, value-based contracts, or other types of contracts.

56.     Insurers seek to create a network of healthcare providers that is attractive to current and prospective customers. Employers aim to find health plans with a provider network that is suitable for a broad range of their employees. For this reason, insurers attempt to contract with local hospitals that are desirable to residents who are current or prospective members of a commercial health plan. Patients prefer to seek treatment close to where they live. It is typically far less expensive for health plan members to receive care from an in-network hospital than a hospital that is not included in the health plan's provider network. Having local hospitals in-network thus enables the insurer to assemble a provider network that is attractive to current and prospective customers in a particular geographic area, generally local employers and their employees.

57.     A hospital is likely to attract more of a health plan's members if it is in-network because members will face lower out-of-pocket costs for care at that facility. Hospitals therefore have an incentive to offer competitive terms and reimbursement rates to induce insurers to include the hospital in their provider networks.

58.     A hospital has significant bargaining leverage if its absence would make an insurer's health plan provider network substantially less attractive to current and prospective customers and members in a geographic area. The relative importance of a hospital to the insurer hinges on whether other nearby hospitals could serve as viable in-network substitutes in the eyes of customers and health plan members. The nearby presence of alternative, high-quality hospitals creates important competition that limits the ability of hospitals to raise prices and to impose other unfavorable terms in negotiations with insurers. Where there are fewer meaningful alternatives—i.e., less competition—a hospital will have greater bargaining leverage to obtain higher reimbursement rates and other more onerous contract terms.

59.     A merger involving hospitals that are good substitutes for patients increases the combined entity's bargaining leverage with insurers. Such a merger can lead to higher prices and a reduced incentive to invest in innovation and quality of care because the merger eliminates an alternative that an insurer could otherwise offer (or threaten to offer) its customers and health plan members.

60.     Increases in reimbursement rates significantly impact health plan customers and members, such as through higher premiums, increased cost-sharing payments, or fewer benefits. Self-insured employers fully bear increased reimbursement rates because they pay for claims directly. Fully insured employers face higher premiums driven by increased reimbursement rates. Individual consumers also can feel the burden of increased reimbursement rates in the form of higher insurance premiums, co-pays, co-insurance, deductibles, or other out-of-pocket costs.

61.     In the second stage of hospital competition, hospitals compete to attract patients to their facilities by offering convenient, high-quality healthcare services. After selecting a health plan, patients generally do not face different out-of-pocket costs to access various hospitals included in their health plan's provider network. As a result, hospitals compete on non-price features, including location, quality of care, enhanced service offerings, reputation, amenities, and patient satisfaction. Hospitals also compete for patient volume by seeking to persuade physicians to refer or admit patients to their facility.

62.     Non-price competition benefits all patients of the competing hospitals, whether those patients are covered by commercial insurance, Medicare or Medicaid, or no insurance at all. Indeed, many Medicaid and low-income patients have limited transportation options, which makes local non-price competition particularly important. A merger of competing hospitals eliminates this significant non-price competition.

20

**B. Lake Norman Regional and Novant Huntersville Compete Closely**

63.     CHS's Lake Norman Regional and Novant Huntersville are direct competitors. Each hospital pays close attention to the competitive threat posed by the other.

64.     Lake Norman Regional treats Novant Huntersville as its most important competitive rival. In July 2022, Lake Norman Regional's CEO shared a set of growth strategies he characterized as "███████████████████████████████████████" Executives at Lake Norman Regional repeatedly prepared strategic presentations featuring a ████████████████████████████████████████████████████ ████████ CHS also characterized Novant Huntersville as the ████████████████ ████████████████████████ Lake Norman Regional's leaders monitor Novant Huntersville's █████████████████████████████, noting that ██████████ ██████████████████████████████████. In 2022, CHS named Novant Huntersville as ████████████████████████████████████████ ██████████████████████

65.     Novant likewise views Lake Norman Regional as one of its closest competitors. For example, Novant's strategic plans for its self-defined ██████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████ to Novant Huntersville. Novant regularly tracks Lake Norman Regional's █████████████████████████████████████.

66.     Lake Norman Regional and Novant Huntersville are significant competitors because they offer a similar set of services in close geographic proximity. The two hospitals are located closer to each other than either is to any other currently operating GAC hospital. The "service areas" of these hospitals (i.e., the areas from which the hospitals draw their patients)

21

overlap significantly, particularly in southern Iredell County, where "██████████████ ████" and "███████████████████████████████████████████."

67.     Both CHS and Novant have strong incentives to compete vigorously in the Eastern Lake Norman Area. This geographic area has rapid population growth and a lucrative "payor mix" that features a large proportion of commercially insured patients. Hospitals receive substantially higher reimbursement rates for commercially insured patients relative to patients covered by Medicare, Medicaid, or related managed care health plans.

