**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION NO. 5:24-cv-00028-KDB-SCR**

FEDERAL TRADE COMMISSION,

*Plaintiff,*

v.

NOVANT HEALTH, INC.

and

COMMUNITY HEALTH SYSTEMS, INC.,

*Defendants.*

**<u>REDACTED VERSION
OF DOCUMENT FILED
UNDER SEAL (ECF 80)</u>**

**MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION**

Novant Health, Inc.'s ("Novant's") proposed acquisition of two hospitals from Community Health Systems, Inc. ("CHS") would irreversibly consolidate the market for hospital services in the Eastern Lake Norman Area in the northern suburbs of Charlotte. Patients throughout the United States depend on nearby hospitals to provide critical inpatient services like maternity care or cardiac surgery. This is no less true for the residents in the Eastern Lake Norman Area—for these patients, having choices for local healthcare is imperative. As one Novant executive explained, Novant's local hospital seeks "to provide as many services for the people of Lake Norman as possible so they don't have to go downtown,"[1] fighting traffic into center-city Charlotte while in labor or experiencing chest pains.

Today, Huntersville Medical Center ("Novant Huntersville") is in ███████████ with Lake Norman Regional Medical Center ("Lake Norman Regional") to ████████

---

[1] PX5103 (WSOC-TV) at 1.

█████████ [2] They compete aggressively against each other to gain market share and provide better ████████████████████████████████████ [3] As Novant recognizes, ████████████████████████████████████████████ ████████████████████████████████████ [4] Novant now seeks to acquire one of its closest competitors in the area, threatening this vibrant competition and exposing North Carolinians to increased costs and limited healthcare options.

Novant has been ███████████████████████████████████████████ [5] CHS was █████████████████████████ but rather was only willing to do so if the ████████ [6] Determined to combine Lake Norman Regional with its closest competitor—Novant Huntersville, only 12 miles away—Novant put together a █████████ of $320 million to compensate CHS for ███████████████ [7] On February 28, 2023, Novant entered into an agreement with CHS to purchase Lake Norman Regional and CHS's other North Carolina hospital, Davis Regional Medical Center ("Davis") at a █████ price. [8]

For two independent reasons, the Court should grant the Federal Trade Commission's ("FTC's" or "Commission's") request for a preliminary injunction. *First*, the proposed transaction is presumptively unlawful because it would result in a combined entity with an eye-

---

[2] PX1208 (Novant) at 5; PX1223 (Novant) at ████████████████████ tab; *see also* PX1204 (Novant) at 2 ████████████████████████████████

[3] PX1022 (Novant) at 2; *see also* PX1204 (Novant) at 2; PX1287 (Novant) at 27; PX2150 (CHS) at 11, 21; PX2228 (CHS) at 3–4; PX2099 (CHS) at 20, 22–23, 25–26.
[4] PX1290 (Novant) at 2–3.
[5] *See* PX7023 (Armato) at 65:13–66:10; PX1142 (Novant) at 2.
[6] PX7031 (Medley) at 57:13–20, 58:1–18 ███████████████████████████████████████████████████████ at 4 ███████
[7] PX1128 (Novant) at 1, 3; PX1004 (Novant) at 7; *cf.* ███████████████████ at 23:12–24:23 ██████████████████████████████████
[8] PX1004 (Novant) at 7; *see also* PX1172 (Novant) at 1; PX2217 (CHS) at 2.

popping 64% share of the market in the Eastern Lake Norman Area. The Supreme Court has held that mergers are presumptively unlawful if they result in a single entity controlling a 30% market share. *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 364 (1963). Here, the proposed transaction readily clears that bar. Faced with similar facts, courts have held that hospital acquisitions should be enjoined. *See FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 168 (3d Cir. 2022); *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 342 (3d Cir. 2016); *FTC v. Advocate Health Care Network*, 841 F.3d 460, 465 (7th Cir. 2016); *FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1094 (N.D. Ill. 2012); *FTC v. ProMedica Health Sys., Inc.*, 2011 WL 1219281, at *60 (N.D. Ohio Mar. 29, 2011).

*Second*, independent of market shares, the proposed transaction would eliminate substantial head-to-head competition between Novant Huntersville and Lake Norman Regional. "If evidence demonstrates substantial competition between the merging firms prior to the merger, that ordinarily suggests that the merger may substantially lessen competition." U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* § 2.2 (2023) ("*Merger Guidelines*"); *see also FTC v. IQVIA Holdings Inc.*, 2024 WL 81232, at *40 (S.D.N.Y. Jan. 8, 2024) ("It is sufficient to show, as the FTC has, that Defendants vigorously compete head-to-head and that this competition would be eliminated by the proposed transaction."). Today, aggressive competition between Novant Huntersville and Lake Norman Regional benefits patients through lower prices, improved quality of care, and new service offerings. The proposed transaction would immediately wipe out this competition, reducing Defendants' incentives to invest in quality and leaving fewer options for patients.

These concerns are not theoretical. After signing the agreement, Novant ██████████ ███████████████████████████████████████████ demonstrating that Novant would rather

3

buy a nearby competitor than invest in  Moreover, CHS's lead negotiator warned a commercial insurer shortly after the transaction was announced that ████████████████ ████████████████ and ████████████ ████████████████████████ [9] That ████████████ confirms that the proposed transaction would saddle consumers with higher healthcare costs.

For these reasons, the Commission voted to commence an administrative proceeding to determine whether the proposed transaction violates the antitrust laws. At the forthcoming administrative hearing, the parties can conduct extensive discovery and present up to 210 hours of live testimony to determine whether this acquisition will substantially lessen competition. 16 C.F.R. § 3.41(b). The question before this Court is limited: Has the FTC shown that it has a "fair and tenable chance" of success on the merits sufficient to maintain the status quo pending a full administrative hearing? *In re Sanctuary Belize Litig.*, 409 F. Supp. 3d 380, 396 (D. Md. 2019), *aff'd*, 795 F. App'x 184 (4th Cir. 2020). Because the evidence before the Court easily meets that standard, the Court should grant a preliminary injunction.

## BACKGROUND

Novant is one of the largest hospital systems in the southeastern United States with $7.6 billion in 2022 revenue, 19 hospitals in North Carolina and South Carolina, and over 2,000 employed or affiliated physicians.[10] Six Novant hospitals are located near Charlotte, including Novant Huntersville, a 151-bed acute care community hospital located in northern Mecklenburg County approximately 14 miles north of center-city Charlotte.[11]

---

[9] PX2004 (CHS) at 2; *see also* PX3025 (CHS) at 2.
[10] PX1006 (Novant) at 6; PX5069 (Novant) at 1.
[11] PX1166 (Novant) at 4; PX7038 (Riley) at 170:3–5.

4

CHS is a publicly traded healthcare company that operates 71 hospitals and thousands of other sites of care across 15 states, with a net operating revenue of $12.5 billion in 2023.[12] CHS owns two hospitals in North Carolina. Most relevant here, CHS's Lake Norman Regional is a 123-bed acute care community hospital located in Mooresville in southern Iredell County, approximately 25 miles north of center-city Charlotte.[13] Lake Norman Regional is a ███ ████ hospital centered in the "fastest-growing city" in North Carolina.[14] As the FTC's expert Dr. Lawton Burns describes, Lake Norman Regional has numerous accolades for its quality of care, and CHS highlighted these accomplishments to potential buyers.[15] On top of its positive reputation among insurers and patients,[16] Lake Norman Regional offers among the lowest—if not the lowest—prices for inpatient services in the Eastern Lake Norman Area.[17]

There are two other acute care hospitals in the Eastern Lake Norman Area: (i) Iredell Memorial, a community hospital in Statesville; and, if and when it opens, (ii) Atrium Lake Norman, a 30-bed hospital in Cornelius, anticipated to open mid-2025 with limited services. The proposed transaction would leave Novant with a dominant share of hospital services in the local area, with almost 65% of the market, far overshadowing Iredell Memorial and Atrium Lake Norman.

