IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CASE NO. 5:24-CV-28

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>  Plaintiff,<br><br>  v.<br><br>NOVANT HEALTH, INC., and COMMUNITY HEALTH SYSTEMS, INC.,<br><br>  Defendants. | AMICUS CURIAE BRIEF OF NORTH CAROLINA TREASURER DALE R. FOLWELL IN SUPPORT OF THE FEDERAL TRADE COMMISSION |

## INTRODUCTION

North Carolina Treasurer Dale R. Folwell supports the Federal Trade Commission's motion for preliminary injunction, which seeks to block Novant's acquisition of Lake Norman Regional and Davis Regional.

Consolidation in the health care market is a major concern for the Treasurer. As a fiduciary of the North Carolina State Health Plan for Teachers and State Employees (State Health Plan or Plan), the Treasurer is responsible for one of the largest purchasers of health care in the state. When mergers eliminate competitors (like this one), taxpayers and state employees are forced to subsidize the resulting monopolist's profits. Hospital systems with a high market share demand greater reimbursement from insurers and third-party administrators (TPAs), and those costs

are ultimately passed along to the Plan.[1] Those costs to the Plan erode the Plan's near- and long-term solvency and impair its strategic objectives of holding employee premiums steady, lowering dependent and family premiums, and not increasing member cost-sharing. These costs are also borne by general taxpayers, who fund the Plan through annual appropriations, and the Plan's members, who either pay higher premiums or forgo health benefits due to such high costs. Finally, such increased costs reduce the availability of public funds for other critical needs, such as funding schools, improving roads, and improving public employee salaries to align with inflation and market demands. Health care consolidation, therefore, harms everyone in the state.

It's no response to say that Novant's legal "nonprofit" status can justify a concentrated market. Nonprofit hospitals in North Carolina generally fail to provide sufficient charity care to justify their tax-exempt status. These nonprofit hospitals even sue patients who would be eligible for charity care. They also rake in extraordinary profits (or "excess revenue"), far outstripping their peers in other states.

Nor can the defendants hypothesize about future market entrants who will rekindle the competition that this acquisition would stamp out. North Carolina has a Certificate of Need (CON) law, which requires new health care providers to obtain government permission to compete. Under the CON law, the state engages in central

---

[1] The Plan is self-funded; it pays directly for claims of its members. Blue Cross Blue Shield currently serves as the Plan's TPA, which provides access to its network to the Plan's members, and processes claims for the Plan.

market planning, trying to predict what medical needs will arise in the next year. If the state determines that there is no need, then it's illegal for a new market entrant to offer new facilities, like hospital beds or operating rooms. As the filings in this case show, even a successful CON applicant may need six years from the time of application to the provision of long-needed services. In other words, a unique structural barrier in North Carolina exacerbates the anti-competitive harm from this acquisition.

The Treasurer offers these additional points to the Court as it considers the FTC's motion for a preliminary injunction. Among the Court's considerations will be the public's interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008) (on a motion for preliminary injunction, the "proper determination" of the public interest should not be considered "in only a cursory fashion"). The harm from this proposed acquisition is very real to the Plan and the people of North Carolina. Therefore, the Treasurer respectfully requests that the Court pause the transaction until the FTC completes its administrative proceeding.

## STATEMENT OF INTEREST

The office of the North Carolina Treasurer is created by the North Carolina Constitution. N.C. Const. art. III, § 7(1). As a member of the Council of State, the Treasurer is chosen by voters in a statewide election. *Id.*

By statute, Treasurer Folwell is also a fiduciary for the State Health Plan. N.C. Gen. Stat. § 135-48.2. Consisting of almost 750,000 members, including active and retired members, the Plan is one of the largest purchasers of health care in North Carolina. In the most recent fiscal year ending in June of 2023, the Plan had over $4

3

billion in expenditures, the vast majority of which are associated with medical and pharmacy claims. Thus, as a fiduciary, Treasurer Folwell is concerned for the continued solvency of the Plan, which is largely funded by taxpayers.[2]

## ARGUMENT

### I. Hospital Consolidation Harms North Carolinians.

The market consolidation from Novant's pending acquisition threatens real harm to North Carolinians. This harm includes local patients and Plan members in the Lake Norman market. But the threatened harm extends further. This acquisition threatens statewide harm to the Plan, its members, and every North Carolina taxpayer.