68.     Lake Norman Regional and Novant Huntersville currently serve as important alternatives to one another for insurers constructing provider networks. They are the only currently operating GAC hospitals along the 42-mile stretch of I-77 between Iredell Memorial in Statesville and center-city Charlotte. Insurers believe that a health plan must have an in-network GAC hospital within fewer than 15 or 20 miles to be marketable in parts of northern Mecklenburg and southern Iredell counties—leaving Defendants' hospitals as the only two options. Moreover, for commercial health plans sold on the Affordable Care Act Health Insurance Marketplace, Lake Norman Regional and Novant Huntersville are the only hospitals that can satisfy geographic access requirements for large swathes of northern Mecklenburg County.

69.     Defendants recognize that patients frequently choose between Lake Norman Regional and Novant Huntersville. Lake Norman Regional's CEO pointed out his hospital's "█ ███████" of "█████████████████████" Novant Huntersville's progress ███████████████████████████████████████████████ ██████████ "███████████████████████████████████████ ██████████████████." When Lake Norman Regional launched a "█████

22

████████" plan to shore up its market share, its target was clear. The plan involved █████████

████████████████████████████████████████████████████

███████████████████████ ██████████████████████████."

70.     Patients treat Lake Norman Regional and Novant Huntersville as close substitutes, which drives the intensity of competition between the two hospitals. Diversion analysis is an economic tool that measures patterns of patient substitution between hospitals using data describing where patients receive hospital services. Diversion analysis shows that, if Lake Norman Regional became unavailable to patients for inpatient GAC services, Novant Huntersville would be their top alternative destination. If Novant Huntersville were to become unavailable, a substantial proportion of Novant Huntersville's patients would seek inpatient GAC services at Lake Norman Regional. Insurers similarly consider Lake Norman Regional and Novant Huntersville to be important substitutes in the eyes of their health plan members.

71.     In addition to removing CHS as a competitor, the Proposed Transaction would eliminate the possibility of a different healthcare system acquiring Lake Norman Regional and continuing to compete against Novant Huntersville. ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████" The Proposed Transaction would put an immediate stop to competition between Novant Huntersville and Lake Norman Regional and the benefits it produces for patients.

72.     Atrium's plan to open a small, 30-bed hospital in Cornelius does not neutralize the competitive intensity between Lake Norman Regional and Novant Huntersville. Atrium Lake Norman aspires to open its doors in mid-2025, but that timeline is not certain. Assuming Atrium Lake Norman is operational, the Proposed Transaction would reduce the number of competing

23

providers in the Eastern Lake Norman Area from four to three, and it would leave a weaker set of competitive alternatives. Even if it were consistently filled to maximum capacity, Atrium Lake Norman would serve less than 50 percent as many patients as Lake Norman Regional and less than 30 percent as many patients as Novant Huntersville. ████████████████ ████████████████████████████████████████████████████ Atrium Lake Norman's limited capacity and service offerings would make it unable to treat a meaningful proportion of the patients seeking care in the area.

### C. Head-to-Head Competition Between
### Lake Norman Regional and Novant Huntersville Constrains Healthcare Rates

73.     Today, close head-to-head competition between CHS's Lake Norman Regional and Novant Huntersville incentivizes Defendants to keep prices lower and quality of care higher than they would absent this competition. Lake Norman Regional obtains in-network status with insurers by offering low reimbursement rates relative to other GAC hospitals. Across the largest commercial insurers in North Carolina. ██████████████████████████████ ████████████████████████████████████████

74.     CHS also competes on non-price factors to ensure the inclusion of Lake Norman Regional in insurers' provider networks. Lake Norman Regional has sought to ████████ ████████████████████████████████████████████████ ██████████████████████

75.     By eliminating Lake Norman Regional and Novant Huntersville as competitive alternatives, the Proposed Transaction likely would increase Novant's leverage in insurer negotiations to obtain higher reimbursement rates, especially at Lake Norman Regional. Today, competitive pressure may prevent Lake Norman Regional from negotiating higher rates with insurers. But if the Proposed Transaction is allowed to close, Novant would be able to leverage

24

its control of an even greater proportion of the Eastern Lake Norman Area's hospitals when negotiating rates for Lake Norman Regional. The Proposed Transaction is likely to substantially reduce the need to offer attractive rates at Lake Norman Regional to persuade insurers to include the hospital in their provider networks.

76. CHS recognizes that ███████████████████████████ ██████████████████████████. In an email, the company's ████████████ ████████████████████████████████████████████████. He predicted that "█████████ ███████████████████████████████████████████████████." Instead, CHS began ███████████████████████████████ ██████████████████████. ██████████████████████████████ ███████████████████████████████████████████████."