Courts recognize that hospitals compete for inclusion in insurance networks and to attract

---

[12] PX5042 (CHS) at 8; PX5043 (CHS) at 1.
[13] PX2060 (CHS) at 7.
[14] *See infra* note 137 (showing Lake Norman Regional is ████████████ PX5142 (Iredell Econ. Dev. Corp.) at 1 (calling Mooresville "the fastest-growing city in the entire state").
[15] PX0002 (Burns Report) ¶ 63 (listing Lake Norman Regional's accolades); *see also* PX2060 (CHS) at 9; PX2235 (CHS) at 11, 31; ██████████ at 227:13–229:17 ████████████ ██████████████████; ██████████ at 124:10–126:10; ████████ at 157:3–159:7.
[16] PX2099 (CHS) at 11.
[17] Commercial insurers reimburse Novant Huntersville at rates ████████████ than those for Lake Norman Regional. PX0001 (Tenn Initial Report) at tbl.10.

patients. *See Hackensack*, 30 F.4th at 168; *Hershey*, 838 F.3d at 342; *Advocate*, 841 F.3d at 465. By combining two close competitors, Novant will be able to extract higher rates from insurers, which is likely to translate to higher premiums and out-of-pocket costs for individual health plan members.[18] The proposed transaction will also eliminate competition to attract patients, thereby reducing Novant's incentive to invest in quality.

## LEGAL STANDARD

Section 13(b) of the FTC Act permits the FTC to seek in federal district court a preliminary injunction to preserve the status quo pending an administrative proceeding on the merits. 15 U.S.C. § 53(b). The narrow issue before the Court is whether it should prevent Defendants from consummating the proposed transaction until the Commission has had an opportunity to adjudicate the merger's legality. *Hershey*, 838 F.3d at 352. "The district court is not authorized to determine whether the antitrust laws have been or are about to be violated" because the "adjudicatory function is vested in [the] FTC in the first instance." *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1342 (4th Cir. 1976). The FTC bears a lighter burden than the "more stringent, traditional 'equity' standard for injunctive relief." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001).

Courts determine if injunctive relief under Section 13(b) is warranted by considering two factors: "(1) the likelihood of success, and (2) a balancing of public equities." *Food Town*, 539 F.2d at 1344. The FTC demonstrates a likelihood of success if it "shows preliminarily, by affidavits or other proof, that it has a fair and tenable chance of ultimate success on the merits." *Sanctuary Belize*, 409 F. Supp. 3d at 396. The FTC carries its burden merely if it has "raised serious and substantial questions going to the antitrust merits that are fair ground for

---

[18] ███████████████████ PX0001 (Tenn Initial Report) ¶¶ 55–61.

6

Case 5:24-cv-00028-KDB-SCR   Document 88   Filed 03/25/24   Page 6 of 37

investigation by the Commission itself." *IQVIA*, 2024 WL 81232, at *53; *see also FTC v. Whole Foods*, 548 F.3d 1028, 1035–36 (D.C. Cir. 2008).

In the administrative merits proceeding, the Commission will apply a three-step burden-shifting framework to assess the legality of the transaction. *See In re Otto Bock HealthCare N. Am., Inc.*, 2019 WL 5957363, at *11 (F.T.C. Nov. 1, 2019). At step one, the FTC must "establish a prima facie case that an acquisition is unlawful." *Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 423 (5th Cir. 2008). At step two, the burden shifts to the defendants to rebut the prima facie case with sufficient evidence to show that "the prima facie case inaccurately predicts the relevant transaction's probable effect on future competition," or to "discredit the evidence underlying the initial presumption." *United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017) (quotations omitted). At step three, if the defendants successfully carry their burden, "the burden of production shifts back to the [FTC] and merges with the ultimate burden of persuasion." *Chicago Bridge*, 534 F.3d at 423.

The text of Section 7 of the Clayton Act requires the analysis to focus on "probabilities, not certainties," *Hershey*, 838 F.3d at 337 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962)), embodying Congress's intent "to arrest anticompetitive tendencies in their incipiency," *Phila. Nat'l Bank*, 374 U.S. at 362. Thus, even in the merits proceeding before the Commission, "[d]oubts are to be resolved against the transaction." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989). That principle applies even more strongly here, where the FTC's burden is simply to show a fair and tenable chance of success on the merits. At this preliminary stage, courts "do not resolve the conflicts in the evidence, compare concentration ratios and effects on competition in other cases, or undertake an extensive analysis of the antitrust issues." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1164 (9th Cir. 1984).

7

In addition to the likelihood of success, the Court balances the equities implicated by preliminary injunctive relief. "The equities will often weigh in favor of the FTC, since 'the public interest in effective enforcement of the antitrust laws' was Congress's specific 'public equity consideration' in enacting the provision." *Whole Foods*, 548 F.3d at 1035 (quoting *Heinz*, 246 F.3d at 726); *see also Food Town*, 539 F.2d at 1346 ("The equities to be weighed are not . . . the usual equities in private litigation," but rather equities that bear on the "public interest.").

## ARGUMENT

### I.    THE FTC IS LIKELY TO SUCCEED ON THE MERITS

The proposed transaction will greatly increase concentration in a highly concentrated market and eliminate substantial head-to-head competition between close rivals. At the administrative hearing, the FTC will meet its burden to show the acquisition is reasonably likely to substantially lessen competition on both grounds. The Court should preliminarily enjoin the proposed transaction until the parties are able to litigate the transaction's legality before the Commission in a full administrative proceeding.

#### A.  The Proposed Transaction Is Presumptively Illegal

To assess a merger's probable effects on competition, one method courts and the Commission use is to test whether the merger may increase concentration in a relevant market that is an "area of effective competition." *Advocate*, 841 F.3d at 467 (quoting *Brown Shoe*, 370 U.S. at 324). A relevant market consists of a relevant: (1) service market (what is being sold) and (2) geographic market (where those services are being sold). Defining a market follows a "pragmatic, factual approach . . . and not a formal, legalistic one." *Id.* (quoting *Brown Shoe*, 370 U.S. at 324). Moreover, at the Section 13(b) stage, the FTC is only required to establish "a reasonable probability that it will be able to prove its asserted market." *Whole Foods*, 548 F.3d at 1049 (Tatel, J., concurring); *accord Food Town*, 539 F.2d at 1344. Because the Section 13(b)

inquiry "is a narrow one," courts are not required to resolve "conflicting evidence on the relevant product market, market concentration, [or] market shares." *Warner*, 742 F.2d at 1162, 1164.

Here, Defendants currently compete in the market for inpatient general acute care ("GAC") services sold to commercial insurers and their members in the Eastern Lake Norman Area. By absorbing Lake Norman Regional into Novant, the proposed transaction would significantly increase concentration in this highly concentrated market, far exceeding the Supreme Court's threshold for a presumption of illegality.

### 1. Inpatient GAC Services Sold to Commercial Insurers and Their Members Are a Relevant Service Market

Inpatient GAC services offered by both Lake Norman Regional and Novant Huntersville and sold to commercial insurers and their members are a relevant service market. This market includes a broad set of hospital services—surgical and medical services requiring an overnight stay—for which competitive conditions are substantially similar.[19] Although the hundreds of individual acute care services typically cannot serve as substitutes for one another—for instance, a caesarean section cannot be used in place of heart surgery—it is appropriate to consider services together as a "cluster" for analytic convenience when, as here, competitive conditions are similar across those services.[20] *See ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 565–66 (6th Cir. 2014). Courts routinely find that inpatient GAC services sold to commercial insurers may be analyzed as a relevant service market to assess the competitive effects of a hospital

---

[19] PX0001 (Tenn Initial Report) ¶¶ 76–84, 169. Outpatient services and services offered at specialty hospitals are not included in the relevant market because they are provided at different facilities under dissimilar conditions. *Id.* ¶¶ 85–88; PX2060 (CHS) at 7 (describing the services offered at Lake Norman Regional). Inpatient GAC services sold to Medicare, Medicaid, or other government insurance programs are not included, because many commercially insured patients are not eligible to switch to government-sponsored insurance. ███████ 143:16–144:20; *see also Hackensack*, 30 F.4th at 166; PX0001 (Tenn Initial Report) ¶ 84.
[20] *See, e.g.*, ███████ 146:16–147:7.

merger. *See, e.g.*, *Hackensack*, 30 F.4th at 166; *Advocate*, 841 F.3d at 468 (collecting decisions).