It's no secret that the hospital market has become increasingly concentrated. Zack Cooper & Martin Gaynor, Addressing Hospital Concentration and Rising Consolidation in the United States, *1% Steps*, https://rb.gy/jipdl2 (last accessed April 10, 2024) (showing the trend from 1998 to 2017). Today, "[a]pproximately 80% of hospital markets in the US are 'highly concentrated.'" *Id.*

Nor is hospital consolidation beneficial. Studies show that it leads to higher prices and worse health care quality. *Id.* That shouldn't come as a surprise. Basic economics demonstrate that when market participants lack the threat of competition, they'll charge higher prices and ignore innovation. This is why the federal antitrust

---

[2] Besides amicus and its counsel, no party or party's counsel authored this brief in whole or in part; no party or party's counsel's contributed money that was intended to fund preparing or submitting the brief; and no person—other than amicus curiae or his counsel—contributed money that was intended to fund preparing or submitting the brief.

laws rest "on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958). The antitrust laws impose an unyielding assumption that competition is "best," and there will be no judicial "inquiry into the question whether competition is good or bad." *NCAA v. Alston*, 594 U.S. 69, 95-96 (2021) (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978)).

The FTC has correctly explained how hospital consolidation leads to higher prices for patients. (Compl. ¶¶ 54-62.) In a market where hospitals compete, they offer health care payors lower reimbursement rates for services to be included in the insurer's or TPA's network. (*Id.* ¶¶ 55, 57.) Insurers and TPAs, in turn, compete for customers (insureds or health plans) by offering lower premiums in the case of insurers, and claims costs and administrative fees in the case of health plans. Insurers and TPAs also compete for customers by seeking to create an attractive network that includes hospitals near where patients and health plan members live. (*Id.* ¶ 56.)

But when hospitals eliminate competition and achieve market dominance, they have undue leverage over insurers, other health care payors, and ultimately patients. These hospitals know that they hold an important part of a geographic market that an insurer or TPA needs to be able to provide a sufficient network of hospitals and providers for patients. (*Id.* ¶ 58.) And without meaningful competition, the incumbent hospital can demand higher reimbursement rates from health care payors and

5

patients. (*Id.*) The insurers and TPAs then pass those higher prices on to health plans in the form of higher premiums, administrative fees, and other costs. (*Id.* ¶ 60.) And then, in the case of insurers, the insureds themselves are left footing the bill for this more expensive insurance that isn't paying for health care services that are any better than in a competitive market. (*Id.*) In the case of TPAs, the health plan and its members bear the increased costs through increased administrative fees and larger health care bills. In concentrated markets, health care costs are higher, but the quality of the care isn't any better. Zack Cooper et al., Nat'l Bureau of Economic Research, *Do Higher-Priced Hospitals Deliver Higher-Quality Care?* (Feb. 2022), https://rb.gy/x7dl7u.

These basic market mechanisms have been observed by the Treasurer in his role as a fiduciary of the State Health Plan. Treasurer Folwell has explained, "Everywhere that we've seen the consolidation of health care . . . it's resulting in lower quality, lower access and higher cost." Johanna F. Still, State Treasurer, *Novant Health Spar Over NC Expansions*, WilmingtonBiz (Mar. 8, 2023), https://rb.gy/ed3nsm. The Treasurer has seen this problem with Novant in particular, with its recent acquisition of New Hanover Regional. Theresa Opeka, *Folwell calls on AG to investigate antitrust as hospitals consolidate*, Carolina Journal (Mar. 8, 2023), https://rb.gy/il7igw (Treasurer Folwell: "We're seeing story after story about sellers' remorse in Wilmington and Brunswick, Pender, and surrounding counties with Novant taking over New Hanover Regional.").