77. ███████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████████ ██████████████████████████████

78. Novant would have the ability to profitably raise prices at both Lake Norman Regional and Novant Huntersville following the Proposed Transaction. The competitive harm of the Proposed Transaction is likely to increase annual healthcare costs by approximately ████ ████ Rate increases are likely to be particularly acute at Lake Norman Regional—economic

modeling indicates the post-merger entity may be able to obtain ██████████████ ████████████

79.     Post-merger, insurers constructing a provider network would have fewer alternatives to either Lake Norman Regional or Novant Huntersville. Iredell Memorial in Statesville is a 20- to 30-minute drive north of population centers in Mooresville, Cornelius, and Huntersville, making it a less desirable replacement for Lake Norman Regional or Novant Huntersville. Even upon the anticipated opening of the 30-bed Atrium Lake Norman hospital in Cornelius, its limited capacity would make it a less effective substitute for hospitals in an insurer's provider network than Lake Norman Regional and Novant Huntersville are for each other. As a result, should Novant acquire Lake Norman Regional, the merged firm would likely be able to command higher reimbursement rates or other more onerous contractual terms than Defendants do separately today. Such higher rates would likely harm employers and consumers through increased costs—such as higher insurance premiums, co-pays, co-insurance, and deductibles—or decreased benefits.

80.     Moreover, the risk of competitive harm is even more severe during the period for which the FTC requests preliminary injunctive relief. Atrium Lake Norman is not anticipated to open until mid-2025. Before that point, the planned opening of Atrium Lake Norman may provide a limited competitive constraint at most. In the absence of preliminary injunctive relief, the risk of interim competitive harm during the pendency of the Commission's administrative merits proceeding is particularly acute.

### D. Current Competition between Defendants to Attract Patients Drives Investment in Quality of Care and Innovation

81.     In addition to constraining healthcare rates, CHS's Lake Norman Regional and Novant Huntersville also compete with one another to attract patients to utilize their inpatient

GAC services, regardless of the patient's insurer. This competition currently incentivizes each hospital to improve quality, technology, amenities, equipment, access to care, and service offerings. The benefit of that competition would be lost if the Proposed Transaction is allowed to proceed.

### i. Quality and Service Improvements

82.     Defendants have invested in their healthcare systems and facilities to compete to attract patients to Lake Norman Regional and Novant Huntersville. █████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████

83.     ████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



84.

85.

86.

[REDACTED]

87.     All patients of Lake Norman Regional and Novant Huntersville benefit from the hospitals' non-price competition. The intense head-to-head competition between the two hospitals has spurred investments that have delivered newer medical equipment, more accessible healthcare services, and expanded service offerings. If the Proposed Transaction is allowed to close, the competitive pressure driving these business investments would cease the day the merger is completed.

### ii. Physicians and Physician Referrals

88.     Defendants also compete with one another by recruiting physicians. [REDACTED]

[REDACTED]

███████████████████████████████████████████████████████████████

████████████████████████████

89.     Lake Norman Regional and Novant Huntersville also currently compete for

physician referrals. ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

### *iii. Investments in Capacity and Output*

90.     The Proposed Transaction also threatens to eliminate planned improvements in

capacity and quality in the Eastern Lake Norman Area. ████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████

### VII. COUNTERVAILING FACTORS DO NOT OFFSET THE PROPOSED TRANSACTION'S THREAT TO COMPETITION

91.     *De novo* entry of providers of inpatient GAC services in the Eastern Lake Norman

Area in response to the Proposed Transaction would not be timely, likely, or sufficient to offset

the Proposed Transaction's anticompetitive effects.

30

92.     Constructing a new hospital is expensive and involves significant financial risks, including the time and resources necessary to develop plans, acquire land or repurpose a facility, garner community support, obtain regulatory approvals, build the hospital, and prepare to open its doors.

93.     North Carolina state law requires providers to obtain a certificate of need ("CON") before building a new GAC hospital or expanding an existing GAC hospital. The process of obtaining a CON is expensive, time-consuming, and uncertain to succeed. Denial of a CON application would bar a prospective competitor from entering the market or increasing the number of beds with which to provide inpatient GAC services.

94.     Atrium's experience pursuing the opening of Atrium Lake Norman illustrates the high barriers to building a new hospital in this area. State regulators twice denied Atrium's applications for a CON for Atrium Lake Norman. Atrium gained approval only after it abandoned its attempt to secure new licensed beds, instead reallocating 30 licensed beds that were already approved at other Atrium hospitals. Atrium did not begin construction of Atrium Lake Norman until May 2023, nearly four years after it applied for a CON for the facility in 2019. The hospital has faced multiple years of delays and cost overruns of nearly 50 percent. Atrium Lake Norman is now projected to open in mid-2025—nearly six years after Atrium first filed its CON application. Other healthcare systems agree that opening a new hospital is an enormously daunting proposition that would require hundreds of millions of dollars.