### 2. The Eastern Lake Norman Area Is a Relevant Geographic Market

A relevant geographic market "consists of 'the geographic area in which the defendant faces competition and to which consumers can practically turn for alternative sources of the product.'" *Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196 (1st Cir. 1996) (citation omitted); *accord E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011). Competition does not neatly track lines on a map, thus "markets need not—indeed cannot—be defined with scientific precision." *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974). A geographic market need not encompass every competitor; in fact, defining a market too broadly fails to reflect actual competition and may understate the significance of the merging parties. *Advocate*, 841 F.3d at 472, 476. Market definition is therefore "guided by the 'narrowest market' principle," which requires the Court to "attempt to identify the narrowest possible market." *IQVIA*, 2024 WL 81232, at *12, *24 (quoting *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 26 (D.D.C. 2015)). At the Section 13(b) stage, the FTC meets its burden if it simply "rais[es] some question of whether [the alleged market] is a well-defined market." *Whole Foods*, 548 F.3d at 1036–37. Once the FTC makes this showing, courts "trench on the FTC's role when they choose between plausible, well-supported" evidence. *Id.* at 1048 (Tatel, J., concurring).

**The Geographic Area.** The Eastern Lake Norman Area includes the four GAC hospitals located east of Lake Norman along Interstate 77 in Iredell County and northern Mecklenburg County: (i) CHS's Lake Norman Regional, (ii) Novant Huntersville, (iii) Iredell Memorial, and (iv) the planned Atrium Lake Norman.[21] To its south, the Eastern Lake Norman Area is bordered

---

[21] *See* PX0001 (Tenn Initial Report) ¶ 34 fig.2.

by Interstate 485, which divides Charlotte from its outer suburbs. To the west, Lake Norman forms a "[n]atural lake boundary" that impedes east-west travel.[22] The north and east ends of the Eastern Lake Norman Area consist of less-populous areas along the Iredell and Mecklenburg county lines. Defendants,[23] other hospitals,[24] insurers,[25] and business leaders[26] recognize that the ███████████████ the █████████████ or the ██████████ forms a distinct community for hospital services. Economic analysis confirms that conclusion.

**Patients and Insurers.** Patients who live or work in the area prefer to receive inpatient GAC services in the Eastern Lake Norman Area because they value convenient access to care, familiarity with local hospitals, and the ability for family to visit during an inpatient stay.[27] Additionally, many inpatient admissions stem from emergency visits, for which proximity is essential.[28] Traffic makes travel to center-city Charlotte long and unpredictable, which discourages many Eastern Lake Norman Area residents from visiting center-city Charlotte hospitals.[29] Quantitative analysis confirms this competitive reality: Two-thirds of patients who

---

[22] PX2227 (CHS) at 5; ████████████████ at 57:19–58:6
███████████████████████████████████████████

[23] *See, e.g.*, PX7021 (Medley) at 50:17–51:6; PX7024 (Littlejohn) at 41:2–9; PX2195 (CHS) at 2; PX7038 (Riley) at 178:10–18.

[24] *See, e.g.*, ███████████████ at 7 ████████████████████████████████████████████████ at 19; ████████████████ at 108:8–110:4, 135:5–13 ██████████████████████ at 79:20–80:3, 84:18–85:11; *cf.* ████████████ at 145:8–146:1.

[25] *See, e.g.*, ████████████ at 82:13–83:4; ████████████ at 36:18–40:14; ██████ at 31:8–32:3.

[26] *See, e.g.*, PX2193 (Lake Norman Chamber) at 1–3; PX2220 (Lake Norman Chamber) at 1; PX2221 (Lake Norman Econ. Dev.) at 1.

[27] ████████████████ at 152:21–153:17; ████████████ at 166:6–167:16; ██████ at 51:24–53:10; ████████████ at 52:15–53:21; ██████████ at 30:10–13.

[28] *See* PX0001 (Tenn Initial Report) ¶ 167 (██████ of Lake Norman Regional's visits stem from ER visits); ████████████ at 91:7–25; ██████████ at 52:15–53:21.

[29] *See* ████████████ at 65:10–66:8; ██████████████ at 130:17–131:11; ██████ at 100:14–22.

reside in the Eastern Lake Norman Area stay in the area for inpatient GAC services offered by Lake Norman Regional and Novant Huntersville, with most patients traveling 20 minutes or less for such care.[30]

Commercial insurers confirm the significance of the Eastern Lake Norman Area. Because insurers negotiate prices for inpatient GAC services, defining a relevant market is informed by which healthcare providers are substitutes in the eyes of insurers. *See Hackensack*, 30 F.4th at 168. ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████[31] Insurers must build provider networks that address the varied healthcare preferences of current and prospective plan members, most of whom prefer to receive care locally.[32] The Eastern Lake Norman Area has a favorable payor mix and fast-growing population, making it an "economically significant" area that insurers cannot ignore. *See Hershey*, 838 F.3d at 338.[33]

**<u>Defendants and Non-Party Hospitals.</u>** Defendants and non-party hospitals treat the Eastern Lake Norman Area as a distinct market.[34] CHS tracks its ████████████████ ███████████████████ within the Eastern Lake Norman Area,[35] and its strategic documents

---

[30] PX0001 (Tenn Initial Report) at tbl.4 (two-thirds); *id.* ¶ 121 & tbl.9A (20 minutes or less); *see also* █████████████ at 52:17–24; ████████████████ at 71:15–72:8; █████████████████ at 33:12–23; PX7021 (Medley) at 91:17–25.
[31] *See* ████████████ at 82:13–83:4; ████████████ at 34:25–35:11, 35:23–36:13; ████████ at 220:2–22; █████████ at 111:17–112:12.
[32] *See* ████████ at 28:15–21; ████████████████ at 61:24–62:10; ████████ at 31:6–18; ████████ at 73:20–74:3; ████████ at 119:12–19.
[33] ████████████ at 22; *see also* PX2060 (CHS) at 9, 11; PX1152 (Novant) at 1–2; ████████ █████ at 2.
[34] PX2172 (CHS) at 18; PX2195 (CHS) at 2; PX2227 (CHS) at 5, 8; PX7038 (Riley) at 205:2–20; PX7023 (Armato) at 69:19–20 ("I believe health care is delivered locally."); ████████ █████ at 196:5–9; ████████████ at 28:20–29:2.
[35] PX2008 (CHS) at 14–16, 18–19; PX2020 (CHS) at 7–11, 56.

12

for the ███████████████ [36] regularly include ██████████████████████████
█████████████████████████████████████████ [37] When announcing plans to
████████████████████████████ Lake Norman Regional's CEO again focused on the
████████████████████████████████████████████████████████████████
███████████ [38]

    Novant similarly assesses competition and strategizes for a ████████████ that largely overlaps with the Eastern Lake Norman Area,[39] and in which Novant Huntersville is Novant's only hospital.[40] Novant historically conceived of this market as ████████████████████ ████████████████████████████████████████████████████████████ ██████████████ playing a more limited competitive role.[41] Today, Novant regularly monitors its ██████████████████████████████████ [42] and has developed plans to ██████████ ████████████████████ by attracting patients from the area to Novant Huntersville.[43]

    Non-party hospitals also view the Eastern Lake Norman Area as a distinct market. Atrium follows a █████████████████████████████████████████████

---

[36] PX2195 (CHS) at 2; *see also* PX2280 (CHS) at 38 (planning for the ████████████████ ████████████

[37] PX2172 (CHS) at 34–35 (assessing the ████████████████████████ ██████████████████████████████; PX2196 (CHS) at 38–39 (same).

[38] PX2350 (CHS) at 3. Section I.B details the evidence of head-to-head competition between Lake Norman Regional and Novant Huntersville, which provides further support for a relevant market defined around these hospitals. *See IQVIA*, 2024 WL 81232, at *20.

[39] PX1151 (Novant) at 9; PX1289 (Novant) at 11, 13; *see also* PX7017 (Gymer) at 60:23–61:8.

[40] PX7020 (Ehtisham) at 146:9–12; *see also* PX5103 (WSOC-TV) at 1 ("We're trying to provide as many services for the people of Lake Norman as possible so they don't have to go downtown[.]").

[41] PX1152 (Novant) at 2.

[42] *See* PX1042 (Novant) at 6–11; PX1025 (Novant) at 8–12; PX1076 (Novant) at 9, 13; PX1029 at 10; PX7027 (Ehtisham) at 43:5–19; PX1022 (Novant) at 2; PX1151 (Novant) at 11–13, 22–25.

[43] PX1047 (Novant) at 1; *see* PX7018 (Riley) at 148:20–149:1; PX7027 (Ehtisham) at 55:19– 56:19 ██████████████████ PX1093 (Novant) at 3; PX1203 (Novant) at 5, 8.