But because of the nature and role of the State Health Plan, higher health care costs are a problem for the entire state, not just the patients who use the services of specific hospitals. The State Health Plan is one of the largest purchasers, if not *the* largest purchaser, of health care in North Carolina. The Plan has nearly 750,000 members among North Carolina's 10 million residents. N.C. State Health Plan, *Who We Are*, https://rb.gy/5j6per (last accessed April 10, 2024). Premiums for the State Health Plan are paid partly by Plan members (the patients) and partly by the General Assembly through annual appropriations. N.C. Gen. Stat. § 135-48.22(2) (employee premium set by Plan's Board of Trustees); N.C. Sess. Law 2023-134, § 39.26(d)-(e) (appropriation for State-paid portion of premium). So, when hospitals use their dominance to drive up reimbursement prices, these hospitals' anti-competitive profits are paid out of the pocketbooks of state employees and the Plan's own accounts, which are funded by all taxpayers in the state.

If prices rise too much, this could be disastrous for the Plan. Health care costs have gotten so high that Treasurer Folwell is already concerned "for those who are eligible for the [State Health Plan] but can't afford the premiums." Opeka, *supra*. If the prices rise further still, the Plan could go into a death spiral, where the young and healthy leave the plan, which raises costs and premiums for those who remain, causing even more members to leave the Plan.

Nothing in the antitrust laws approves of that result, but it unfortunately follows from consolidation in the health care industry.

## II. Novant's Nonprofit Status Does Not Justify the Merger.

In the past, some judges have considered giving leniency to nonprofit hospitals in merger litigation. Barak D. Richman, *Antitrust and Nonprofit Hospital Mergers: A Return to Basics*, 156 U. Pa. L. Rev. 121, 126-27 (2007). Such leniency is unwarranted, and federal appellate courts have shut the door on any "nonprofit" exemption from the federal antitrust laws. *Id.* at 127-28; *see also Alston*, 594 U.S. at 95-96 ("social justifications" for anticompetitive conduct can never make it lawful).

And for good reason. In North Carolina, some nonprofit hospitals wield their tax exemption to do more harm than good, behaving the same, if not worse, in their efforts to consolidate markets and increase prices more aggressively than many for-profit hospitals. Many nonprofit hospitals fail to provide sufficient charity care to pay for and justify their tax-exempt status. Instead, these hospitals vigorously pursue patients for medical debts, even patients who qualify for charity care.

The problems with charity care by nonprofit hospitals are well documented in scholarly research, most recently in a study jointly published by the Johns Hopkins Bloomberg School of Public Health and the State Health Plan. *N.C. Hospitals: Charity Care Case Report* (Oct. 27, 2021), https://rb.gy/ni71t4. As the study notes, North Carolina is among the most expensive in the country for health care. *Id.* at 3. Some State Health Plan members, such as an entry-level teachers or troopers, "must work five days out of every month just to pay his or her share of the family premium" due to the increasing cost of health care and the funding levels of the State Health Plan. *Id.*

Meanwhile, North Carolina's hospitals are unusually profitable compared to their peers in other states. *Id.* at 3, 5. In 2019, for example, our hospitals "were more than three times more profitable than the national average." *Id.* at 5. This is no less true for our nonprofit hospitals. Some of Novant's hospitals rake in a whopping 30% profit margin. *Id.* For reference, the average net profit margin across all industries is 7.71%. *Id.*

Nonprofit hospitals are tax-exempt because legislators expect the hospitals to repay in charity care what the public forgoes in tax proceeds. But one problem is that there's no one to ensure that nonprofit hospitals are really providing sufficient charity care to earn their tax-exempt status. *Id.* at 3. Novant appears to take advantage of that non-enforcement loophole. For instance, in 2019-2020, Novant's tax exemption was worth over $320 million. *Id.* at 6. But Novant only paid out about half of that amount in charity care during the same period. *Id.* Novant's total capital assets are also worth nearly $2.5 billion, and it had over $3 billion in unrestricted reserves even back in 2017-2018. *Id.*[3]

News also broke recently about Novant's staggering use of Caribbean tax shelters. *See* Peter Castagno, *Novant invests hundreds of millions in Caribbean, leading to questions about its nonprofit strategy*, Port City Daily (April 11, 2024), https://rb.gy/btpt09. Novant refused to explain why it shifted over half a billion

---

[3] Novant, of course, isn't the only nonprofit hospital that fails to earn its tax exemption. Unfortunately, only 20% of nonprofit hospitals earn that status. *Id.* at 7.