95.     There are no pending CON applications to add new inpatient beds in the Eastern Lake Norman Area. None of the healthcare systems in other parts of the Charlotte region have announced plans to enter the Eastern Lake Norman Area.

31

96.     Expanding existing GAC hospitals would encounter similarly high barriers, including substantial time and expense for planning, pursuing a CON and other regulatory approvals, and construction. ████████████████████████████████

████████████████████████████████████████████████████████████

97.     Expansion of inpatient capacity at existing GAC hospitals in the Eastern Lake Norman Area in response to the Proposed Transaction would not be timely, likely, or sufficient to offset the Proposed Transaction's anticompetitive effects.

98.     Atrium has not applied to expand Atrium Lake Norman's inpatient capacity beyond its 30 currently licensed beds. There is a low likelihood that Atrium Lake Norman would be able to timely expand its capacity to blunt the anticompetitive effects of the Proposed Transaction.

99.     Defendants cannot demonstrate merger-specific, verifiable, and cognizable efficiencies sufficient to overcome the structural presumption of illegality or to show that the Proposed Transaction does not threaten to substantially lessen competition.

## VIII. LIKELIHOOD OF SUCCESS ON THE MERITS, BALANCE OF EQUITIES, AND NEED FOR RELIEF

100.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that a proposed acquisition is unlawful, to seek preliminary injunctive relief to prevent consummation of the acquisition until the Commission has had an opportunity to adjudicate the acquisition's legality in an administrative proceeding. In deciding whether the requested relief is in the public interest, the Court must balance the FTC's likelihood of ultimate success on the merits with the weight of the equities. The predominant equity in cases brought under Section 13(b) is the public's interest in effective enforcement of the antitrust laws.

32

To the extent private equities affecting only Defendants' interests are even relevant at this stage, they should be afforded little weight and cannot tip the scale against a preliminary injunction.

101.    The FTC is likely to succeed in proving at the administrative trial that the effect of the Proposed Transaction may be substantially to lessen competition or to tend to create a monopoly in violation of Section 7 of the Clayton Act or Section 5 of the FTC Act, or that the Proposed Transaction constitutes an unfair method of competition in violation of Section 5 of the FTC Act.

102.    The equities weigh strongly in favor of preliminary injunctive relief. Should the Commission rule after the full administrative trial that the Proposed Transaction is unlawful, it would be difficult, and perhaps impossible, to unwind the competitive harm of the Proposed Transaction if the merger has already been completed. The integration of Novant and Lake Norman Regional's operations, including by implementing higher prices, altering Lake Norman Regional's operations and business plans, eliminating key Lake Norman Regional personnel, and sharing competitively sensitive information, would impede any attempt to reverse the competitive harm of the Proposed Transaction.

103.    Moreover, in the absence of relief from this Court, substantial harm to competition could occur immediately, even if it were feasible to obtain an effective divestiture remedy following the administrative proceeding. This interim harm would likely result in increased healthcare costs for employers and individuals in the Eastern Lake Norman Area and lessen providers' incentive to invest in quality of care and healthcare innovation.

104.    There are no countervailing equities implicated by the Proposed Transaction sufficient to overcome the public's strong interest in effective enforcement of the antitrust laws.

105.    Accordingly, the requested equitable relief is in the public interest.

WHEREFORE, Plaintiff respectfully requests that the Court:

a.  Enter the parties' stipulated temporary restraining order;

b.  Preliminarily enjoin Defendants from taking any further steps to consummate the Proposed Transaction, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly;

c.  Retain jurisdiction and maintain the status quo until the conclusion of the administrative proceeding that the Commission has initiated; and

d.  Award such other and further relief as the Court may determine is appropriate, just, and proper.

Dated: January 25, 2024

Respectfully submitted,

Of counsel:

*/s/ Nathan Brenner*

NATHAN BRENNER (Illinois Bar No. 6317564)

HENRY LIU
Director
Bureau of Competition

Federal Trade Commission
600 Pennsylvania Avenue
Washington, DC 20580

RAHUL RAO
Deputy Director
Bureau of Competition

Tel.: (202) 326-2314
Email: nbrenner@ftc.gov
*Attorney for Plaintiff Federal Trade Commission*

SHAOUL SUSSMAN
Associate Director for Litigation
Bureau of Competition

ANISHA DASGUPTA
General Counsel
Federal Trade Commission

MARK SEIDMAN
Assistant Director

KAREN H. HUNT
Deputy Assistant Director

CORY GORDON
CHRISTOPHER HARRIS
KENNAN KHATIB
RYAN MADDOCK
LOUIS NAIMAN
JEANNE L. NICHOLS
NICOLAS STEBINGER
ANUSHA SUNKARA
GOLDIE VERONICA WALKER
KURT D. WALTERS
Attorneys
Federal Trade Commission