13



████████████[44]████████████ ████████████ [45] Iredell Memorial █████████████████████████████ within the Eastern Lake Norman Area.[46]

**Economic Analysis.** Courts and the FTC typically use the hypothetical monopolist test as an economic tool to "identify relevant geographic markets." *Advocate*, 841 F.3d at 468. Under this test, an area is a relevant geographic market if a hypothetical monopolist of all relevant services in that area could profitably implement a small but significant and non-transitory increase in price or other worsening of terms ("SSNIPT"). *See id.*; *Merger Guidelines* § 4.3.A.[47] A price increase of 5% or more generally qualifies as a SSNIPT. *See Hershey*, 838 F.3d at 338 n.1.[48] In hospital merger cases, the hypothetical monopolist test is applied through "the lens of the insurers" that negotiate prices. *Hershey*, 838 F.3d at 342. The test is satisfied if the hospitals in the market are sufficiently close substitutes that their exclusion from an insurer's network would make it significantly less desirable, resulting in a SSNIPT for at least one hospital in the market. *Cf. Hackensack*, 30 F.4th at 170–71.

---

[44] ██████████████ at 7, 26; *see also* ████████████ at 79:20–80:3.
[45] ██████████████ at 196:7–9; *see also* ████████████ at 7; ██████████ at 89:1–17
[46] ██████████████ at 154:4–11, 158:11–21, 164:13–18.
[47] Some early hospital merger decisions defined geographic markets through analysis of patient flow data. *E.g.*, *United States v. Carilion Health Sys.*, 892 F.2d 1042, at *3 (4th Cir. 1989) (table decision). After later empirical literature illustrated the flaws of this approach, courts have uniformly concluded it is "not an appropriate method to define geographic markets in the hospital sector." *Hershey*, 838 F.3d at 340; *see also Advocate*, 841 F.3d at 471–72; 1 John J. Miles, *Health Care and Antitrust Law* § 2:5 (2024).
[48] A small but significant and non-transitory increase in price, sometimes called a "SSNIP," is one form of a SSNIPT and often the most easily administrable. *See Merger Guidelines* § 4.3.B.

14

The Eastern Lake Norman Area satisfies the hypothetical monopolist test because ███ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████[49] This market reflects the commercial reality: Today, commercial insurers ██████████████ ████████████████████████████████████████████████████████████████ ████████████[50]

The FTC's expert, Dr. Steven Tenn, confirms that the Eastern Lake Norman Area passes the hypothetical monopolist test. Using well-established econometric techniques to calculate "diversion ratios"—estimating substitution patterns for patients when their first-choice hospital is no longer available—Dr. Tenn's analysis reveals that a hypothetical monopolist of inpatient GAC services in the Eastern Lake Norman Area could profitably raise prices for commercial insurers at Lake Norman Regional or Novant Huntersville by more than a SSNIPT.[51]

### 3. The Increase in Concentration Creates a Strong Presumption of Illegality

Having defined a relevant market, the next step is to determine whether the proposed transaction would increase market concentration to a presumptively unlawful level. In *Philadelphia National Bank*, the Supreme Court held that "a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase

---

[49] *See supra* Section I.A.2; ████████████ at 30:10–13; ██████████ at 220:8–22; ███████ ████████ at 82:16–83:4; ████████████ at 153:9–155:17; ████████████ at 34:25–36:13; ████████████ at 111:17–112:12.
[50] *See* ████████████ at 40:21–41:4 ██████████████████████████████████████████████ ████████████████████████████████████ at 122:16–124:8 ██████████████████████████████ ████████████████████████████████████████████████ at 1 ███████████████████████████ ████████████████ at 140:18–141:1 ████████████████████████████████████████████ ████████████ at 46:13–47:1 ███████████████████████████████████████
[51] PX0001 (Tenn Initial Report) ¶¶ 113, 115–17.

in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." 374 U.S. at 363; *see also Food Town*, 539 F.2d at 1344. Traditionally, courts use two basic metrics—market shares and the Herfindahl-Hirschman Index ("HHI")—to determine whether a merger triggers a presumption of illegality. A merger is presumptively anticompetitive if it increases the HHI in a market by more than 100 points and results in either: (a) a combined market share for the merging parties of 30% or more; or (b) a post-merger HHI that exceeds 1,800. *Merger Guidelines* § 2.1; *see also IQVIA*, 2024 WL 81232, at *33 (30% presumption); *Chicago Bridge*, 534 F.3d at 431 (HHIs).

**Market Shares.** The Supreme Court has held that a merger is presumptively unlawful if it would significantly increase concentration to produce a combined entity controlling 30% of the relevant market. *See Phila. Nat'l Bank*, 374 U.S. at 364; *Liggett & Myers, Inc. v. FTC*, 567 F.2d 1273, 1275 (4th Cir. 1977) ("fully warranted" by precedent to hold 29% share unlawful); *IQVIA*, 2024 WL 81232, at *33 (discussing recent cases applying the 30% threshold); *Merger Guidelines* § 2.1. The proposed transaction easily exceeds that threshold. The FTC's expert calculated market shares and HHIs using hospital discharges from all hospitals located within the Eastern Lake Norman Area,[52] including patients who reside outside of the market. Using this framework, Dr. Tenn made a conservative calculation that the proposed transaction would leave Novant with a 64% market share,[53] far exceeding the threshold for presumptive illegality.

**HHI.** The proposed transaction is also presumptively illegal based on the change in

---

[52] Market shares and HHIs assume that Atrium Lake Norman will open as planned in mid-2025 and operate at approximately full capacity immediately. PX0001 (Tenn Initial Report) ¶¶ 142, 145 & tbl.5.

[53] *See* PX0001 (Tenn Initial Report) ¶ 145 & tbl.5.

market concentration. Market concentration is a "useful indicator of the likely competitive, or anticompetitive, effects of a merger." *Hershey*, 838 F.3d at 346. Market concentration is measured by the HHI, which is calculated by summing the squares of the individual market share of each participant. *Id.* "Sufficiently large HHI figures establish the FTC's prima facie case that a merger is anti-competitive." *Heinz*, 246 F.3d at 716; *see also Chicago Bridge*, 534 F.3d at 431.

Here, the proposed transaction would increase the HHI in the Eastern Lake Norman Area for inpatient GAC services sold to commercial insurers by 1,866 points, resulting in a post-merger HHI of 4,786.[54] These HHIs easily surpass the thresholds for presumptive illegality. *See Advocate*, 841 F.3d at 466 (HHI increased 1,782 points to 3,943); *ProMedica*, 749 F.3d at 568 (HHI increase of 1,078 points to 4,391 "blew through [the presumption's] barriers in spectacular fashion"); *Heinz*, 246 F.3d at 716 (HHI increase of 510 points created presumption "by a wide margin"); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1221 n.12 (11th Cir. 1991) (HHI increased over 630 to approximately 3,200); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 72 (D.D.C. 2011) (HHI increased 400 points to 4,691); *Burlington Indus., Inc. v. Edelman*, 666 F. Supp. 799, 804 (M.D.N.C. 1987) (HHI increased 472 points to 1,973, "indicat[ing] an unacceptable change in the HHI"), *aff'd*, 1987 WL 91498 (4th Cir. June 22, 1987).

### 4. *The Proposed Transaction Is Presumptively Illegal Even if Analyzed in a Broader Geographic Market*

Defendants have argued that the proposed transaction should be evaluated in a far broader geographic market for inpatient services. But the existence of broader markets does not negate a narrower relevant market. *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp.

---

[54] *See* PX0001 (Tenn Initial Report) ¶ 145 & tbl.5.

3d 1, 28 (D.D.C. 2022).[55] And even if the Court were to consider a broader market, the proposed transaction is still presumptively unlawful.

To be conservative, the FTC's expert measured the likely effects of the proposed transaction in a broader Center City/Northern Charlotte Region. This area combines the four hospitals in the Eastern Lake Norman Area with six additional hospitals in center-city Charlotte and northeast of Charlotte.[56] To be clear, this expansive geographic region vastly understates the competitive effect of the proposed transaction because it does not reflect the primary area in which Defendants compete and to which consumers (i.e., insurers and patients) can practically turn for alternative sources of GAC inpatient services. *See Coastal Fuels*, 79 F.3d at 196. Still, even in this overbroad area, the proposed transaction would increase the HHI by 325 points to a total of 4,723 points, with Novant controlling 38% of the market.[57] These figures readily surpass either threshold for presumptive illegality. *See IQVIA*, 2024 WL 81232, at *33 (30% presumption); *Chicago Bridge*, 534 F.3d at 431 (HHIs); *Merger Guidelines* § 2.1.