9

dollars to offshore tax shelters in 2022. *Id.* Novant doesn't provide any medical services in these countries. *Id.*

Instead of generously giving back to their communities and patients, many of North Carolina's nonprofit hospitals pursue their poor patients in collections. As noted in another report, jointly published by Rice University's Baker Institute for Public Policy and the State Health Plan, 20% of families in North Carolina have medical debt in collections, which is significantly higher than the national average of 13%. *N.C. Nonprofit Hospitals Bill the Poor*, at 2 (Jan. 26, 2022), https://rb.gy/xlicwu; Urban Inst., *Debt in America: An Interactive Map*, https://rb.gy/yjc751 (last accessed April 14, 2024) (national data). When patients can't pay, North Carolina's nonprofit hospitals "have sued patients, garnished their tax returns, damaged their credit and encouraged them to open medical credit cards charging interest rates as high as 11.25% after the first year." *Id.* at 3. Based on available data, our nonprofit hospitals are routinely billing many of their patients who ought to qualify for charity care. *Id.*

Because of the tax-exempt status of our nonprofit hospitals, the State Health Plan and its members, taxpayers, and needy patients all end up with a bad bargain. In short, Novant's nonprofit status should *not* be a reason to let the acquisition proceed. *Hosp. Corp. of Am. v. F.T.C.*, 807 F.2d 1381, 1390 (7th Cir. 1986) (Posner, J.) ("The adoption of the nonprofit form does not change human nature, as the courts have recognized in rejecting an implicit antitrust exemption for nonprofit enterprises." (citation omitted)). In fact, nonprofit hospitals are sometimes associated

10

with "huge executive pay." *N.C. Nonprofit Hospitals Bill the Poor*, *supra*, at 8; *accord N.C. Hospitals: Charity Care Case Report*, *supra*, at 3, 6.

And given the track record of Novant and other nonprofit hospitals in North Carolina, this proposed acquisition poses another financial problem. Novant—a nonprofit—would be converting two of CHS's hospitals to its nonprofit status. As just explained, nonprofit hospitals generally don't provide enough charity care to cover their tax-exempt status. At least for-profit hospitals, like Lake Norman and Davis, are required to provide a public benefit—their tax dollars. But if these hospitals become nonprofits, that tax base will disappear. State and local governments will then face a dilemma with the loss of those tax dollars: raise taxes on everyone else or provide fewer government services.

Thus, the proposed acquisition will harm North Carolinians in multiple ways. The consolidation will lead to higher prices, which will ultimately be borne by the Plan, its members, and North Carolina taxpayers generally. *See supra* Argument § I. It will also reduce the tax base, requiring either higher taxes or less services for everyone else. This double squeeze on North Carolinians shows that a preliminary injunction against the merger will serve the public interest.

### III. The Certificate of Need Law Is a Unique Structural Barrier to Competition from New Entrants.

To the extent that Novant points to the possibility of new market entrants to justify market consolidation, North Carolina's CON law undermines such an argument.

Certificate of need laws were born from a belief that health care providers had a mis-incentive to increase their own costs. *Certificate of Need Laws: A Prescription for Higher Costs*, 30 Antitrust 50, 51 (2015); Matthew D. Mitchell, *Certificate-of-Need Laws: Are They Achieving Their Goals?*, Mercatus Center 1 (April 2017). Congress initially mandated that states pass CON laws, until the 1980s, when Congress repealed that mandate because the CON laws had failed to reduce costs and were actually harming local communities. Pub. L. No. 93-641, 88 Stat. 2225 (1975) (codified at 42 U.S.C. §§ 300k-300n-5), *repealed by* Pub. L. No. 99-660, § 701, 100 Stat. 3799 (1986); Patrick John McGinley, *Reconsidering Certificate of Need Laws in a "Managed Competition" System*, 23 Fla. St. U. L. Rev. 141, 157 (1995). The FTC actively advocates against CON laws across the country because the laws "undercut consumer choice, stifle innovation and weaken markets' ability to contain health care costs." Press Release, Federal Trade Commission and Department of Justice, *FTC, Dep't of Just. Issue Joint Statement on Certificate-of-Need Laws in Illinois* (Sept. 12, 2008). Research shows that "by limiting supply and undermining competition, CON laws may undercut" the aims originally used by legislators to justify the laws. Mitchell, *supra*, at 1-2.