## B. The Proposed Transaction Would Eliminate Substantial Competition Between Lake Norman Regional and Novant Huntersville

Independent of market shares, a transaction can be illegal if it eliminates substantial competition between two firms. *Merger Guidelines* § 2.2. This is true "even where the merging parties are not the only two, or even the two largest, competitors in the market." *IQVIA*, 2024 WL 81232, at *37 (quotations omitted). When conducting this analysis, "[c]ourts frequently rely on ordinary course documents and witness testimony illustrating that two merging parties view each other as strong competitors." *Id.* (collecting cases); *see also Sysco*, 113 F. Supp. 3d at 61

---

[55] Economic theory and judicial precedent have long recognized that "the fact that one area comprises a relevant market does not mean a larger, smaller, or overlapping area could not as well." *Merger Guidelines* § 4.3 & n.77; *see also Brown Shoe*, 370 U.S. at 336.
[56] PX0001 (Tenn Initial Report) ¶¶ 135, 146 & tbl.5.
[57] PX0001 (Tenn Initial Report) ¶ 146 & tbl.5.

18

(collecting cases); *ProMedica*, 749 F.3d at 569 ("The extent of direct competition between . . . the merging parties is central to the evaluation of" competitive effects.).

Defendants' internal documents reveal that Novant Huntersville and Lake Norman Regional are in ███████████████ and seek to █████████ each other to attract patients.[58] This fierce competition constrains hospital reimbursement rates with commercial insurers, resulting in lower out-of-pocket costs for patients. And competition also incentivizes Defendants to invest in expanded health services and improved quality of care. The proposed transaction would wipe out those benefits by dampening the merged firm's need to compete, leaving local patients with higher healthcare costs and reducing Novant's incentive to improve quality.

### 1. *Lake Norman Regional and Novant Huntersville Currently Compete Closely*

**Defendants View Each Other as Close Competitors.** Lake Norman Regional and Novant Huntersville are close competitors. At the July 2022 Lake Norman Regional Board of Trustees meeting, the board specifically focused on the hospital's █████████████████ ███████[59] and considered a ██████████████████████████████████ ██████████[60] Lake Norman Regional's ██████████████████████████████ ██████████████ including ████████████████████████████ ████████████████████████████████████████████████████ █████████[61] In fact, Lake Norman Regional consistently █████████████████████ Lake Norman Regional ████████████████████████████████████████████████████ in Lake Norman Regional's primary service area ("PSA"),[62] launched a █████████████ plan

---

[58] PX1208 (Novant) at 5; PX2228 (CHS) at 3; PX2226 (CHS) at 3.
[59] PX2280 (CHS) at 35.
[60] PX2226 (CHS) at 3.
[61] PX2280 (CHS) at 36; *see also* PX2226 (CHS) at 3.
[62] PX2009 (CHS) at 13, 22; *see also* PX2235 (CHS) at 19–20 ████████████████████ ████████████████████████████████████████████████████████

in 2019 to ███████████████████ [63] and ███████████████████████████
███████████████████████ [64]

Novant likewise describes its Huntersville hospital as being in ████████████████
████████████████ [65] Indeed, Lake Norman Regional is ████████████████████
████████████████████████████ [66] In response to competitive pressure,
Novant has ████████████████████████████████████████████████████ [67]

Lake Norman Regional and Novant Huntersville are understandably in ██████████
████████ because the two hospitals offer similar services and are located only 12 miles apart
from one another. [68] Defendants and non-parties broadly agree that hospitals offering similar
services in an overlapping service area are competitors. [69] Here, Defendants characterize both
Novant Huntersville and Lake Norman Regional as "community hospitals," and ████ of these
hospitals' inpatient GAC admissions involve services that both provide. [70] Further, because
patients tend to prefer to receive care close to home, the competition between Lake Norman
Regional and Novant Huntersville is particularly strong in Mooresville and southern Iredell
County, where ███████████████████ and ███████████████████████████
████████████████████ [71] Indeed, Defendants' internal analyses show that both hospitals

---

[63] PX2227 (CHS) at 8.
[64] PX2003 (CHS) at 75.
[65] PX1208 (Novant) at 5.
[66] PX1074 (Novant) at 13; PX1028 (Novant) at 9.
[67] PX1126 (Novant) at 13 ██████████████ PX7032 (Helms) at 111:5–113:4
PX1102 (Novant) at 20 ██████████████ PX1293 (Novant) at tab ██████████ *infra* note
119 ███
[68] PX1208 (Novant) at 5; PX0001 (Tenn Initial Report) ¶¶ 214–18.
[69] PX7038 (Riley) at 74:13–75:8; PX7031 (Medley) at 95:17–97:10.
[70] PX7021 (Medley) at 34:7–10; PX7016 (DiPace) at 44:21–45:4; PX7038 (Riley) at 170:3–17;
PX0001 (Tenn Initial Report) ¶ 270 & tbl.2; *see also* PX1221 (Novant) at 14 (community
hospitals "focus on lower acuity emergency, outpatient, and inpatient services").
[71] PX1011 (Novant) at 1–3.

### **Defendants' Customers and Non-Parties View Defendants as Close Competitors.**

Patients and insurers view Lake Norman Regional and Novant Huntersville as important

alternatives for hospital services. Today, Lake Norman Regional and Novant Huntersville are the

only GAC hospitals along the 42-mile stretch of I-77 between Iredell Memorial in Statesville and

center-city Charlotte[73]—leaving these hospitals as the most convenient options for many patients

who live or work in that area. Thus, insurers agree that Lake Norman Regional and Novant

Huntersville engage in ██████████████████[74] ████████████████ if Lake

Norman Regional went out of network, a substantial number of their patients would switch to

Novant Huntersville and vice versa.[75] ██████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████[76] Other non-party hospitals

in the Charlotte region similarly view Novant Huntersville and Lake Norman Regional as ████

█████████████████████[77] Defendants' ordinary course documents likewise

confirm that patients regularly choose between Lake Norman Regional and Novant Huntersville,

---

[72] PX1102 (Novant) at 20 ████████████████████████ to Lake Norman
Regional); PX2194 (CHS) at 17; PX7022 (Helms) at 80:25–81:10 ████████████████
██████████████████
[73] *See* PX0001 (Tenn Initial Report) ¶ 17 fig.1.
[74] ██████████ at 68:7–69:2; *see also* ██████████ at 219:12–14 ████████
█████████ at 60:7–20; ██████████ at 34:4–22.
[75] ██████████ at 37:9–14, 41:5–15; ██████████ at 69:3–15, 72:2–12; ████
at 60:7–20; ██████ at 176:21–178:14.
[76] ██████████ at 3.
[77] ██████████ at 146:2–147:11; *see also* ██████████ at 121:2–22 ████
██████████ at 95:23–96:21

21

██████████████████████████████████████████ over time.[78]

Atrium's plan to open a small, 30-bed hospital in Cornelius will not negate the competitive harm from the proposed transaction. Atrium Lake Norman aspires to open its doors in mid-2025.[79] Even assuming this hospital opens when planned,[80] the proposed transaction would still reduce the number of competing providers in the Eastern Lake Norman Area from four to three, and it would leave a weaker set of competitive alternatives. If operating at full capacity, Atrium Lake Norman would serve less than 60% as many patients as Lake Norman Regional and less than one-third as many patients as Novant Huntersville.[81] Atrium Lake Norman also plans to offer what CHS calls ███████████████████████[82] Therefore, Atrium Lake Norman will be unable to treat a sufficient number of patients seeking care in the area to mitigate the proposed transaction's likely anticompetitive effects.

**Expert Analysis Confirms Defendants Are Close Competitors.** The FTC's expert tested Defendants' closeness of competition by calculating the percentage of patients at each of Defendants' hospitals that, if that hospital were unavailable, would turn to the other Defendant's hospital(s). Courts routinely use these diversion ratios to measure closeness of competition. *See, e.g.*, *Advocate*, 841 F.3d at 466; *H & R Block*, 833 F. Supp. 2d at 86–88; *Saint Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, 2014 WL 407446, at *10 (D. Idaho Jan. 24,

---

[78] PX2206 (CHS) at 12 ██████████████████████████████████████████████
████████████████████████ PX1072 (Novant) at 1 ████████
████████████ PX1102 (Novant) at 20 (same).
[79] ████████████████████ at 158:9–13.
[80] ████████████████ at 201:25–203:2 ██████████████████
[81] PX0001 (Tenn Initial Report) at tbl.6.
[82] PX2230 (CHS) at 12.