When the federal mandate lifted, some states repealed their CON laws and restored competition. Others, however, left their CON laws on the books. North Carolina is among the latter. *See* N.C. Gen. Stat. §§ 131E-175 to -191.1 (current codification of North Carolina's CON law). North Carolina's CON law requires health

care providers to receive government permission before they offer certain facilities and services. That permission is tethered to the state's central planning efforts.

The state determines "need" for medical facilities annually. *Id.* § 131E-183(a). When the state lets businesses apply for a new CON, that reflects the state's view that a new operating room or other facility is "needed" in the market. *Id.* §§ 131E-178(a), -183(a), -190(a). If the state determines no need exists for an operating room or hospital bed, no one can enter the market and offer that kind of facility.

And even if the state determines that a need exists, the road to providing that service is long and expensive. "The process for obtaining a CON can take years and tens or even hundreds of thousands of dollars." Mitchell, *supra*, at 2. This litigation presents a textbook example of the problem. Novant views Atrium as a competitor. (Compl. ¶ 40.) Atrium plans to open Atrium Lake Norman in mid-2025. (*Id.* ¶ 49.) Atrium's small, 30-bed hospital requires a CON from the state to operate. (*Id.* ¶¶ 72, 94); N.C. Dep't of Health and Human Servs., *Overview of Certificate of Need*, https://info.ncdhhs.gov/dhsr/coneed/overview.html (last accessed April 10, 2024). It will have taken Atrium *six years* to go from CON application to grand opening just to provide some modest competition in this geographic market.[4] (Compl. ¶ 94.)

Whenever the state finds an increased need for some health care service, the competition for the new CON is intense. Incumbent health care providers are willing

---

[4] Of course, Novant is attempting to circumvent the CON process by buying competitors that already have CONs, rather than await a new need determination before applying for a CON.

to "inflict economic harm by spending heavily to sustain current monopoly barriers." Barak D. Richman, *Concentration in Health Care Markets: Chronic Problems and Better Solutions*, American Enter. Inst. 6 (June 2012). Incumbents will litigate against each other and prospective entrants over new CONs, using the law as a shield against competition. *Id.* ("This is especially true for health care monopolists because so many are maintained with legal and regulatory barriers [such as] certificate of need laws . . . . Thus, health care monopolists are willing to spend heavily . . . on legal and political resources that impede competition."). Losing applicants usually appeal the issuance of the CON to their competitors, which stays issuance of the CON until the state appellate process is complete, often many years later. N.C. Gen. Stat. § 131E-187(c).

North Carolina's CON law is a unique structural barrier to competition. The law protects existing hospitals like Novant from competition from new entrants, which in turn exacerbates the anti-competitive effect of Novant's proposed acquisition. If Novant means to justify the market power it seeks to acquire by suggesting that a challenger may arise to compete against Novant, that argument is fanciful. The CON law—and Atrium's experience—shows that it will be many, many years before there's any hope of restored competition. The CON law is a tool in the toolkit of monopolists like Novant. Federal antitrust law is plenty capable of taking structural barriers, like the CON law, into account when analyzing Novant's proposed acquisition of competing hospitals.

## CONCLUSION

Treasurer Folwell respectfully requests that the Court grant the FTC's motion for a preliminary injunction because Novant's proposed acquisitions will eliminate competition and harm the public interest.

This the 15th day of April, 2024.

/s/ Troy D. Shelton
Troy D. Shelton
N.C. Bar No. 48070
tshelton@dowlingfirm.com
DOWLING PLLC
3801 Lake Boone Trail
Suite 260
Raleigh, North Carolina 27607
Telephone: (919) 529-3351

*Counsel for Amicus Curiae North Carolina Treasurer Dale R. Folwell*