22

2014). Diversion ratios are a measure of competition independent of market definition.[83]

Dr. Tenn confirmed that Novant Huntersville is Lake Norman Regional's closest competitor. If Lake Norman Regional went out of network, more of its patients would turn to Novant Huntersville than to any other hospital.[84] Dr. Tenn's estimates also show that Lake Norman Regional is a close competitor for Novant Huntersville. If Novant Huntersville were not an option, a substantial share of its patients would instead choose Lake Norman Regional.[85]

### 2. *The Proposed Transaction Is Likely to Raise Healthcare Prices*

The elimination of head-to-head competition between Novant Huntersville and Lake Norman Regional is likely to raise healthcare prices. The added leverage resulting from combining two close competitors would allow Novant to obtain higher rates in negotiations because insurers would no longer have the option of contracting with Lake Norman Regional if they fail to reach agreement with Novant, or vice versa.[86] The loss of a local hospital alternative increases the remaining hospitals' bargaining leverage, because their inclusion in an insurer's network becomes all the more necessary.[87] *See, e.g.*, *St. Luke's*, 2014 WL 407446, at *10 ("Stripped of acceptable alternatives, the buyer's leverage disappears."). Because of the loss of competition, ██████████████████████████ the proposed transaction will drive up

---

[83] Dr. Tenn's diversion ratio estimates account for commercial inpatient discharges in a broad area from which approximately 99% of Novant Huntersville's and Lake Norman Regional's patients originate. PX0001 (Tenn Initial Report) ¶¶ 264–65 & tbl.3A.
[84] PX0001 (Tenn Initial Report) ¶ 163 & tbl.7A.
[85] PX0001 (Tenn Initial Report) ¶ 164 & tbl.7A.
[86] PX0001 (Tenn Initial Report) ¶ 61; *see also* ███████████████████████
[87] *See* ███████████ at 96:6–10
██████████████████ *id.* at 175:15–22 ██████████
████████████████████████████████████████ at 155:21–156:22, 171:5–174:18, 243:14–244:9; PX7016 (DiPace) at 225:22–226:2; PX0001 (Tenn Initial Report) ¶ 49.

23

reimbursement rates.[88] Increases in reimbursement rates ultimately ███████████████ ███████████████████████ for insurers' members.[89] Thus, the resulting rate increases from Novant's greater bargaining leverage will directly harm employers and individual patients by increasing the cost of care.[90]

Defendants' ordinary course documents acknowledge that Novant will be able to extract higher reimbursement rates post-merger. After the proposed transaction was announced, CHS's lead negotiator for North Carolina inquired internally ███████████████████████████ ████████████████████████████████████████████████████████ ███████ than a standalone Lake Norman Regional.[91] The lead negotiator used ██████ ████████████████████████ as a negotiating tactic to seek higher reimbursement rates ██████ ████████████████████████████████████████████████ ████████████████[92] This candid admission is direct evidence that the proposed transaction will reduce competition and harm consumers. *See H & R Block*, 833 F. Supp. 2d at 85 (a merger that eliminates a low-cost competitor could "have the effect of stifling price and [non-price] competition").

Other evidence confirms that Novant will apply its bargaining leverage to demand greater rates at Lake Norman Regional post-acquisition. Today, Novant's size, scale, and market power already allow it to extract higher rates throughout North Carolina.[93] In Novant's last insurer

---

[88] ███████████████ at 96:6–10, 121:13–122:1, 175:15–176:20; ███████████ at 197:24– 198:10; ██████████████ at 99:2–12, 100:2–4.
[89] ██████████████ at 121:8–122:1; ██████████████ at 149:8–150:7.
[90] PX7032 (Helms) at 55:18–56:21; ██████████████ at 74:24–75:3; ██████████████ at 1; ██████████████ at 65:20–66:11, 67:2–67:5; *see also* PX0001 (Tenn Initial Report) ¶¶ 40–41.
[91] PX2004 (CHS) at 2.
[92] PX2081 (CHS) at 3–4. ████████████████████████████ at 61:7–23.
[93] PX1045 (Novant) at 10 (Novant's

24

negotiating cycle the company sought ████████ reimbursement rate targets of ██████

████████████████████████ and recognized that ████████████████████████ may be

required to secure those rates.[94] Novant's CEO also noted internally that Novant should

████████████████████████████████████[95] In the Eastern Lake Norman Area, however,

Novant has █████████████████████████████████████████████████████

Recently, Novant ████████████████████████████████████████████████████

████████████████████████████████████[96] Defendants recognize that

prices at the ██████████████████████ influence their ability to secure higher rates from

insurers, because assessing relative price requires ███████████████████[97]

    Novant's past practice demonstrates that the proposed transaction would result in higher

rates. Novant has ██████████████████████████████████████████████████

████████████████████████████████████████████████████████[98] For

example, after purchasing New Hanover Regional Medical Center ("New Hanover") in 2021,

Novant ███████████████████████████████████████████████████████

████████████[99]██████████████████████████████████████████████████

██████████████████████████████[100]████████████████████████

██████████████████████████████[101]███████████████████

████████████████████████████████████████[102]

---

[94] PX1045 (Novant) at 7, 11; *see also* PX7022 (Helms) at 151:25–152:11.
[95] PX1280 (Novant) at 1.
[96] PX7032 (Helms) at 112:18–114:4; PX1102 (Novant) at 20.
[97] PX7040 (DiPace) at 105:5–106:2.
[98] ██████████████████████████
[99] PX1045 (Novant) at 7, 11.
[100] PX1104 (Novant) at 6; PX7022 (Helms) at 210:12–211:15; ███████████ at 85:19–24.
[101] ████████████████ at 205:22–206:9.
[102] ████████████████ at 104:17–105:6, 201:21–203:5; ███████████ at 95:25–98:20.

*Hackensack*, 30 F.4th at 175 (history of imposing price increases following a previous merger "often indicative of future behavior"). Post-merger, Novant will be able to impose its already substantial bargaining leverage in the next negotiations for Lake Norman Regional's reimbursement rates, and thus, significant rate increases are likely.

Finally, economic analysis confirms that insurers and their members will face higher rates because of the proposed transaction. The FTC's expert, Dr. Tenn, applied commonly employed economic tools to assess the proposed transaction's likely effect on the merged firm's bargaining leverage and subsequent negotiations with insurers. Dr. Tenn's analyses predict the proposed transaction will likely increase the merged firm's bargaining leverage. He estimates that, as a result of lost competition between the hospitals, prices will increase by approximately 18% at Lake Norman Regional and 4% at Novant Huntersville.[103]

### 3. Head-to-Head Competition Between Defendants Drives Investment in Quality of Care, Access, and Innovation

In addition to higher healthcare prices, the proposed transaction will eliminate competition for patients that drives Lake Norman Regional and Novant to invest in improving quality of care, access, and innovation. Lake Norman Regional's CEO explained that providing ████████████████████ and ████████████████████████████ were all part of Lake Norman Regional's ████████████████ Novant Huntersville.[104] Novant likewise recognizes that ████████████████████████████████████████████████[105]

Novant and CHS have competed vigorously in recent years to improve services, to the benefit of patients. Cardiology provides a prime example. ████████████████████████

---

[103] PX0001 (Tenn Initial Report) ¶¶ 196, 203 & tbl.12B.
[104] PX2226 (CHS) at 3.
[105] PX1291 (Novant) at 3; *see also* PX1151 (Novant) at 32 ████████████████
████████████████████████████

26



[REDACTED][106]

[REDACTED][107] CHS [REDACTED] one of Novant Huntersville's [REDACTED]

[REDACTED][108]

[REDACTED][109] Together, these efforts caused a rebound in Lake Norman Regional's cardiology market share and improved patients' access to quality care.[110]

Novant immediately responded to this competitive threat. Loath to [REDACTED] [REDACTED] in Mooresville.[111] Novant has since continued to build its cardiology service line's [REDACTED] [REDACTED][112]

Defendants also compete with each other by investing in expanded facilities and new

---

[106] PX2009 (CHS) at 11; *see id.* at 22 [REDACTED]

[107] PX2199 (CHS) at 1 [REDACTED] PX2099 (CHS) at 25 [REDACTED] *see also* PX2153 (CHS) at 3

[108] PX2260 (CHS) at 1; PX7028 (Littlejohn) at 95:8–12; PX2206 (CHS) at 21, 24 [REDACTED] PX1225 (Novant) at 1.

[109] PX2351 (CHS) at 1 [REDACTED] PX2206 (CHS) at 17 [REDACTED]

[110] *See* PX2006 (CHS) at 29 [REDACTED] PX7028 (Littlejohn) at 91:13–18 [REDACTED]

[111] PX1225 (Novant) at 1 [REDACTED]

PX1288 (Novant) at 3 [REDACTED]

[112] PX1126 (Novant) at 13.

27

equipment. Since 2020, CHS invested ███████████ in capital expenditures to obtain ███

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████[113] ███

████████████████████████████████████████████████████████████

███████████████████████████████████[114] As recently as

December 2022, ███████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████[115] These investments would have

followed on the heels of Lake Norman Regional receiving more than ███████████████

███████ to invest in the quality of its care and facilities.[116] CHS has continued ███████

██████████████████████████ Lake Norman Regional leaders created a ████████████

█████████████████████████████████████████[117] Similarly,

Novant recognizes that its Huntersville hospital ███████████████████████████████

███████████████████████ and ███████████████████████████████

███████████████████████[118] Within the past five years, ███████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████[119]

---

[113] PX2175 (CHS) at 2; PX2195 (CHS) at 4.

[114] PX2026 (CHS) at 1–2 ██████████████████████████████████████████████

████████████████ PX2051 (CHS) at 1

[115] PX7028 (Littlejohn) at 123:2–11; PX2272 (CHS) at 2; *see* PX2118 (CHS) at 6 ████████████

██████████████████████████

[116] PX2248 (CHS) at 9.

[117] PX2033 (CHS) at 1; *see* PX2026 (CHS) at 1–2.

[118] PX1208 (Novant) at 5–6.

[119] PX1204 (Novant) at 2; *see also* PX1180 (Novant) at 7 (bed expansion); PX1294 (Novant) at 6 (C-section room and ED expansion); PX1292 (Novant) at 1 (new OR); PX1208 (Novant) at 10.

28

In addition to improving services and facilities, Defendants also compete closely to attract patients by recruiting physicians, thus expanding access to their inpatient services. Lake Norman Regional more than ████████████████████████████████

████████████████████[120] ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████[121]███████

████████████████████████████████████████

████████████████████[122] Novant tried to ████████████████████████

████████████[123] To protect the hospital's patient volume, ████████████████

██████████████████████████████[124]

Novant recognizes that the proposed transaction would immediately extinguish that competition. Concerned that Novant's physicians have directed ████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████[125] But patients benefit when hospitals strive to outdo each other, and Novant's admission confirms that the proposed transaction threatens to harm the local community by ending the longstanding rivalry between Novant Huntersville and Lake Norman Regional.

---

[120] PX2186 (CHS) at 8 ████████████████████████████
PX2195 (CHS) at 3 ████████████████████████
[121] PX2257 (CHS) at 2; PX2283 (CHS) at 1 ██████████████████
████████████████████████████████
[122] PX1025 (Novant) at 26.
[123] *See* PX2267 (CHS) at 1.
[124] PX2267 (CHS) at 1; PX7028 (Littlejohn) at 111:13–21, 114:8–18.
[125] PX1072 (Novant) at 1.

29

## 4. *The Proposed Transaction Has Already Had Anticompetitive Effects*

The proposed transaction is already having harmful effects resulting from anticipated lost competition. ███████████████████████ Novant admitted that the proposed transaction would ████████████████████████████ in the Eastern Lake Norman Area. Novant had planned ██████████████████████████████████████████ ████████████████████ which would provide enormous benefits.[126] Because of this acquisition, Novant now plans to ██████████████████████████[127]

If Novant does so, the impact on the community will be massive. ███████████████ ████████████████████████████████████████████████ ███████████████████████████████████████ all of which would likely increase capacity, quality, and accessibility at Novant Huntersville.[128] When Novant Huntersville added half as many inpatient beds in 2019, CHS recognized Novant's expansion plans as a ██████████ that threatened to allow Novant to ████████████ from Lake Norman Regional's service area.[129] Now, faced with the opportunity to simply buy a competitor outright rather than compete, Novant's admission that it intends ███████████ █████████████ is direct evidence that the proposed transaction will harm competition—and patients. *Cf. FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1091 (D.D.C. 1997) ("Failure to grant a preliminary injunction also would deny consumers the benefit of any new competition that would have occurred, absent the merger . . . . Both parties had aggressive expansion plans before

---

[126] PX1267 (Novant) at 4; *see* PX1058 (Novant) at 26, 33 ██████████████████ PX1082 (Novant) at 1–15; PX4004 (Advocacy) at 25.
[127] *Compare* PX1267 (Novant) at 4, *with id.* at 3. *See* PX4004 (Advocacy) at 25.
[128] PX1267 (Novant) at 4; PX1130 (Novant) at 6 ███████████████████████████ ███████████████████████████████ PX4004 (Advocacy) at 25.
[129] PX2003 (CHS) at 75; *see* PX2191 (CHS) at 26 ███████████████████████████████ ████████

30

the merger, many of which have been put on hold pending the outcome of this case.").

**C. Defendants Cannot Rebut the FTC's Strong Prima Facie Case**

The strength of the FTC's two prima facie bases for relief will create an uphill battle for Defendants in meeting their burden on rebuttal before the Commission. "[T]he more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully." *Heinz*, 246 F.3d at 725 (quotations omitted). It is clear that neither entry nor efficiencies—nor Defendants' "weakened competitor" theory—can offset the competitive harm of this deal.

*1.   Entry Will Not Be Timely, Likely, or Sufficient to Offset the Harm*

Defendants cannot come close to demonstrating new hospital entry or expansion in the relevant geographic market would offset the overwhelming evidence of this deal's anticompetitive effects. To justify an anticompetitive transaction, entry or expansion must be "timely, likely and sufficient in its magnitude, character, and scope" to deter or counteract anticompetitive effects. *FTC v. Sanford Health*, 926 F.3d 959, 965 (8th Cir. 2019) (quotations omitted). Defendants assert that new entrants will build or expand hospitals that will "ensure that there will be no harm to competition" from the proposed transaction. ECF No. 45 at 22. However, hospital construction is expensive, time-consuming, and complex.

Defendants' claim, centered on Atrium Lake Norman, is misplaced. That facility is not an example of entry induced by the proposed transaction.[130] *See Merger Guidelines* § 3.2 (explaining that a rebuttal argument may exist when "the merger would induce entry or repositioning"). Moreover, the FTC expert's analysis already conservatively accounts for Atrium Lake Norman. Atrium Lake Norman in fact illustrates the high barriers to entry in the Eastern Lake Norman Area—its North Carolina certificate of need ("CON") application to build was

---

[130] ███████████ at 160:17–25.

denied twice, and its planned opening is more than ██ years after Atrium began the project.[131] Expansion at Atrium Lake Norman is entirely speculative and would require an additional CON, funding, and time.[132] Defendants cannot show entry or expansion in a timely, likely, or sufficient manner to counteract the anticompetitive impact of the proposed transaction.

## 2. Any Purported Efficiencies Are Not Substantiated, Cognizable, or Sufficient to Prevent Harm from the Proposed Transaction

Defendants ask this Court to set aside the anticompetitive effects of this merger because they claim it will result in efficiencies. ECF No. 45 at 22. *First*, no court has denied a preliminary injunction to pause a merger solely on the grounds of an efficiencies defense. *Cf. Phila. Nat'l Bank*, 374 U.S. at 371 ("[An anticompetitive] merger . . . is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial. A value choice of such magnitude is beyond the ordinary limits of judicial competence, and in any event has been made . . . by Congress . . . [in] § 7."); *Staples*, 970 F. Supp. at 1088–89 (discussing uncertainty whether efficiencies are a viable defense in merger cases). *Second*, even if an efficiencies defense applies, Defendants cannot meet its stringent requirements. Efficiencies may be cognizable where merging parties demonstrate that they are (1) merger-specific; (2) verifiable; (3) actually prevent the anticompetitive risks identified by the FTC; and (4) do not result from the anticompetitive worsening of terms for the parties' trading partners. *Merger Guidelines* § 3.3; *see Hershey*, 838 F.3d at 348–49.

Novant's claimed efficiencies are not cognizable. First, Defendants' asserted efficiencies cannot be independently verified. *Cf. IQVIA*, 2024 WL 81232, at \*50 ("Defendants have not provided any indication that their internal estimates of these savings were independently

---

[131] *See* ████████ at 3 ██████████████████ 158:9–13 ██████████████
[132] ██████████ at 239:23–240:22, 245:6–246:5, 246:19–247:2.

verified."). As to claimed cost savings, Defendants have obscured any underlying work, data, or assumptions behind blanket assertions of privilege. And as to claimed quality improvements, Defendants have opted to gloss over concrete plans in favor of hand-waved aspirations. Further, Defendants' claimed efficiencies are not merger specific—to the extent they can be achieved at all, this anticompetitive merger is not a necessary catalyst. *Hershey*, 838 F.3d at 348–49.

### 3. Defendants' Self-Inflicted Flailing Division Argument is Factually Unsupported and Legally Unsound

Defendants' made-for-litigation "weakened competitor and/or flailing firm" defense, ECF Nos. 45 & 46, is strongly disfavored by courts as "probably the weakest ground of all for justifying a merger." *Univ. Health*, 938 F.2d at 1221 (quotations omitted). The defense comes with stringent prerequisites that Defendants cannot meet. Courts routinely reject this defense when "it is not certain" that the weakness of a flailing firm will "cause a loss in market share beyond what has been suffered in the past, or that such weakness cannot be resolved through new financing or acquisition by other than a leading competitor." *Id.* (cleaned up); *see Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 715 (4th Cir. 2021); *ProMedica*, 749 F.3d at 572.

Defendants fall far short of satisfying the requirements of this rarely granted defense, which is commonly labeled the "Hail Mary pass of presumptively doomed mergers." *ProMedica*, 749 F.3d at 572. *First*, Defendants' argument is a particularly farfetched form of the weakened competitor defense. ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████[133]████████████████████████████████

███████████████████████████████████████████████████████

---

[133] PX4008 (Advocacy) at 8.

33

█████████████████████████████████████████████████████████ [134] CHS appears to be asserting that it will purposely degrade the quality or strength of its healthcare assets should the deal not proceed. Even if undermining a ████████████ hospital in a █████████████ ████████████ were consistent with the company's duty to its shareholders, [135] ████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████ [136]

*Second*, Defendants cannot simply point to purported benefits of new ownership to assert the weakened competitor defense. There is no evidence that an asserted weakness of Lake Norman Regional [137] will cause a change in market shares sufficient to bring the merger below the threshold of presumptive illegality. *JELD-WEN*, 988 F.3d at 715. Nor can Defendants show that CHS had no "options besides merging with [Novant] that would have preserved competition." *Id.* Accordingly, this is not the "rare case[]" where the weakness of the acquired firm undermines the FTC's prima facie case. *Univ. Health*, 938 F.2d at 1221.

---



[134] ECF No. 45 at 1 (Davis); PX4008 (Advocacy) at 10 ████████████ PX7024 (Littlejohn) at 64:6–7
[135] PX2286 (CHS) at 2.
██████████████████████████████████████████████████████████████
██████████████████████████ PX2061 (CHS) at 73; PX2175 (CHS) at 2.
[136] *See, e.g.*, PX2033 (CHS) at 1 ███████████████████████████████████████████
█████████████ PX2118 (CHS) at 6
████████████████████ PX7021 (Medley) at 128:9–130:18; PX7039 (Novak) at 33:4–13; 46:12–16
[137] *Contra* PX2305 (CHS) at 32 ███████████████████████████████████████████
███████████ *id.* at 4 ██████████████████████████████████████████████
PX7028 (Littlejohn) at 105:2–107:10 ████████████████████████████████████████████
██████████████████████████ PX7015 (Conti) at 78:21–81:6; PX7023 (Armato) at 76:4–8; ████████████████ at 4 ████████████████████
██████████████████████████████████ at 36:18–37:10; PX2161 (CHS) at 2.

## II.   THE EQUITIES HEAVILY FAVOR A PRELIMINARY INJUNCTION

"[N]o court has denied a Section 13(b) motion for a preliminary injunction based on weight of the equities where the FTC has demonstrated a likelihood of success on the merits." *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 918 (E.D. Mo. 2020) (quotations omitted). Here, the equities weigh strongly in favor of a preliminary injunction. If permitted to consolidate, Novant and Lake Norman Regional would have strong financial incentives to implement higher prices, eliminate key Lake Norman Regional leadership and other staff, and share competitively sensitive information.[138] At that point, it would be extremely difficult, if not impossible, to unwind the damage and return to the status quo. *Hershey*, 838 F.3d at 352–53.

Preliminary injunctive relief is necessary to prevent interim harm to competition and consumers while the merits proceeding before the Commission is ongoing. Prices for hospital services at Lake Norman Regional could increase quickly due to ███████████████ ███████████████████[139] As a result, "employers may reduce healthcare benefits for their employees, and some insured employees may drop their healthcare coverage altogether and/or forgo medical treatment due to higher out-of-pocket expenses." *ProMedica*, 2011 WL 1219281, at *51. Defendants cannot establish countervailing cognizable equities. There is "no reason why, if the merger makes economic sense now, it would not be equally sensible to consummate the merger following a FTC adjudication on the merits that finds the merger lawful." *Hershey*, 838 F.3d at 353; *accord Heinz*, 246 F.3d at 726.

## CONCLUSION

The FTC respectfully requests that the Court grant the preliminary injunction.

---

[138] PX0001 (Tenn Initial Report) ¶¶ 187, 205; PX4004 (Advocacy) at 56, 60, 71–72, 74 ███████

[139] PX1258 (Novant) at 2.

Dated:     March 15, 2024          Respectfully submitted,


/s/ Nathan Brenner
Nathan Brenner (Illinois Bar No. 6317564)
Jennifer Fleury
Karen H. Hunt
Ryan Maddock
Kurt D. Walters

Cory Gordon
Christopher Harris
Kennan Khatib
Susan A. Musser
Louis Naiman
Jeanne L. Nichols
Nicolas Stebinger
Anusha Sunkara
Goldie Veronica Walker

Federal Trade Commission
600 Pennsylvania Avenue
Washington, DC 20580
Tel.: (202) 326-2314
Email: nbrenner@ftc.gov
*Attorneys for Plaintiff Federal Trade Commission*

36

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing was served upon the following counsel on March 25, 2024, by email and/or CM-ECF:

Heidi Hubbard
Beth Stewart
CJ Pruski
Liat Rome
Kaitlin Beach
Altumash Mufti
Williams & Connolly LLP
680 Maine Avenue, SW
Washington, DC 20024
Tel.: (202) 434-5451
hhubbard@wc.com
bstewart@wc.com
cpruski@wc.com
lrome@wc.com
kbeach@wc.com
amufti@wc.com

Brian S. Cromwell
Caroline B. Barrineau
Parker Poe Adams & Bernstein LLP
Bank of America Tower
620 S. Tryon Street, Suite 800
Charlotte, NC 28202
Tel: (704) 372-9000
Fax: (704) 334-4706
Briancromwell@parkerpoe.com
Carolinebarrineau@parkerpoe.com

*Counsel for Defendant Novant Health, Inc.*

Michael Perry
Jamie France
Scott Hvidt
Thomas Tyson
Logan Billman
Connie Lee
Connor Leydecker
David Lam
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Tel: (202) 887-3558
mjperry@gibsondunn.com
jfrance@gibsondunn.com
shvidt@gibsondunn.com
ttyson@gibsondunn.com
lbillman@gibsondunn.com
clee2@gibsondunn.com
cleydecker@gibsondunn.com
dlam@gibsondunn.com

Adam K. Doerr
Kevin R. Crandall
Robinson, Bradshaw & Hinson, P.A.
101 N. Tryon St. #1900
Charlotte, North Carolina 28246
Tel: (704) 377-8114
adoerr@robinsonbradshaw.com
kcrandall@robinsonbradshaw.com

*Counsel for Defendant Community Health Systems, Inc.*

*/s/ Nathan Brenner*
Nathan Brenner (Illinois Bar No. 6317564)
Federal Trade Commission
600 Pennsylvania Avenue
Washington, DC 20580
Tel.: (202) 326-2314
Email: nbrenner@ftc.gov
*Attorney for Plaintiff Federal Trade Commission*

37