**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CIVIL ACTION NO. 5:24-CV-00028-KDB-SCR**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **ORDER** |
| **COMMUNITY HEALTH SYSTEMS, INC. AND NOVANT HEALTH, INC.,** | |
| **Defendants.** | |

Antitrust law, specifically the Clayton Act, serves the important public interest of promoting fair and robust markets by prohibiting horizontal mergers that may substantially lessen competition. This case, however, raises an unusual question: How does that law apply when a currently profitable hospital "competitor" decides, for entirely legitimate reasons independent of a challenged merger, to simply quit trying to compete? And, how are the public equities and interests affected if that hospital is not acquired? The Federal Trade Commission's ("FTC") pending Complaint for a Preliminary Injunction, (Doc. No. 1), demands that the Court answer these questions and decide if Novant Health, Inc.'s ("Novant") purchase of Community Health Systems, Inc.'s ("CHS") Lake Norman Regional Medical Center ("LNR") and Davis Regional Psychiatric Hospital ("Davis") can proceed during the FTC's administrative process to consider the lawfulness of the transaction. For the reasons summarized below and fully explained in the Order, the Court declines to enter an injunction pursuant to Section 13(b) of the Federal Trade

Commission Act, thereby allowing the purchase to go forward (if the Defendants choose to do so despite the continued regulatory risk).

The hospital market in the Charlotte metropolitan area is already heavily concentrated, with sixteen of the nineteen hospitals in an eight-county area including and surrounding Charlotte owned either by Atrium Health ("Atrium") (9), the dominant largest hospital system, or Novant (7), the second largest. In addition, Atrium and Novant collectively have thousands of employed doctors as well as numerous outpatient facilities and free-standing emergency rooms which steer patients to their hospitals. North of Charlotte along Interstate 77 lies Lake Norman, which is surrounded by growing population centers. LNR is a licensed 123-bed hospital located in Mooresville, North Carolina, approximately 12 miles north of Novant's Huntersville Medical Center ("NH"), which is licensed for 151 beds. Significantly, Atrium is in the process of building a new hospital, Atrium Lake Norman ("ALN"), which will be located between LNR and NH in Cornelius, North Carolina. Initially, ALN will be licensed as a 30-bed hospital, but it is being constructed with an additional floor to allow it to expand quickly to 54 beds and is located on a planned "hospital campus" already zoned for 140 beds. Davis, located in Statesville, North Carolina, was formerly licensed as a 144-bed acute care hospital. In August 2022, CHS closed the hospital for financial reasons and converted Davis to a behavioral health facility that provides adult psychiatric care.

The FTC argues that the merger of LNR into Novant will exceed the FTC's "Merger Guidelines" that indicate a merger is presumptively likely to have anti-competitive effects. While the FTC is correct that in one or more "relevant markets" the level of combined market share and market concentration will be outside the permitted guideline range after Novant's purchase, this appears to be in large measure the result of Novant's substantial current market share and the

already concentrated market rather than LNR's own competitive presence. Thus, the Court needs to look beyond the economic numbers to assess the likelihood that, considering commercial realities, the merger may in fact "substantially lessen" competition.

Defendants defend the transaction on two grounds. First, and primarily, Novant repeatedly argued that LNR is a bad hospital with low quality and low occupancy that is "struggling" and "declining." The Court finds this doomsday characterization is mostly inaccurate and certainly exaggerated. Over 40% of the patients in the two Lake Norman area zip codes closest to LNR still use LNR rather than other hospitals for LNR's offered services. Also, although it has not achieved the highest quality or safety ratings, LNR currently, and for much of the past several years, has had a "B" rating on the Leapfrog safety metrics, has had only one serious safety incident over many years, and has quality metrics that generally fall within the range of the various individual Novant hospitals. Indeed, Novant repeatedly praised the doctors, nurses and other medical professionals who are providing care at LNR (and is poised to retain them if LNR's sale moves forward). With respect to its low occupancy, LNR has long operated within a reduced seasonally adjusted level of 40 to 70 "staffed" beds and its occupancy level has remained relatively flat over the past six years. More broadly, the issue before the Court is not whether NH or other Novant hospitals are "better" hospitals than LNR. This is an antitrust lawsuit not a hospital quality survey. "A" quality hospitals are not exempt from the antitrust laws when they propose to acquire "B" or even "C" hospitals or vice-versa.

However, even though LNR provides appropriate care for those services it offers, the evidence indisputably established that LNR has lost important service lines during the past few years, including the ability to regularly treat dangerous heart attacks ("STEMI") in its emergency room, staff a higher level Neonatal Intensive Care Unit ("NICU II") and treat certain oncology

patients. This loss of services, together with CHS' decision to strictly limit any investments in LNR (including paying low nursing salaries which has led to staffing shortages), has consigned LNR to a relatively insignificant competitive position. In other words, although LNR is profitable for now, if LNR is not sold to Novant it seems clear that – like a car that its owner can't afford to replace – CHS plans to just continue to drive LNR down the same road until the proverbial wheels fall off. And, unfortunately for LNR, a competitive "wreck" appears to be on the immediate horizon. Atrium's new hospital, which is only five exits away on the interstate, will open in mid-2025. CHS and third-party evaluators conservatively believe that ALN will cut LNR's revenue by 20% to 30%, to the point where CHS will need to incur additional debt to keep the hospital running. (Doc. No. 214-4 at 56-58, Tr. 1615 (Hammons), PX 2104). Moreover, changes in North Carolina's Certificate of Need ("CON") law to permit the opening of outpatient surgery facilities without a CON will likely further increase competition for outpatient services, which are a primary source of LNR's revenue. (*See* Tr. 992; Tr. 278 (Littlejohn) ("CON reform would be one of the greatest threats to Lake Norman")).

Second, Novant suggests that the merger will be pro-competitive because it will enable Novant to better compete with Atrium as it inevitably expands its presence in the Lake Norman area. While the impact of Novant buying LNR on the competitive balance between Novant and Atrium may be modest overall and is certainly difficult to quantify, it seems obvious that the presence of two Novant hospitals on either side of ALN will provide more competitive balance than the combination of NH and LNR operated separately. Put another way, it is unlikely that LNR will be much of a competitive threat to ALN (or Novant) as currently operated by CHS. Therefore, Novant's purchase of LNR is likely to promote added competition with Atrium.

The Court must also weigh the public "equities" to determine whether it is in the public interest to allow Novant to buy LNR and Davis. The FTC argues that 1) insurance companies and ultimately their customers will be charged Novant's higher prices; 2) state and local governments will receive millions less in tax revenues as soon as LNR and Davis are owned by a "non-profit" hospital system; and 3) CHS could make additional investments or enter into partnerships with other healthcare companies if the transaction is not enjoined. Defendants in turn claim that the equities favor allowing the sale to proceed because 1) otherwise Davis will quickly close,[1] depriving the community of important mental health services; 2) the important medical service lines listed above will be immediately added to LNR; and 3) Novant has committed not to raise prices at LNR for three years, to support LNR's doctors and nurses with additional staff and higher pay, and to add numerous capital improvements (which CHS will either be unwilling or unable to provide).

In summary, the Court must look at the future not as an economist or scholar but as a judge, determining whether it believes the witnesses will do what they say they will do as well as considering what has actually been done in the past. That is, the Court must go beyond an assessment of what "could" occur in theory or "might" be possible, to decide what is likely to happen in fact. Here, the Court believes that absent the transaction 1) Davis will close; 2) there is no plausible alternative buyer for LNR or Davis; 3) LNR is unlikely in the near term to resume important services in cardiology, newborn care and oncology because of CHS's decision not to

---

[1] In response to CHS' unequivocal testimony at the hearing that it would close Davis because of the facility's ongoing losses of $1 million a month, Tr. 1576-1577 (Hammons), the FTC informed Novant by letter dated May 9, 2024, that the Commission would not object to Novant's separate purchase of Davis. There is, however, no evidence that Novant would purchase Davis outside the presently proposed transaction. And, the Court notes that the FTC's recent change in position is similar to Novant's "made for litigation" commitments, which the FTC questions as being offered only in response to its Complaint.

invest in the growth of the hospital; and 4) LNR's external competitive challenges, particularly the opening of ALN and the changes in the CON process for outpatient facilities, likely will shortly lead to its closing in light of CHS' difficult financial position. All of this, especially the closure of the hospitals, will reduce rather than enhance competition. At most, on its current and expected path, LNR can only hope to maintain its already limited competitive position for a short time. Therefore, the proposed merger carries at least as much likelihood of competitive benefits as it does competitive harm and the FTC is unlikely to ultimately be successful in proving that the transaction may "substantially lessen competition."

With respect to the equities, the Court finds that on balance the equities favor allowing the sale to go forward. While the loss of tax revenue is a concern, it is outweighed by the loss of critically needed psychiatric medical services, the addition of medical service lines that are no longer offered at LNR and the commitment of Novant executives (which the Court believes and accepts) not to raise prices at LNR for three years after the acquisition.

Therefore, having weighed the equities and considering the Commission's likelihood of ultimate success, the Court concludes that entry of an injunction pending the conclusion of the FTC's administrative process would not be in the public interest. The FTC's Complaint will be denied and the purchase of LNR and Davis by Novant allowed to proceed.

## I.    LEGAL STANDARD

Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), empowers the FTC to file suit in federal district courts and seek a preliminary injunction to prevent a merger pending an FTC administrative adjudication "[w]henever the Commission has reason to believe that a corporation is violating, or is about to violate, Section 7 of the Clayton Act." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001) (quoting *FTC v. Staples, Inc.*, 970 F.Supp. 1066, 1070

(D.D.C. 1997)); *see* 15 U.S.C. § 53(b). The Court's decision as to whether to issue a preliminary injunction is statutorily grounded in the "public interest." *See F.T.C. v. Food Town Stores, Inc*., 539 F.2d 1339, 1343–44 (4th Cir. 1976). Specifically, the Court may issue a preliminary injunction "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b).

The "public interest" standard is not the same as the traditional equity standard for injunctive relief. *See Food Town Stores*, 539 F.2d at 1343 ("The equities to be weighed are not, however, the usual equities in private litigation …");[2] *see also FTC v. Exxon Corp.,* 636 F.2d 1336, 1343 (D.C. Cir. 1980) ("In enacting [Section 13(b)], Congress further demonstrated its concern that injunctive relief be broadly available to the FTC by incorporating a unique 'public interest' standard in 15 U.S.C. § 53(b), rather than the more stringent, traditional 'equity' standard for

---

[2] In *Food Town Stores*, the court interpreted the statute, in part, from the Conference Committee Report No. 93-924 concerning P.L. 93-153, the legislation which enacted 13(b). In speaking of the relevant language, the Report states:

> Section 408(f) relates to the standard of proof to be met by the Federal Trade Commission for the issuance of a temporary restraining order or a preliminary injunction. … The intent is to maintain the statutory or "public interest" standard which is now applicable, and not to impose the traditional "equity" standard of irreparable damage, probability of success on the merits, and that the balance of equities favors the petitioner. This latter standard derives from common law and is appropriate for litigation between private parties. It is not, however, appropriate for the implementation of a Federal statute by an independent regulatory agency where the standards of the public interest measure the propriety and the need for injunctive relief.
>
> The inclusion of this new language is to define the duty of the courts to exercise independent judgment on the propriety of issuance of a temporary restraining order or a preliminary injunction….

U.S. Code Cong. and Admin. News, 93 Cong., 1st Sess., pp. 2523, *et seq*. (1973).

7

injective relief.");[3] *H.J. Heinz Co*., 246 F.3d at 714. Indeed, it has "long been recognized that in order for the Government to monitor and implement effectively the antitrust laws, and thus protect the public interest in the vigorous enforcement of those laws, it is essential that some mechanism exist by which the Government may prevent the consummation of a merger or acquisition that it believes to be unlawful." *Exxon Corp*., 636 F.2d at 1342 (noting that "mergers and acquisitions are often followed by a commingling of assets and other substantial changes in the structures of the enterprises involved. Once those changes occur, it is often impossible for the Government to compel a return to the status quo, and the legality of the challenged merger or acquisition may become essentially a moot question.");[4] *see FTC v. Dean Foods Co*., 384 U.S. 597, 606 n.5 (1966) (holding (prior to the FTC Act) that a merger could be enjoined under the All Writs Act, 28 U.S.C. § 1651(a), because "without standing to secure injunctive relief, and thereby safeguard its ability to order an effective divestiture of acquired properties, the Commission's efforts would be frustrated").[5]

Therefore, under Section 13(b), the Court must consider the FTC's likelihood of success on the merits and weigh the equities to independently determine whether a preliminary injunction

---

[3] The *Exxon* court then cited a typical "equity" preliminary injunction opinion (not a Section 13(b) case) for the proposition that "the issuance of a preliminary injunction prior to a full trial on the merits is 'an extraordinary and drastic remedy.'" However, this standard is inconsistent with Section 13(b)'s statutory language and *Food Town Stores*, which govern this Court.

[4] Some courts have noted that the length of FTC proceedings also often means that private transactions will not survive the delay until a final ruling on the FTC's antitrust challenge. *See Exxon Corp*., 636 F.2d at 1343. Thus, there is significant potential harm to both the interests inherent in the antitrust laws and the ability of private companies to lawfully combine. While these dual risks clearly emphasize the importance of the Court's ruling, they cannot substantively change the standard of review as set by the statute.

[5] The Supreme Court went on to explain, "[i]f consummation of the merger is not restrained, the restoration of (the acquired company) as an effective and viable competitor will obviously be impossible by the time a final order is entered. This is not unusual. Administrative experience shows that the Commission's inability to unscramble merged assets frequently prevents entry of an effective order of divestiture." *Dean Foods Co*., 384 U.S. at 606 n.5.

would be in the public interest. *See Food Town Stores*, 539 F.2d at 1343–44; *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1217–18 (11th Cir. 1991). However, our Court of Appeals has made clear that determination of a Section 7 violation is an adjudicatory function vested in the FTC in the first instance. Thus, the "only purpose of a proceeding under [Section] 13 is to preserve the status quo[6] until [the] FTC can perform its function." *Food Town Stores*, 539 F.2d at 1342; *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 352 (3d Cir. 2016) (reversing district court and granting injunction of hospital merger). "The district court is not authorized to determine whether the antitrust laws have been or are about to be violated." *Id.*; *FTC v. Whole Foods Mkt., Inc.* 548 F.3d 1028, 1035 (D.C. Cir. 2008) (quoting *Food Town Stores*, 539 F.2d at 1342). That determination is left to the FTC. *Fed. Trade Comm'n v. Sanford Health, Sanford Bismarck*, No. 1:17-CV-133, 2017 WL 10810016, at *23–24 (D.N.D. Dec. 15, 2017), *aff'd sub nom. Fed. Trade Comm'n v. Sanford Health*, 926 F.3d 959 (8th Cir. 2019).

    To evaluate the FTC's likelihood of success, this Court must consider the likelihood that "after an administrative hearing on the merits, the Commission will succeed in proving that the effect of the [proposed] merger 'may be substantially to lessen competition, or to tend to create a monopoly' in violation of section 7 of the Clayton Act." *H.J. Heinz Co.*, 246 F.3d at 714 (quoting 15 U.S.C. § 18). Neither the Supreme Court nor the Fourth Circuit has described any standard for

---

[6] Preservation of the "status quo" is regularly argued as a reason to enter injunctive relief. In this context, it most often refers to the status of the parties as separate entities prior to a proposed merger. However, it is also true that, absent a legal prohibition, the parties would currently be free to merge or otherwise pursue their private business interests. Therefore, a call to maintain the "status quo" under these circumstances is, at best, of uncertain consequence. More appropriately, the Court should simply follow the clear direction of the statute to determine (by assessing the likelihood of ultimate success and the equities) whether or not the public interest is best served by a preliminary injunction.

evaluating the "likelihood of success" in this context.[7] However, several other circuit and district courts have held (both in granting and denying injunctions) that, to prevail on a motion for a preliminary injunction, the FTC "must raise questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation, and determination by the FTC in the first instance and ultimately by the Court of Appeals." *Id*. at 714-15; *see also FTC v. Tenet Health Care Corp*., 186 F.3d 1045, 1051 (8th Cir. 1999); *University Health,* 938 F.2d at 1218; *FTC v. OSF Healthcare Sys*., 852 F. Supp. 2d 1069, 1074 (N.D. Ill. 2012); *FTC v. Butterworth Health Corp*., 946 F. Supp. 1285, 1289 (W.D. Mich. 1996), *aff'd sub nom. Fed. Trade Comm'n v. Butterworth Health Corp*., 121 F.3d 708 (6th Cir. 1997); *Sanford Health*, 2017 WL 10810016 at *23-24; *F.T.C. v. ProMedica Health Sys., Inc*., No. 3:11 CV 47, 2011 WL 1219281, at *53 (N.D. Ohio Mar. 29, 2011); *Fed. Trade Comm'n v. Advoc. Health Care*, No. 15 C 11473, 2017 WL 1022015, at *2 (N.D. Ill. Mar. 16, 2017); *Fed. Trade Comm'n v. IQVIA Holdings Inc.*, No. 23 CIV. 06188 (ER), 2024 WL 81232, at *6–9 (S.D.N.Y. Jan. 8, 2024).

The FTC need not establish all of these descriptors for each issue. Rather, the FTC satisfies its burden as to any particular question if it shows that the question has any one or more of these attributes. *See H.J. Heinz Co.,* 246 F.3d at 727 (concluding that a preliminary injunction was warranted where "the FTC has raised serious and substantial questions"); *FTC v. Warner Commc'ns Inc.,* 742 F.2d 1156, 1164 (9th Cir. 1984) ("The government has met its burden of demonstrating a likelihood of success by presenting evidence sufficient to raise 'serious,

---

[7] Indeed, it may well be that no further standard for determining "likelihood of success" is necessary at all. Read as it is written, the statute directs the court to simply "consider" the "Commission's likelihood of ultimate success" (as well as "weigh the equities"). This distinguishes the Section 13(b) analysis from the typical preliminary injunction standard which requires proof of a likelihood of success and irreparable harm. So, under a plain reading of the statute, the Court need not necessarily find a clear likelihood of success to enter an injunction.

substantial, difficult' questions regarding the anticompetitive effects of the proposed joint venture."); *OSF Healthcare Sys*., 852 F. Supp. 2d at 1074.

Neither of the parties' proposed likelihood of success standards comport with the Court's understanding of the law as discussed above. A showing of only a "fair or tenable chance of success on the merits," as suggested by the FTC, is not sufficient. *Sanford Health*, 2017 WL 10810016, at *23–24; *Tenet Health Care,* 186 F.3d at 1051 ("A showing of a fair or tenable chance of success on the merits will not suffice for injunctive relief."); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1072 (D.D.C. 1997). And, Defendants' argument that the Court should apply the full preliminary injunction standard of Federal Rule of Civil Procedure 65 requiring a clear showing of likelihood of success is similarly off the mark. As described above, Congress has dictated a different, specific "public interest" standard that governs Section 13(b) proceedings. Therefore, following the plain language of the statute, the Court will "consider" (but need not decide as it would under Rule 65) the FTC's likelihood of ultimate success and weigh the equities to determine if the public interest is or is not best served by enjoining the proposed merger.

In deciding the FTC's request for a preliminary injunction blocking a merger under § 13(b), a district court must balance the likelihood of the FTC's success against the equities, under a sliding scale. *See Heinz,* 246 F.3d at 727; *FTC v. Elders Grain, Inc.,* 868 F.2d 901, 903 (7th Cir.1989). Thus, even if the FTC establishes a likelihood of success that creates a presumption in favor of preliminary injunctive relief, the Court must still weigh the equities in order to decide whether enjoining the merger would be in the public interest. *H.J. Heinz*, 246 F.3d at 726; *see* 15 U.S.C. § 53(b). If a court determines that a proposed merger is likely to substantially lessen competition, the defendants "face a difficult task in justifying the nonissuance of a preliminary injunction"

because if a merger proceeds and the FTC later finds it to be unlawful, it is difficult to restore competition to its pre-merger state. *Id.*

Further, although the statute mandates that the court weigh the "equities," it is silent as to what specifically those equities are. The prevailing view is that, although private equities may be considered, they are not to be afforded great weight. *See Food Town Stores,* 539 F.2d at 1346 ("All of these reasons go to the private injury which may result from an injunction delaying the merger. I do not minimize them, but I conclude that they are of such a nature that they are not proper considerations for granting or withholding injunctive relief under s 13(b).... [indeed] many of them would result if any merger is enjoined on the eve of its consummation; yet Congress enacted §13(b) authorizing injunctive relief, thereby indicating that it thought that little weight should be given to them."); *Univ. Health*, 938 F.2d at 1225 ("While it is proper to consider private equities in deciding whether to enjoin a particular transaction, we must afford such concerns little weight."); *H.J. Heinz*, 246 F.3d at 727 n.25 (same); *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. Cir. 1981).

Emphasizing the public rather than private equities is consistent with the Court's statutory obligation to weigh the equities in order to decide whether granting the injunction would be in the public interest. In answering this question, therefore, the Court considers whether the injunction, not the merger, would be in the public interest. *See Penn State Hershey Med. Ctr.*, 838 F.3d at 352–53 ("On balance, the equities favor granting the injunction. None of the private equities, or those equities that may have public benefit, on the Hospitals' side of the ledger are sufficient to overcome the public's strong interest in effective enforcement of the antitrust laws. We recognize that certain extrinsic factors have made these types of mergers beneficial—perhaps even

necessary—to the continued success of some hospital systems. Yet, in this case, we are tasked with deciding only whether preliminary injunctive relief would be in the public interest.").

In summary, the Court may not simply rubber stamp the FTC's request for an injunction upon the showing of a mere possibility that the antitrust laws will be violated. Instead, the Court must exercise its independent judgment to determine where the public interest lies, considering whether the FTC is likely to ultimately succeed and whether the equities support issuance of the requested injunction.

## II.    PROCEDURAL HISTORY

On February 28, 2023, Novant and CHS entered into an Asset Purchase Agreement in which Novant agreed to acquire LNR, Davis and related assets in North Carolina for $320 million. Defendants sought regulatory approval for the transaction, and the FTC engaged in a monthslong merger review process, including requests for documents, sworn investigatory interviews and informal meetings with Novant and CHS. At the conclusion of that review, on January 25, 2024, the Commission found reason to believe that the deal may violate Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45, or constitutes an unfair method of competition in violation of Section 5 of the FTC Act. On the same day, the Commission initiated an administrative proceeding to determine the antitrust merits of the proposed transaction. The administrative merits hearing before an Administrative Law Judge ("ALJ") is scheduled to begin on June 26, 2024.[8] After reviewing the recommended decision of the ALJ, the FTC will issue a

_____

[8] On May 29, 2024, the Parties jointly filed a Notice informing the Court that they had sought a thirty-day postponement of the administrative trial in *In re Novant Health, Inc.*, No. 9425 (F.T.C.) "in order to give the parties the opportunity to review this Court's decision and consider next steps." *See* Doc. No. 216.

decision, which is then subject to review in a United States Court of Appeals. This administrative process and appeal is likely to last more than two years.

Also on January 25, 2024, the FTC filed in this Court a Complaint for a Temporary Restraining Order and Preliminary Injunction Pursuant to Section 13(b) of the Federal Trade Commission Act ("Complaint"). (Doc. No. 1). In that Complaint, the FTC asks that Novant's purchase be enjoined until the Commission has had the chance to review the transaction's legality in the pending administrative proceeding. The FTC contends that this temporary and preliminary injunctive relief is necessary to maintain the status quo and prevent interim harm during the Commission's administrative proceeding. With respect to a temporary restraining order, the parties stipulated to entry of a TRO to pause the completion of the transaction, which was entered by the Court on January 29, 2024. (Doc. Nos. 4, 16). Under this temporary restraining order, Defendants cannot consummate the Proposed Transaction until the fifth business day after the Court rules on the FTC's request for a preliminary injunction or until after the date set by the Court, whichever is later.

After an expedited period of extensive fact and expert discovery and the Parties' filing of memoranda of law in support of and in opposition to the FTC's Complaint, the Court held an evidentiary hearing over seven days from May 1 to May 10, 2024. The Parties presented the testimony of twenty-three witnesses, including four experts, together with numerous exhibits. Each side also gave opening and closing oral argument. Following the hearing, the Parties filed detailed proposed findings of fact and conclusions of law. (Doc. Nos. 212, 214). The matter is now ripe for the Court's decision.

### III. FACTS

#### A. The Parties

### 1. FTC

Plaintiff Federal Trade Commission is an administrative agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq.*, with its principal offices in Washington, D.C. The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

### 2. Novant

Novant is one of the largest non-profit health systems in the southeast United States with $7.6 billion in 2022 revenue, 19 hospitals and approximately 800 outpatient facilities and physician offices. Novant Answer ¶¶ 17-18; PX5069 at 1; PX1006 at 6. Novant also employs a network of 3,200 physicians and other providers. Tr. 1480 (Oliver). Novant has seven hospitals located in or near Charlotte: Huntersville, Presbyterian, Charlotte Orthopedic, Mint Hill, Matthews, Ballantyne, and Rowan, PX1166 at 4, and is widely recognized as a high-quality healthcare system, Tr. 1547-48 (Wyatt); Tr. 1245 (Armato); DX 008 (Iredell County Board). NH, a 151-bed General Acute Care ("GAC") community hospital located in northern Mecklenburg County, is Novant's closest operating hospital to LNR. PX1166 at 4; Tr. 480 (Riley). Novant does not currently operate any hospitals in Iredell County.

### 3. CHS

CHS is a publicly traded company and one of the nation's largest for-profit health systems with $12.5 billion in 2023 net operating revenue, 71 hospitals and more than 1,000 additional sites of care across 15 states. PX5042 at 3, 8; PX5043 at 1. CHS operates two hospitals in North Carolina: LNR and Davis. PX5042 at 49. LNR is a 123-bed GAC community hospital located in southern Iredell County. Tr. 480-81 (Riley). In 2022, CHS converted Davis Regional Medical

Center, located in Statesville, North Carolina, from a 144-bed GAC hospital to a behavioral health hospital. Doc. No. 46 (CHS Answer) at ¶ 21. CHS also employs about twenty-four physicians in North Carolina, has a majority interest in an endoscopy center in Mooresville, and holds a CON to build a new ambulatory surgery center in Mooresville. *See* PX1010 at 2; PX1004 at 36; PX4004 at 1.

CHS is in a difficult financial situation. It carries approximately $11.5 billion in debt and owes $1 billion in debt payments in every year except one between 2026 and 2032. Tr. 1564 (Hammons); PX 5042 at 79, 95, 103. Interest payments on its debt alone have amounted to roughly $800 million per year in each of the past few years. *Id*. Over $2 billion of debt payments are due as early as 2026. *Id*. CHS's debt rating is a CCC, which carries junk bond status. Tr. 1565 (Hammons).

Also, CHS does not generate enough cash flow to cover its costs. Tr. 1564 (Hammons). In 2023, CHS was forced to borrow $400 million to fund its operations. *Id*. CHS therefore prioritizes investments in regions where it has a network of facilities and healthcare providers. Tr. 1570-72 (Hammons). North Carolina has not been a priority for CHS investments for a number of years and would not be in the future. Tr. 1570-72; 1628-29 (Hammons); DX 017; DX 018.

### B. The Charlotte / Lake Norman Hospital Market

The healthcare and hospital market in the Charlotte area is competitive but highly concentrated, without regard to whether Novant is permitted to purchase LNR and Davis. As discussed above, Novant is a large hospital system with numerous hospitals, doctors and related facilities. Yet, it is not the largest hospital system. That distinction belongs to Atrium, which is the largest health system in North Carolina and the "dominant hospital system in the Charlotte area." In addition to Atrium and Novant, there are three smaller hospital systems (including CHS) that

operate one or two hospitals and related facilities in North Carolina.[9]  In sum, it is a two-horse

race, with one horse clearly in the lead.

The Charlotte metropolitan area includes Mecklenburg County (where the City of Charlotte

is located) plus five to ten surrounding counties,[10] depending on context and how far afield one

looks. Given the size of the metropolitan region, the health systems commonly divide the market

into submarkets for management and strategic focus. One of those submarkets runs generally from

the northern parts of Charlotte / Mecklenburg County along I-77 into Iredell County, including

several communities near Lake Norman.

CHS describes the area where LNR is located as the "Lake Norman Market," the "Lake

Norman Area," or the "North Charlotte Market." *See, e.g.*, Tr. 175 (Littlejohn); PX2227 at 5;

PX2195 at 2; PX2123 at 20, 22. Similarly, Novant has a "North Market," which largely tracks—

but is not identical to—CHS's Lake Norman Area. Tr. 481-82 (Riley); PX1151 at 9; PX1295 at 5,

11; *see also* Tr. 1515-16, 1523-24 (Oliver). NH is Novant's only inpatient GAC hospital in its

"North Market" and Novant considers it part of the "Lake Norman Area." PX0001 at ¶ 99; Tr. 482

(Riley); PX5133 at 38, 45. Novant accordingly tracks inpatient market shares and develops

strategic plans specifically for the "North Market." Tr. 483-84 (Riley); Tr. 799-800, 802, 808-09,

811-12 (Ehtisham); PX1022 at 1-2; *see generally* PX1151; PX1042; PX1222. Atrium and other

providers also use the term "Lake Norman Area" or "North Area" and view NH and LNR as

---

[9] There are also health systems with hospitals in South Carolina near the Mecklenburg County border. No party has suggested that those hospitals need to be considered as competitors here, but they do provide competition for Novant's and Atrium's hospitals in the southern end of the Charlotte area.

[10] The contiguous counties to Mecklenburg are Gaston, Union, Iredell, Lincoln and Cabarrus in North Carolina, and York and Lancaster in South Carolina.

serving this area. Tr. 548-49, 551 (Haynes /Atrium); PX3142 at 16, 19; PX3017 at 7; Tr. 977 (CaroMont / Murphy); PX7055 93-4, 112-13 (LifePoint).

This Lake Norman Area has among the fastest rates of population growth in the Charlotte region and is economically significant to both providers and insurers. DX111 at 1 (identifying the Lake Norman area as a "Highly Affluent Growth Market"); Tr. 1007 (Murphy); Tr. 204 (Littlejohn); PX1295 at 5; Tr. 1519 (Oliver); Tr. 94 (Page / Blue Cross); Tr. 362-66 (Daniels / United); PX2060 at 9, 11; PX1152 at 2. Indeed, the Lake Norman area was described by another hospital as "the most hotly contested hospital market in the entire metro region." DX 111 (CaroMont).

### 1.     Atrium Health

Atrium currently operates nine hospitals in Mecklenburg and seven surrounding counties with a tenth, ALN, scheduled to open in July 2025. When ALN opens, Atrium will have more than 2500 GAC licensed beds, 175 outpatient sites and 2600 employed physicians. PX0003 at p.188. Atrium's flagship facility, Carolinas Medical Center ("CMC"), is the largest hospital in Charlotte with over 1,000 beds. DX 001 at 014, 036. Atrium's other Charlotte-area hospitals include University City, Cabarrus, Mercy, Union West, Pineville, and several others. *Id*. Atrium attracts patients to its many nearby hospitals with its "front door" strategy, Tr. 571-75, 585-86 (Haynes), and has more ambulatory surgery centers, employs more physicians, and treats more patients than all other Charlotte-area hospital competitors combined. DX 001 at 23-24, 188. Atrium also operates a number of freestanding emergency departments, including ones located in Huntersville and Mountain Island. Tr. 507 (Riley); Tr. 572-74 (Haynes); Tr. 837-38 (Ehtisham).

ALN will open in Cornelius, North Carolina between NH and LNR in July 2025, initially with 30 inpatient beds and 8 observation beds. Tr. 555 (Haynes); Tr. 1241-42 (Armato). ALN can

quickly expand from 30 to 54 beds by utilizing the already-built fifth floor of "soft space." Tr. 596 (Haynes); DX 100 at 026 ("[W]e have 30 beds approved but we are jumping to 54 with the addition of the 5th floor."). Atrium plans to "expand [ALN] as needed with the population" and already has zoning approval for up to 140 beds at that facility. Tr. 596-97 (Haynes). Atrium's former Charlotte area President (and current Southeast Region President) testified that the building site has even further capacity for Atrium "to do a whole lot more than that" and "go extremely large." Tr. 597 (Haynes). Atrium will need CON approval to expand. However, the area is growing and CON opportunities are likely to be pursued. Tr. 598 (Haynes). Atrium also can move beds between its existing facilities. Tr. 837-39 (Ehtisham); Tr. 990-91 (Murphy).

### 2. Other Health Systems

#### a) CaroMont Health

CaroMont Health is a distant third in size among the hospitals in the area surrounding Charlotte. It operates a single 439-bed general acute care hospital in Gastonia, North Carolina and a facility in Mount Holly, North Carolina with a free-standing emergency department. Tr. 969-70, 994 (Murphy). CaroMont is building a new 54-bed hospital in Belmont, North Carolina. Tr. 974-75 (Murphy). However, CaroMont does not consider Iredell County or the Lake Norman area to be part of its service area nor does it consider either LNR or NH to be competitors (although it does consider Novant Presbyterian a competitor). Tr. 973, 977, 979-980 (Murphy). Further, it has no plans to try to attract patients from the Lake Norman area. Tr. 984 (Murphy). CaroMont briefly considered but decided not to bid on LNR because it did not want to expand into the Lake Norman market, preferring to focus its efforts on the Gaston County and western Mecklenburg County area where it has a significant local presence (as well as other concerns discussed below).

#### b) Iredell Health System

In addition to CHS, the only other healthcare system currently operating in Iredell County is Iredell Health System, another single hospital health system. Iredell Health operates Iredell Memorial, a general acute care hospital in Statesville, North Carolina. Tr. 682 (Green). Unlike Huntersville, Cornelius and Mooresville, Statesville is not considered a suburb or "bedroom community" of Charlotte. Tr. 714. Iredell Health also runs Iredell Mooresville, a 68,000 square foot facility offering 24-hour urgent care, imaging, surgery, rehab, occupational medicine, and primary care. Tr. 682-83 (Green). Iredell has two ambulatory surgery centers, an urgent care in Statesville, and approximately twenty-five physician or provider practices. *Id*. In response to the closing of Davis as an acute care hospital, Iredell Health significantly increased its emergency room coverage and has benefited from there now being only one hospital in Statesville. Tr. 712-713 (Green). Its President testified that while he did not view Novant's NH hospital as an inpatient competitor, Novant's purchase of LNR and Davis would increase competition for Iredell Health, particularly if Novant again opens Davis as a hospital. Tr. 693-694, 719-721 (Green).

### c) Health Systems Farther North of Charlotte

Other health systems outside the Charlotte metropolitan area include (1) Catawba Valley Health System, which operates Catawba Valley Medical Center in Hickory; and (2) Duke LifePoint, which operates Frye Regional Medical Center in Hickory. Tr. 715 (Green). Atrium Wake Forest Baptist, a large academic medical center, is located in Winston-Salem, North Carolina. DX001 at 24.

### C. The Proposed Acquisition

Because of its debt, CHS has engaged in an ongoing effort to sell (or close) many of its hospitals. Since 2014, when it owned 208 hospitals, it has sold well over 100 hospitals. Tr. 1565-66 (Hammons); PX 5042 at 55-56 (CHS). Where it has been unable to find a buyer, it has closed

hospitals, as it recently did in Florida when a competitor opened a nearby hospital. Tr. 1578 (Hammons). CHS identified Lake Norman and Davis as divestment candidates. Tr. 1563 (Hammons).

CHS began soliciting bids for LNR and related assets in July 2022. PX7015 at 111-12; PX1010 at 2. CHS conducted a diligent search for potential buyers, which included outreach to Novant, LifePoint, UNC Health, and CaroMont. PX 2104 at 005; Tr. 1578-80, 1627-28 (Hammons). LifePoint, CaroMont, and UNC requested and received confidential information on the hospitals but none submitted an offer, at any price. *Id*.[11]

Their reasons for not bidding reflected various competitive concerns. LifePoint concluded that Atrium already had a "significant presence" in the area and the opening of Atrium Lake Norman would take another 20% to 30% market share (conservatively) from LNR, which would result in an estimated $20 million decline in LNR's earnings. Doc. No. 214-1, Ex. 3 at 29, 32-33; 53-58 (Reardon); DX 313 (LifePoint). Thus, LifePoint opted not to submit a bid, even when urged by CHS to bid at any "comfortable" price. *Id*.; Doc. No. 214-1, Ex. 3 at 22, 34, 59, 62-63 (Reardon).

CaroMont identified several reasons not to bid on LNR, including declining "EBITDA" margins; the opening of Atrium's new hospital which "will take significant market share" at a time when LNR was already "experiencing sustained market share losses"; changing CON laws for outpatient services, which "expos[es] them to great risk"; and that the local market was "saturated with already aligned provider networks." Tr. 996-97, 1001-02, 1004 (Murphy); DX 111 (CaroMont). Novant was the only entity that submitted a bid. Tr. 1579-80 (Hammons).

---

[11] UNC Health obtained advice on the potential purchase from Morgan Stanley. Despite some favorable comments on potential benefits from the bankers (which also included a note that "Atrium's new hospital project will need to be incorporated into purchase price and valuation") UNC Health did not submit a bid. *See* PX 3176 at 8: PX 7060 at 66-67.

In September 2022, Novant proposed to acquire LNR and related assets for $300 million, PX2217 at 2, and in October 2022, Novant and CHS executed a letter of intent on those terms. *See generally* PX2218. Novant signed a second letter of intent to acquire Davis for an additional $20 million in January 2023. PX1172 at 1. On February 28, Novant and CHS entered into a purchase agreement, whereby Novant would acquire LNR, Davis, and related assets for $320 million. PX1004.

### D.    Health Insurance Negotiations and Pricing

The four largest insurance companies in the Charlotte area are Blue Cross Blue Shield of North Carolina ("Blue Cross"), United Healthcare ("United"), Cigna HealthCare of North Carolina ("Cigna"), and Aetna. DX 001 at 031. Hospital competition occurs in two stages. First, hospitals compete for inclusion in insurers' networks. Tr. 1110 (Tenn). Second, hospitals compete for patients. Tr. 1110 (Tenn). In the negotiations between insurers and hospitals, insurers seek the inclusion in their plans of hospitals (and other providers) whose services are demanded by the insurer's current or prospective members. Tr. 98 (Blue Cross); Tr. 345 (United).

The relative bargaining leverage of an insurer and a hospital determines the contracted reimbursement rate and non-price terms, which are set in these negotiations. Tr. 1110-11 (Tenn). In general, a hospital's bargaining leverage depends on its size and popularity; in other words, the extent to which its absence would make the insurer's provider network less attractive and marketable. Tr. 115-16 (Blue Cross); Tr. 461 (Ambetter). Also, a hospital's leverage is impacted by whether other hospitals could serve as viable in-network substitutes in the eyes of the insurer's members. Tr. 115 (Blue Cross); Tr. 353-54 (United). The presence of competing hospitals thus theoretically limits a hospital's bargaining leverage with insurers, thereby constraining the

hospital's ability to obtain higher rates. Tr. 115 (Blue Cross); Tr. 352-53 (United). On the other hand, the absence of competing hospitals strengthens the hospital's bargaining position and may lead to higher reimbursement rates. Tr. 355-56 (United); Tr. 144 (Blue Cross). Higher rates result in higher premiums and out-of-pocket expenses for members. Tr. 100 (Blue Cross); PX3028 at 1; Tr. 352-53 (United); Tr. 453-56 (Ambetter); Tr. 1670-71 (Aetna).

Although insurers would prefer to negotiate the inclusion of each hospital in their various plans separately, Tr. 1657 (Aetna), large hospital systems with multiple hospitals like Novant and Atrium often demand that insurers negotiate with them as a system, at least within a broad geographic area. So, the reimbursement rates and other terms for Novant are set on a system-wide basis. Unless special (and unusual) contractual terms are agreed to, each hospital charges the same rates. Additionally, by contract, a hospital system's negotiated rates are also applied to new hospitals that are purchased or built. This system-wide negotiating strategy significantly increases the hospital system's leverage as it would be very difficult (but of course not impossible)[12] for insurers to completely remove large hospital systems from insurers' most popular broad network plans.[13] *See* Tr. 1652-53 (Aetna) (larger providers have more leverage in negotiations, which allows them to demand higher reimbursement rates); PX1280 at 1 (Novant's

---

[12] Insurers have their own leverage, including the ability to create public pressure on hospitals through anticipatory termination notices, press releases and other communications. Also, the larger the insurer, the more costly the loss of that insurer's members would be for the hospital. Indeed, as the size of the hospital systems and insurers increase, the stakes of their negotiations rise to the point where an inevitable compromise must be reached as a practical matter for both sides.

[13] Insurers also offer "narrow networks," in which – in return for discounted rates – only one large hospital system is considered to be "in network" or in a "Tier 1" with other hospitals often available but outside the network or in a lower tier. Both Atrium and Novant are large enough and have enough market power to have narrow plans that feature only their hospitals. Tr. 157-158 (Page); Tr. 367; 406 (Daniels); PX 3127 (United). However, these plans typically attract only a very small percentage of members who are the most price sensitive. Therefore, beyond showing the market dominance of Atrium and Novant, these "narrow network" plans have little impact on the Court's analysis of competitive realities.

CEO challenged Novant's payor contracting lead to "leverage [Novant's] size to achieve" higher reimbursement rates); Tr. 1529-31 (Oliver).

The evidence established that both Atrium and Novant have been successful in negotiating relatively higher reimbursement rates, with Atrium's prices topping Novant's, as would be predicted by Atrium's larger size and resulting leverage. In contrast, with only one hospital in North Carolina, CHS has little leverage with insurers and thus has accepted lower prices at LNR to be included in the insurers' plans. Tr. 325-26 (DiPace). There was, however, no evidence that the presence of LNR or Novant as competitors had explicitly affected the prices negotiated by Novant or CHS. Tr. 1639 (Keibler); Tr. 153 (Page); Tr. 408 (Daniels); Tr. 1639 (Keibler); Doc. No. 214-1, Ex. 5 at 77-78 (Cigna); Tr. 338-39 (DiPace). Nevertheless, if Novant purchases LNR, insurers predict that reimbursement rates (or alternatively lump-sum payments)[14] will significantly increase post-acquisition to reflect Novant's already negotiated rates (absent any special contractual changes or Novant's voluntary action to limit rates). Tr. 144-45 (Blue Cross); Tr. 463 (Ambetter); Tr. 1658 (Aetna); Tr. 356 (United). For example, Blue Cross estimates the transaction will raise LNR's reimbursement rates by 44% and Davis's by 48%, equating to an increase of over $21 million. PX3029 at 2; Tr. 145-48 (Blue Cross).[15]

---

[14] Following Novant's recent purchase of New Hanover Medical Center, rather than sharply increase rates at that hospital (which would have caused significant local market disruptions), Novant agreed to accept a lump-sum payment and higher rates throughout its entire system.

[15] While acknowledging that reimbursement rates at LNR would rise under its current contracts, Novant argued that those rates are only one component of "total costs," which depend on several other factors, including a hospital's ability to reduce readmission rates, infection rates, length of stays, and long-term care needs, as well as to provide preventative care to limit hospitalizations in the first place. Tr. 417-18 (Daniels); Tr. 1247-48 (Armato); Tr. 1485-87 (Oliver) (reduction in C-section rates reduced total cost of care for Novant patients).

Overall, while acknowledging that any increased market share and hospital reach would incrementally benefit Novant in future rate negotiations, insurers either had no opinion on whether adding LNR to Novant's portfolio would impact rates or they believed there would be little or no impact based on LNR's currently limited competitive position. Tr. 1639 (Keibler); Tr. 462 (Portman); Doc. No. 214-1, Ex. 7 at 30-31 (Cigna). During the hearing, insurers were not asked how Novant's purchase of LNR would affect future rate negotiations with Atrium (though based on Novant's position that the purchase of LNR will have no positive effect on its own rates, it would seem highly unlikely that the addition of LNR to Novant would in turn constrain Atrium's system-wide rates).

The second stage of competition is when the hospitals within the health plan network compete to attract patients. Patients may prefer inpatient GAC services close to where they live because they value convenience, familiarity with local hospitals, and the ability for friends and family to visit during a hospital stay, Tr. 98, 103 (Blue Cross); Tr. 345, 350 (United); Tr. 1655-56 (Aetna); Tr. 687-88 (Iredell Health); PX7001 50, 100 (CaroMont), but the primary forces that determine where a patient goes to the hospital are 1) where the patient goes to the emergency room and 2) the recommendation / preference of the patient's doctor. *See* Tr. 238-39 (Littlejohn) (stating "whoever has the doctors has the patients by default."); Tr. 571-75, 585-86 (Haynes) (Atrium attracts patients to its many nearby hospitals with its "front door" strategy of operating numerous free standing emergency rooms and physician groups). Accordingly, the parties' contentions with respect to the factors guiding "patient choices," while not irrelevant, appear to be clearly outweighed by "doctor choices and affiliations" and emergency considerations, factors over which patients have far less influence.

E.    **Hospital Quality**

### 1. Quality of Care

Novant spent much of the hearing attacking the quality of care at LNR. As noted above, and discussed more below, the Court finds that much of Novant's critique is exaggerated and that, considered as a whole, LNR is not a "bad hospital" and certainly not a dangerous one, as Novant repeatedly implied. Moreover, Novant apparently intends to provide care in the future with many, if not all, of the same doctors, nurses and other medical staff that currently serve at LNR. (So, while Novant has promised to increase and improve support, one would generally expect the same basic level of care from the same medical providers).

Again, the task before the Court is to assess the likelihood of antitrust injury to competition not the relative quality of various hospitals. Thus, although a hospital's quality of course has some relevance to its competitive position, it does not play the central role urged by Novant here. In addition, Novant has failed to offer any evidence beyond its conclusory assertions (and statistically questionable arguments)[16] that LNR's competitive position is precipitously "declining" *because* of any quality issues. Indeed, LNR's most recent safety quality rating improved and the evidence shows that LNR's "quality" and occupancy has remained relatively flat over the past several years (or longer). Instead, it appears that LNR's competitive challenges, which are quite real, relate mostly to LNR's loss of important services, lack of nurse staffing, and the inability to grow a physician network to generate referrals into the hospital.

A hospital's overall "quality" is not easily measured, particularly in a competitive sense, as it is ultimately an amalgamation of thousands of medical service interactions involving

---

[16] For example, Novant argued that LNR's average daily census has "been declining for 20 years." However, CHS has only owned LNR less than half that time and, ironically, during most of the earlier years seeing the largest decline, Novant itself had a significant ownership interest in LNR. Far more relevant to current competitive concerns is the recent history at LNR discussed in this Order.

individual doctors, nurses and patients as well as public perception, which may or may not reflect reality. The parties relied on a national safety scorecard rating, analyzed various "metrics," and presented expert testimony as their evidence on "quality." The "Leapfrog Hospital Safety Grade" provides a letter grade rating from A to F based on an independent analysis of up to twenty-two evidence-based measures of patient safety. *See Explanation of Hospital Safety Grades*, The LEAPFROG Group, available at https://www.hospitalsafetygrade.org/your-hospitals-safety-grade/about-the-grade (accessed May 30, 2024). Safety grades are well distributed along the spectrum, with 29% of over 4000 hospitals receiving an "A," 26% a "B," 37% a "C," and the remainder D and F. *Id*. LNR earned a "B" grade in the most recent Spring 2024 grading period. LNR also received a "B" during both reporting periods in 2021 and 2022, but received "C" grades in 2023 (the year that the sale of the hospital to Novant was announced and the legal uncertainty related to the transaction ensued).[17] Therefore, currently and for much of the recent past, LNR has had a good safety rating that very likely ranks in the top half of a large national survey (between 45% and 71%). Likewise, its quality grade is improving (back up to its more typical recent level) rather than "declining" as argued by Novant. Beyond its Leapfrog "safety grade," LNR has also had only one serious safety event since 2018. Tr. 756 (Music).

The FTC and Defendants each presented highly qualified experts on hospital quality who evaluated LNR's quality. Dr. Ashish Jha, Novant's expert, offered his opinion that LNR's quality will improve after Novant's purchase based on Novant's higher average level of care across all its hospitals and other measures. In response, Dr. Lawton Burns, the FTC's expert, analyzed LNR

---

[17] As another example of Novant's concerted (but ultimately unnecessary) effort to denigrate LNR's quality of care, Novant's counsel highlighted these 2023 grades in her opening statement without any reference to LNR's more recent better grade, which was publicly available (and known to Defendants).

and eight Novant hospitals and found no statistically significant differences in performance across nearly twenty quality outcome metrics. Tr. 914-15, 921-22 (Burns). He concluded that LNR outperforms a number of Novant hospitals on a variety of outcome metrics, including Novant Rowan – a hospital purchased by Novant that has been subject to Novant's quality improvement tools for many years. Tr. 919; 937-40 (Burns); PX0006 (Burns Rebuttal Rpt.) §§ IV-V; Tr. 1317-18 (Armato) (Novant Rowan's performance declined following its acquisition by Novant and seven years after it was acquired, it still received "stubbornly low" patient satisfaction scores).

The Court need not decide between these experts' opinions, as both express views that are relevant to the Court's decision. With respect to Dr. Jha, the Court accepts his conclusion that Novant has an overall better track record for providing the highest quality care and is likely (but not certain)[18] to improve quality at LNR if it is allowed to purchase the hospital.[19] Similarly, the Court accepts Dr. Burns' opinion that LNR is currently providing appropriate medical care that is broadly consistent with the care provided at individual Novant hospitals per numerous quality care metrics, even if LNR falls short of Novant's "average" level of care. Again, this is corroborated by the Leapfrog scores, which suggest that LNR's quality is good, but below the very highest level.

_____

[18] Dr. Burns presented evidence that Novant's acquisition of New Hanover Medical Center in 2021 did not immediately lead to quality improvements. *See* PX0006 (Burns Rebuttal Rpt.) § V.B. New Hanover had maintained an "A" Leapfrog rating but fell to (and has stayed at) a "B" shortly after being acquired by Novant. Tr. 1314-15 (Armato). Also, New Hanover's performance declined across five CMS patient experience metrics following Novant's acquisition, PX0002 (Burns Rpt.) ¶¶ 81-84, and a year and a half after Novant acquired New Hanover, the hospital was placed on immediate jeopardy status by CMS, putting its Medicare and Medicaid contracts at risk. PX1278 (Novant) at 3; Tr. 1527-28 (Oliver).

[19] Novant is widely recognized as a high-quality healthcare system, Tr. 1547-48 (Wyatt); Tr. 1245 (Armato); DX 008 (Iredell County Board); DX 011 (Dr. Korrapati), as established by numerous metrics. All of Novant's Charlotte-area hospitals, for example, have an "A" Leapfrog grade, and 4- or 5-star ratings from Vizient. Tr. 851-853 (Ehtisham); Tr. 509-10 (Riley); Tr. 1248-49 (Armato); Tr. 1491, 1494-95 (Oliver).

Novant also repeatedly criticized LNR's level of occupancy as an indication of its supposedly "declining" quality. However, the evidence does not support this conclusion. Rather, LNR's inpatient occupancy has been stable since 2017 at approximately 33%. Tr. 1145- 50, 1885-88 (Tenn) (noting that most of LNR's occupancy decline occurred when Novant held a minority stake in the hospital); PX0005 (Tenn Rebuttal Rpt.) ¶ 121. LNR's inpatient occupancy is strikingly lower than NH (which often exceeds 70%), but is closer to other community hospitals farther from Charlotte, like Iredell Memorial, which has an average occupancy level of 38%. *See* DX015 at 1. Additionally, CHS effectively "downsized" LNR many years ago, staffing only 40 to 70 beds, depending on the season. Looking at "staffed" beds rather than the full number of 123 licensed beds, LNR has a much higher occupancy rate based on its average census count of 38 patients. *See* Tr. 178 (Littlejohn).

Contrary to Novant's contention that "patients have largely stopped going to Lake Norman for care," LNR's occupancy level does not indicate that those most likely to go to LNR have abandoned the hospital. According to the FTC's expert, LNR is the most popular hospital in the two zip codes nearest the hospital (the area from which it draws most of its patients). *See* PX4025 at 2. In those two ZIP codes (28115 and 28117), LNR claims a 46.7% and 45.9% market share, respectively. *Id*. In the same ZIP codes, NH has the second highest share, with 19.6% and 21.8%, respectively. No other hospital has a greater than 10% share in these two ZIP codes. *Id*. Novant's expert calculates similar results (41% and 42%). *See* Doc. No. 214-1, Ex. 2 ¶¶ 7-10 (Wu).[20]

---

[20] Novant argues that these numbers show that "a majority" of the patients in these zip codes seek care elsewhere. However, this is also true for the two closest zip codes to NH, where more than half go to a different hospital. PX4025 at 3. Novant further tells the Court that in 2004 over 60% of patients in the same zip codes nearest to LNR went to LNR. Yet, this fact is unremarkable because NH did not even open until November 2004.

Regardless, considering the issue of occupancy from a competitive rather than a quality standpoint, it is notable that LNR has been unable to improve occupancy through increasing its referring physician networks and "patient access points." When it identified three potential primary care clinics, CHS funded only one: a location near Statesville, which CHS did not move forward with after it closed Davis's acute care services. Tr. 252-53 (Littlejohn). Also, it has not invested in hiring other physicians, resulting in it operating the smallest affiliated primary care provider network in its primary service area. Tr. 249 (Littlejohn); PX 2082 at 016.

LNR also considered a partnership with OrthoCarolina to open an ambulatory surgery center, for which Lake Norman had been awarded a CON. Tr. 256 (Littlejohn). OrthoCarolina decided not to pursue the project after North Carolina repealed its outpatient CON laws. Tr. 1606 (Hammons). As Lake Norman's then-CEO recognized: "Having that paper of the CON was very valuable, but then when CON went away, there was no value to the CON." Tr. 256 (Littlejohn).

## 2. Loss of Medical Services

While one component of the "quality" of care relates to how well a particular medical service is performed, another component of the "level of care" provided by a hospital is the breadth of the services it performs. Thus, colloquially, the public may refer to the "best" hospitals as those where the most complex and cutting-edge medical procedures are available. Though LNR is a "community" hospital, (and not expected to offer the full range of medical services found at the area's "flagship" hospitals, Atrium CMC and Novant Presbyterian), it has experienced a marked loss of important services that impact its competitive position.

For example, LNR no longer offers neonatal intensive care ("NICU") services, so mothers, obstetricians, and neonatal nurses choose other hospitals that provide skilled care for premature births to avoid "separat[ion of] the mom and the baby." Tr. 778-780 (Music). And, despite repeated efforts, LNR offers ST-elevation myocardial infarction ("STEMI") services only sporadically – it was "STEMI

30

red" 30 out of 90 days in the first quarter of 2024 – so EMS bypasses the facility because Lake Norman "[is]n't reliable." Tr. 774, 780-83 (Music); Tr. 259-62 (Littlejohn). Further, LNR lacks some of the oncology services it previously offered and no longer has intensivists supporting its critical care unit, forcing hospitalists to cover those patients. Tr. 776-78 (Music); Tr. 1373 (Jha). There are also other areas of the hospital which are unused, including a 30-bed med-surg unit, 6 beds in the oncology unit, an overflow obstetrics unit, and 18 beds in the ortho/neuro/spine medical unit. Tr. 767-770 (Music); Tr.1367 (Jha); DX 485.

### F. CHS Lack of Investment in LNR

As mentioned previously, CHS decided several years ago, well before it made the decision to sell LNR and Davis, to focus its limited investment dollars on other hospitals. While the FTC assails it as a "voluntary" choice (which is voluntary only in the sense that CHS could have made a different decision on where to use its budget, which is involuntarily limited by its massive debt), the decision to invest elsewhere has plainly led to significant competitive consequences for LNR. CHS has failed to approve or has delayed approval of all but the most routine expenditures. Tr. 270-77 (Littlejohn); DX449 at 036-038. CHS has also delayed an upgrade in LNR's fragmented and antiquated electronic medical records system. The patchwork infrastructure does not allow for integration or communication across systems, risks loss of patient data, and fails to support patient health and safety-related monitoring. Tr. 671-72 (Benet); Tr. 772-73, 785-86 (Music); Tr. 1378-79 (Jha). CHS put LNR on a list for EMR upgrades multiple times, but never made the investment. Tr. 785 (Music); Tr. 1433, 1435-36 (Jha). Following its agreement to sell LNR to Novant, CHS has (unsurprisingly) further reduced its investment in LNR. PX2363 at 1 (describing investment in LNR as on "freeze/emergency only").

Even more fundamental to its success (and ability to grow and compete), CHS's lack of investment in LNR has caused the hospital to struggle to recruit and retain physicians and staff. Tr.

774, 778-80, 782-83 (Music). More than 30% of its nurses leave their positions in their first year. Tr. 660-61 (Benet); Tr. 768 (Music); DX 488. Consequently, LNR has staffing vacancies of 50% in its emergency room, 50% in its med-surg unit, and 30% in its obstetrics unit. Tr. 772-73 (Music). At night, the only physician in the building is in the emergency room; a nurse practitioner services the inpatient beds upstairs. Tr. 778 (Music). As summarized by its quality care coordinator, LNR is currently "in a very fragile, vulnerable state" with staffing. Tr. 725-26 (Music).

## G. The Parties' Plans If the Transaction Is or Is not Approved

### 1. Davis

If this transaction is enjoined, CHS plans to close Davis immediately. Tr. 1575-77 (Hammons). CHS has repeatedly considered closing Davis to avoid continued losses of $1 million per month and the agreement to sell Davis to Novant is the only reason Davis remains open today. DX 460; Tr. 1575-77 (Hammons). If the purchase is not enjoined, Novant will keep Davis open and continue its presently available behavioral-health services. Tr. 886-88 (Ehtisham). Novant also intends to consider reopening the emergency room at Davis or opening a separate emergency room in the Statesville area within two years. Tr. 1260-61 (Armato); DX 677 at 003.

### 2. CHS' Investment in LNR Will Continue to Be Limited

If the sale does not move forward, then CHS will continue to offer LNR for sale, but no potential buyer other than Novant bid initially and no evidence suggests that any of the health systems that decided not to bid would change their mind or that a new bidder would emerge. In the absence of a sale, there is no reason to believe that CHS will do anything other than continue to operate LNR with very limited investments. CHS will continue to allocate funds towards required maintenance of the facility, but will not allocate any meaningful growth capital. Tr. 1630 (Hammons). With both the opening of ALN and the changes in the CON law expected to

significantly reduce revenues and CHS's debt load making carrying operating losses or even marginal profits difficult, LNR's future is decidedly uncertain. Tr. 1577 (Hammons).

### 3. Novant's Commitments Re: Hospital Pricing and Investments

In an effort to avoid an injunction and address the likely rate increases at LNR and Davis should the purchase move forward, Novant has made a public commitment that it will give insurers the option to (i) maintain existing rates at LNR and Davis, or (ii) apply annual reimbursement rate escalators that are capped at the lesser of general inflation or increase in medical CPI for three years. DX 677 at 004; Tr. 895 (Ehtisham). These options will freeze rates at LNR until ALN opens, the CON law changes take effect, and the FTC administrative hearing moves forward. The Court credits and accepts the testimony of Novant's executives that Novant will execute these actions as promised and in good faith. Furthermore, the Court believes the Novant executives' testimony that Novant intends to work diligently to run these hospitals to the best of their ability. Novant has committed to fulfilling these commitments despite the threat of ongoing litigation. When the Court asked Novant's CEO whether the commitments are "dependent upon the successful resolution of all of those litigation risks," Mr. Armato responded that: "I will begin implementing all that I have agreed to and what we've committed to right away." Tr. 1329-30.

Novant will make significant investments in LNR. For instance, Novant has already committed to fund certain capital projects that leaders at LNR have requested, including a cardiac catheterization laboratory expansion ($850,000), building a cardiac care unit ($1,000,000), replacing an end-of-life HVAC system ($300,000), replacing end-of-life anesthesia machines ($360,000), and upgrading an outdated fire alarm system ($150,000). Tr. 1256-57. (Armato). In addition, Novant will restore Lake Norman's well baby nursery into a Level II NICU. Tr. 1257-58 (Armato); Tr. 857-59 (Ehtisham); DX 689.

Further, Novant will 1) recruit the cardiologists and staff necessary to offer STEMI services around the clock, every day. Tr. 842-43 (Ehtisham); 2) recruit an intensivist, Tr. 846-47 (Ehtisham); 3) staff a colorectal surgeon rotation and enhance surgery call coverage, Tr. 1257-58 (Armato); Tr. 846-47 (Ehtisham); DX 677 (Novant); and 4) increase nursing salaries and nurse staffing. Finally, at both hospitals, Novant has committed to implement its Epic EMR system and various safety and clinical management programs, Tr. 877-78 (Ehtisham); DX 677, and provide tele-stroke, tele-ICU, and tele-psychiatry coverage, along with AI-enabled clinical support services. Tr. 846-47, 857-59 (Ehtisham).

In crediting this testimony, the Court notes that in operating LNR and Davis as Novant facilities, Novant risks significant reputational harm if they do so in any manner that reflects poorly on their well-established local brand. DX 677; PX 5026; Tr. 865-66 (Ehtisham); Tr. 1249-50 (Armato). By putting its name on these hospitals, Novant has a strong incentive to improve them. Tr. 1245, 1251-52 (Armato); Tr. 1503 (Oliver); Tr. 865-66 (Ehtisham).

### H. Community Reaction to the Proposed Acquisition

#### 1. North Carolina Treasurer Amicus Brief

North Carolina Treasurer Dale R. Folwell filed an amicus brief in support of the FTC's motion for a preliminary injunction. Doc. No. 98. The brief states that "[c]onsolidation in the health care market is a major concern for the Treasurer" (as a fiduciary for the state's self-funded health plan for teachers and state employees) and argues that Novant's purchase of LNR will raise prices for health plans, hurting health plan members and taxpayers alike. *Id*. at 5-6. Furthermore, the Treasurer expressed his concern that Novant's purchase as a "non-profit" hospital will cause the loss of state and local tax dollars, resulting in either higher taxes or fewer services. *Id*. at 11.

#### 2. Public Comments

A number of community members expressed support for this transaction to the Court. (Although the Court notes that most, if not all of them, had ties to Novant or a personal incentive to support the transaction). Tr. 1546-51 (Wyatt); DX 008 (Iredell County Board); DX 009 (Professor of Nursing); DX 010 (Mitchell Community College President); DX 011 (Dr. Korrapati); DX 005 (Charlotte Regional Business Alliance); DX 012 (Dr. Sturgess); DX 037 (Dr. Gross, Chief of Staff at Lake Norman); DX 006 (FeedNC).

## IV.    DISCUSSION

Again, under Section 13(b), the Court must determine whether the public interest is served by preliminarily enjoining the challenged transaction based on its assessment of the FTC's likelihood of ultimate success and weighing the equities.[21]

### A.    Likelihood of Ultimate Success

Section 7 of the Clayton Act, 15 U.S.C. § 18, provides that "no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person … where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." Section 7 is concerned with "probabilities, not certainties" and its definition of antitrust liability is "relatively expansive." *Brown Shoe Co. v. United States*, 370 U.S. 294, 323. Still, to stop a merger or acquisition, a Section 7 plaintiff ultimately must show that a "substantial lessening of competition" is "sufficiently probable and imminent." *United States v.*

_____

[21] At the conclusion of its proposed findings of fact and conclusions of law, Defendants include conclusory arguments related to "several constitutional defects" that allegedly preclude the FTC from succeeding on the merits. These arguments were not raised at the hearing and will not be addressed in the first instance in this Order, which does not decide the merits of the FTC's action. Defendants may, if it is appropriate to do so, raise their constitutional challenges during the FTC administrative process or on appeal from that process.

*Marine Bancorporation, Inc.*, 418 U.S. 602, 622-23, n.22 (1974) (internal quotation omitted); *see Fed. Trade Comm'n v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 537 (E.D. Pa. 2020).

Congress chose not to define "substantially" either "in quantitative terms of sales or assets or market shares" or "in designated qualitative terms." *Brown Shoe Co.,* 370 U.S. at 321. Instead, Congress's decision "indicated plainly that a merger had to be functionally viewed, in the context of its particular industry." *Id.* at 321-22. A Court might consider:

> for example, that a whole or material part of the competitive activity of an enterprise, which had been a substantial factor in competition, had been eliminated; that the relative size of the acquiring corporation had increased to such a point that its advantage over competitors threatened to be 'decisive'; that an 'undue' number of competing enterprises had been eliminated; or that buyers and sellers in the relevant market had established relationships depriving their rivals of a fair opportunity to compete.

*Id.* at 321 n.36 (citing H.R. Rep. No. 1191, 81st Cong., 1st Sess. 8.) The general language of this standard reflects "a conscious avoidance of exclusively mathematical tests." *Id.*

Such limited guidance suggests that "Congress was simply leaving to the courts the task of determining what specifically must be shown to establish a violation of the statute in so complex and variegated a field as mergers." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 905b. (4th & 5th eds. 2018-2023). There is, however, broad consensus that the Act was not intended "to reach every remote lessening of competition." *Signode Steel Strapping Co. v. Fed. Trade Comm'n*, 132 F.2d 48, 53 (4th Cir. 1942). Rather, it "was intended to prevent such agreements as would under the circumstances disclosed probably lessen competition." *Id.* Courts have accordingly found that "may" means a reasonable probability, not "an 'ephemeral possibility.'" Areeda & Hovenkamp, at ¶ 1160b (quoting *Brown Shoe Co.*, 370 U.S. at 323). "Unfortunately, probability, like substantiality, is not self-defining." *Id.*

In determining whether competition may be "substantially lessened," the Court applies "a burden-shifting analysis." *Steves & Sons, Inc. v. JELD-WEN, Inc*., 988 F.3d 690, 703–04 (4th Cir. 2021); *United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017). Initially, the FTC bears the prima facie burden of showing that the proposed merger would result in "a firm controlling an undue percentage share of the relevant market" as well as "a significant increase in the concentration of firms in that market." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963). The Supreme Court has explained that a merger with these characteristics "is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *Id.* Therefore, "[i]f the government makes this [prima facie] showing, a presumption of illegality arises." *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1221 (11th Cir. 1991); *JELD-WEN*, 988 F.3d at 703 (discussing "a presumption of anticompetitive effect). However, although "[s]tatistics reflecting the shares of the market controlled by the industry leaders and the parties to the merger are, of course, the primary index of market power; [] only a further examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger." *Brown Shoe Co.*, 370 U.S. at 322 n.38.

If a prima facie case is presented, Defendants then have an opportunity to rebut the presumption of anticompetitive effect either by 1) discrediting the FTC's market-concentration evidence (i.e., showing that it doesn't reflect the true level of concentration) or 2) showing that, even if the FTC's market-concentration evidence is credible, it inaccurately predicts the merger's probable effect on competition. *See JELD-WEN,* 988 F.3d at 703-04. To meet this burden, "the defendants may rely on nonstatistical evidence which casts doubt on the persuasive quality of the statistics to predict future anticompetitive consequences." *H.J. Heinz Co.,* 246 F.3d at 715, n.7.

Additionally, "the defendants may demonstrate unique economic circumstances that undermine the predictive value of the government's statistics," *id.*, or present "evidence showing that the intended merger would create significant efficiencies in the relevant market." *Univ. Health,* 938 F.2d at 1222. "If the defendant successfully rebuts the presumption of illegality, the burden of producing additional evidence of anticompetitive effect shifts to the government, and merges with the ultimate burden of persuasion, which remains with the government at all times." *Heinz*, 246 F.3d at 715.

### 1.    Definition of the Relevant Market

The first step in evaluating the FTC's prima facie case is to determine the "relevant market," which consists of two components: a product market (what the merging parties are competing to sell) and a geographic market (where do the parties compete). *United States v. Marine Bancorporation, Inc*., 418 U.S. 602, 618 (1974); *Brown Shoe Co,* 370 U.S. at 324; *Fed. Trade Comm'n v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 166 (3d Cir. 2022). Determination of the relevant market "is a necessary predicate to a finding of a violation of the Clayton Act because the threatened monopoly must be one which will substantially lessen competition within the area of effective competition. Substantiality can be determined only in terms of the market affected." *Brown Shoe Co*, 370 U.S. at 324 (internal quotation omitted). As prescribed by Congress, the definition of relevant markets is a "pragmatic" and "factual" exercise and "not a formal, legalistic one." *Id*. at 336; *Thomas Jefferson Univ*., 505 F. Supp. 3d at 539. Therefore, a properly identified relevant market must "correspond to the commercial realities of the industry." *Id*.

The pricing of medical services involves both insurance companies and patients. As explained by the Court in *Thomas Jefferson*:

Because prices are established through multiple layers of competition, price setting is complicated in the commercial reality of the healthcare market. *See Penn State Hershey*, 838 F.3d at 342. '"In the first stage, hospitals compete to be included in an insurance plan's hospital network. In the second stage, hospitals compete to attract individual members of an insurer's plan."' *Penn State Hershey*, 838 F.3d at 342 …

…

'"[T]he vast majority of health care consumers are not direct purchasers of health care—the consumers purchase health insurance and the insurance companies negotiate directly with the providers ...."' *Saint Alphonsus Med. Ctr*, 778 F.3d at 784 (internal quotations and citation omitted). '"[I]insurance companies effectively act both as buyers and sellers."' *Id.* The insurers are the most relevant buyers, who '"must consider both whether employers would offer their plans and whether employees would sign up for them."' *FTC v. Advocate Health Care Network*, 841 F.3d 460, 475 (7th Cir. 2016).

> '"Not until the insurer passes [a price] increase on to the patient in the form of higher premiums will the patient feel the impact of that price increase. And even then, the cost will be spread among many insured patients; it will not be felt solely by the patient who receives the higher-priced procedure. This is the commercial reality of the healthcare market as it exists today."'

*Penn State Hershey*, 838 F.3d at 342; *see also Advocate Health Care*, 841 F.3d at 471 ('"Insured patients are usually not sensitive to retail hospital prices, while insurers respond to both prices and patient preferences."'). '"Patients, of course, are relevant."' *Penn State Hershey*, 838 F.3d at 343. But the Court's focus is properly '"on the likely response of insurers"' and not on the '"likely response of patients to a price increase."' *Id.* at 339.

*Thomas Jefferson Univ.*, 505 F. Supp. 3d at 539–40.

### a)      Product Market

Product markets usually include the product at issue and its substitutes, the other products that are reasonably interchangeable with it. *Fed. Trade Comm'n v. Advoc. Health Care Network*, 841 F.3d 460, 467–68 (7th Cir. 2016). Products can also be "clustered" together if the cluster is itself an object of consumer demand. *Id.*; *see Philadelphia National Bank*, 374 U.S. at 356 ("commercial banking" approved as "cluster of products"); *Federal Trade Comm'n v. Staples, Inc.*,

970 F.Supp.3d 1066, 1080 (D.D.C. 2016) (consumable office supplies clustered into one market). Through its expert,[22] the FTC contends that the product market here is the cluster of inpatient general acute care services provided by both Novant and LNR that are covered by commercial health plans. This product market includes the typical medical services and procedures that require admission to a hospital, such as abdominal surgeries, childbirth, treatment of serious infections, and some emergency care. A similarly defined "product market" has been found (and often stipulated) in numerous hospital merger cases. *See Advoc. Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016); *Penn State Hershey*, 838 F.3d at 338 (parties stipulated); *Tenet Health Care*, 186 F.3d at 1051–52 (8th Cir. 1999) (same); *Federal Trade Comm'n v. Freeman Hospital*, 69 F.3d 260, 268 (8th Cir. 1995) (same).

In response, Defendants do not offer a specific alternative product market (and they bear no obligation to do so because the FTC bears the burden of proving a relevant market). Rather, through their expert,[23] they criticized the FTC's proposed market primarily on two grounds. First, Defendants argue that there is a "porous boundary between inpatient and outpatient services" because some conditions can be treated either in hospitals or outpatient facilities. However, while there may be overlap in the types of medical services provided in inpatient and outpatient settings, those services are ultimately not the same product because it is a matter of medical judgment in each particular case as to whether inpatient services are required – and when they are, an outpatient facility is (almost by definition) not an equal substitute. Tr. 177 (Littlejohn); 684-85, 715-16 (Green). Second, Defendants challenge limiting the product market to services sold to commercial

---

[22] The FTC's market expert was Steven A. Tenn, Ph.D., a well-credentialed and experienced economist who has previously testified for the FTC in hospital merger litigation.

[23] Defendants' market expert was Dr. Lawrence Wu, a similarly well-credentialed and experienced economist who has also previously testified in hospital merger litigation.

health plans and their members, thereby excluding Medicare and Medicaid plans. The Court finds the distinction between commercial and governmental health insurance to be reasonable. Government insurance is limited to certain eligible populations, negotiated more broadly and constrained by government set prices and regulations. Tr. 1047-48 (Tenn); Tr. 358-60 (United). Therefore, the Court agrees that the relevant product market should be limited to commercial insurance.[24]

Finally, the Court agrees that in defining the relevant product (and geographic) markets, it is most appropriate to focus on the "overlapping" medical services where LNR competes with Novant. *See* Tr. 1043 (Tenn); PX0005, tbl.2 (overlapping services account for approximately 95% of discharges from the two hospitals). LNR and NH are considered to be "community" hospitals that offer primary and secondary medical services rather than the more complex tertiary and quaternary services provided by larger "flagship" hospitals or academic medical centers, like Atrium Carolinas Medical Center and Novant Presbyterian in Charlotte or Wake Forest Baptist Medical Center in Winston-Salem, North Carolina. To the extent that a patient needs tertiary or quaternary care that cannot be found at either LNR or NH then neither hospital can realistically be said to be a "competitor" for that patient. *See* Tr. 690 (testimony of Iredell Health President that, "if someone has a challenging need [that will] require a tertiary care center then we're not their competition. … [s]o to say that's a competitor of ours when we don't have the same level of service isn't fair"). Therefore, the Court concludes that the relevant product market is the cluster of inpatient general acute care services provided by both Novant and LNR that are covered by commercial health plans.

---

[24] Health insurance plans sold on the government "affordable care" exchange to individuals are included by the FTC as "commercial" insurance in defining the relevant market.

**b)** **Geographic Market**

The relevant geographic market is the "area in which a potential buyer may rationally look for the goods or services he seeks." *Thomas Jefferson Univ.*, 505 F. Supp. 3d at 540-41. The market must contain the sellers or producers who are able to "deprive each other of significant levels of business" and is where the merger's effect on competition will be "direct and immediate." *Advocate Health Care*, 841 F.3d at 468 (internal quotations and citations omitted).

The hypothetical monopolist test ("HMT") is a "common method" used to define the relevant geographic market for evaluating a plaintiff's likelihood of ultimate success with respect to claims that a merger will substantially lessen competition. *Penn State Hershey*, 838 F.3d at 338. The HMT "asks what would happen if a single firm became the only seller in a candidate geographic region." *Advocate Health Care*, 841 F.3d at 468 (citation omitted). If that single firm – the hypothetical monopolist – could profitably raise prices above competitive levels, the candidate geographic region is a relevant geographic market. *See id.* "[I]f customers would defeat the attempted price increase by buying from outside the region, it is not a relevant market" and the process "should be repeated with ever-larger candidates until it identifies a relevant geographic market." *Id.* (citations omitted). Using the HMT, a proposed market is properly defined if a hypothetical monopolist could impose a small but significant non-transitory increase in price ("SSNIP"), typically an increase of 5% or more, within its proposed boundaries. *See Penn State Hershey*, 838 F.3d at 338; *see also* U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* §§ 4.1.2 (rev. Dec. 18, 2023) [hereinafter "*Merger Guidelines*"]. A proposed geographic market is too narrow if "consumers would respond to a SSNIP by purchasing the product from outside the market, thereby making the SSNIP unprofitable." *Penn State Hershey*, 838 F.3d at 338.

The FTC proposed three relevant markets. Multiple geographic markets may coexist, and the existence of a broader market "does not render the one identified by the government unusable." *United States v. Bertelsmann SE & Co.*, 646 F. Supp. 3d 1, 28 (D.D.C. 2022). Moreover, there is some flexibility in defining "relevant markets." Markets "cannot be measured by metes and bounds," and a "relevant market need not include all potential customers or participants." *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 193 (D.D.C. 2017). The first and smallest FTC candidate market is the "Eastern Lake Norman Area," which it defines as "the northern suburbs of Charlotte along Interstate 77 and includes Iredell County and northern Mecklenburg County." PX0001 ¶ 90. To the south, the Eastern Lake Norman Area is bordered by Interstate 485, and to the west, Lake Norman forms a natural boundary that impedes east-west travel, causing most people to seek healthcare services on their side of the lake. PX0001 ¶ 33; *see also* Tr. 559-60 (Atrium), PX2227 at 5. The FTC's Eastern Lake Norman Area currently contains three inpatient GAC hospitals: LNR, NH, and Iredell Memorial, with a fourth, ALN, arriving in mid-2025.

The FTC's expert also proposed two broader geographic markets, 1) an "Eastern Lake Norman Area + Center City" market that includes Novant Presbyterian, Novant Charlotte Orthopedic, Atrium CMC and Atrium Mercy, which draw patients from all over the area, and 2) a "Center-City/Northern Charlotte Region," which captures the hospitals that over 90% of Eastern Lake Norman Area residents visit and includes all meaningful substitutes for LNR or NH. PX0001 ¶¶ 135-36; PX0005 at tbl. 4. The Center-City/Northern Charlotte Region adds Atrium's Cabarrus, and University City hospitals to the Eastern Lake Norman Area + Center City Market. PX0001 ¶¶ 128-29, 135-36.

The FTC argues that the Eastern Lake Norman Area is an appropriate geographic market because it supposedly "reflects the commercial realities of the industry and illuminates the

competitive impact of the Transaction." Tr. 1039-40, 1049-50, 1052-53 (Tenn). The Court agrees, but only in part. The FTC is correct that this area is an important market to both health systems and insurers because of its growing population and relative affluence. As discussed above, CHS, Novant, Atrium and others all view the Lake Norman / "North Market" area as a distinct area of competition (i.e., it is not a market "made for litigation" as argued by Defendants). *See, e.g.*, Tr. 175, 195-96 (Littlejohn); Tr. 481-82 (Riley); PX1151 at 9; PX1295 at 5, 11; Tr. 483-84 (Riley); Tr. 799-800, 802, 808-09, 811-12 (Ehtisham); Tr. 548-49, 551 (Atrium); PX3142 at 16, 19; Tr. 977 (CaroMont); PX7055 at 93-4, 112-13.

Insurers testified that they recognize the importance of the Eastern Lake Norman Area when forming networks and consider network marketability at a local level that does not necessarily correspond to the entire area in which plans are sold or from which providers draw patients. Tr. 104, 156-57 (Blue Cross); Tr. 345, 366 (United); PX7013 at 31-32 (Cigna); Tr. 457 (Ambetter); Tr. 1655-56 (Aetna). Additionally, several insurers testified that they must provide access to Lake Norman Area hospitals if they want to offer a marketable plan to residents throughout that area. Tr. 104, 107 (Blue Cross); Tr. 454, 457-58, 464 (Ambetter), Tr. 1656 (Aetna); Tr. 350-51 (United). Narrow insurance networks further substantiate this commercial reality; no narrow network serving the Eastern Lake Norman Area excludes LNR, Novant Huntersville, and Iredell Memorial. Tr. 350-51 (United); Tr. 105-07 (Blue Cross); Tr. 457-58, 464 (Ambetter); PX7044 at 66-67 (Aetna).

However, the FTC's most narrow definition of the Eastern Lake Norman Market (which, at least currently, includes no presence at all for Atrium because it has no GAC hospital in the area), ignores the commercial reality that Atrium already claims a significant share of the market for patients living there. Atrium CMC, Atrium University City and Atrium Cabarrus all draw a

material number of patients from the "Lake Norman Area," but are excluded from the FTC's proposed Eastern Lake Norman Market. *See* PX0005 tbl. 7F. This will likely remain true even after ALN opens because Atrium's total reach extends well past the minimal 30 beds incorporated into Dr. Tenn's analysis. Therefore, the broader Center-City/Northern Charlotte Region market appears to much better reflect commercial realities.

Dr. Tenn applied the HMT to these markets and concluded that the level of patient substitution across the area's hospitals is sufficiently high that a hypothetical monopolist owning all of them would be able to negotiate a SSNIPT of greater than 5% for at least one of the merging parties' hospitals. PX0001 ¶¶ 109, 113; *Merger Guidelines* § 4.3.A. He calculated that a hypothetical monopolist of Eastern Lake Norman Area hospitals would negotiate a 25.2% price increase for LNR and a 6.3% price increase for NH. PX0005 tbl. 12A. Dr. Wu, Defendants' expert, disputed Dr. Tenn's calculations, but still concluded that a hypothetical monopolist would be able to raise prices at LNR by over 5% (7%).[25] The broader geographic markets would logically have equal or even higher numbers (because a health system owning all the hospitals in a larger area would have greater market power).

## 2. Market Shares and Concentration within the Relevant Market

Once the relevant geographic market is determined, a prima facie case is established if the plaintiff proves that the merger will probably lead to anticompetitive effects in that market. *Penn State Hershey*, 838 F.3d at 346. Market concentration is a useful indicator of the likely competitive,

---

[25] Defendants' expert did not identify a different relevant market (and, again, had no duty to do so). Rather, he argued that a broader market that included all the hospitals in the Greater Charlotte Area (over eight to eleven counties) would be more appropriate. The Court disagrees. While Novant and Atrium might contract with insurers statewide and negotiate rates throughout the Charlotte region, the distance between hospitals in, for example, Union County and Mooresville, where LNR is located, is simply too far to consider them to be effective substitutes for one another.

or anticompetitive, effects of a merger. *See Merger Guidelines*, § 5.3, at 18; *see also* H.J. Heinz, 246 F.3d at 715–16 ("Increases in concentration above certain levels are thought to raise a likelihood of interdependent anticompetitive conduct." (internal quotation marks and alterations omitted)). Market concentration is typically measured by the Herfindahl–Hirschman Index ("HHI"). *Penn State Hershey*, 838 F.3d at 346; *Mr. Dee's Inc. v. Inmar, Inc.*, No. 1:19CV141, 2022 WL 3576962, at *1 (M.D.N.C. Aug. 19, 2022). However, it must be remembered that the Clayton Act reflects "a conscious avoidance of exclusively mathematical tests." *Brown Shoe*, 370 U.S. at 321.

The HHI is calculated by summing the squares of the individual firms' market shares. In determining whether the HHI demonstrates a high market concentration, the Court considers both the post-merger HHI number and the increase in the HHI resulting from the merger. *Merger Guidelines* § 5.3, at 18–19. According to the long accepted 2010 Merger Guidelines, a post-merger market with a HHI above 2,500 is classified as "highly concentrated," and a merger that increases the HHI by more than 200 points is "presumed to be likely to enhance market power." *Id.* § 5.3, at 19. The comparable levels in the new 2023 Merger Guidelines are slightly lower: at 1,800 for total HHI and 100 for the HHI increase. The 2023 Merger Guidelines also added an indicator for the merged firm's market share at 30% along with an HHI increase of 100.

Both the FTC's and the Defendants' experts calculated Novant's and LNR's combined market share in the FTC's Center City / Northern Charlotte Region market to exceed 30% (Tenn: – 37%; Wu: – 36.8%). PX0005 tbl. 5; PX0003 Ex. 22A. Similarly, both experts found that the post-acquisition HHI and change in HHI exceeded the 2010 and 2023 Merger Guidelines. Dr. Tenn

calculated a 4886 post-acquisition HHI with an increase of 288 points and Dr. Wu's comparable numbers were a 5006 HHI with a 230-point increase.[26] *Id*.

However, in fairly evaluating the competitive import of these market shares and HHI levels, the Court must take into account that the market is already highly concentrated. Both experts agreed that Novant's pre-transaction market share alone exceeds 30% and that the pre-merger HHI is over 4500. Therefore, any purchase at all by Novant would result in a "combined" market share above 30% and the starting point for the HHI is more than double the 2023 threshold level of presumably unhealthy market concentration (and almost double the 2010 standard). Indeed, Dr. Tenn acknowledged that a patient count of as few as two or three patients a day might trigger an HHI increase above the low end of the 2023 Merger Guidelines. *See* Tr. 1193-95. So, while both the 2010 and 2023 the HHI Merger Guideline thresholds are at least slightly exceeded by the proposed transaction, that appears to be mostly the result of the already heavy concentration of the relevant market rather than LNR's market position.[27]

### 3. Rebutting the Prima Facie Case

---

[26] Using his preferred "patient-based shares" rather than "hospital-based shares" (Dr. Tenn's method), Dr. Wu calculated a post-acquisition HHI of 4580 with an HHI increase of 338. PX0003 Ex. 22A. Dr. Wu performed other calculations using "revenue" rather than patient discharge data as the unit of measure, resulting in a significantly reduced HHI increase of 58 points. However, the Court does not find Dr. Wu's alternate calculations persuasive because they unfairly skew the analysis to favor more expensive providers and procedures and/or relate to all services rather than only to those services for which LNR and NH compete.

[27] In noting the thin margin by which the proposed hospital purchase satisfies the Merger Guidelines, the Court does not mean to imply that the acquisition of a relatively minor competitor (which consequently only moves the HHI needle slightly above the threshold) cannot violate the Clayton Act. To the contrary, allowing one or more market leaders to serially buy their remaining smaller competitors could lead to a complete duopoly, which even further erodes competition. *See IQVIA*, 2024 WL 81232, at *44 (noting the importance of preventing even slight increases in concentration where the market is already heavily concentrated). Instead, the level of HHI increase (along with the already existing heavy market concentration) suggests only that the Court must cautiously apply any presumption of illegality and carefully analyze if the non-mathematical evidence corroborates the likelihood of future competitive harm.

47

Once the FTC has established a prima facie case that the merger may substantially lessen competition, the burden shifts to the Defendants to rebut the FTC's case by showing that, even if the FTC's market-concentration evidence is credible, it inaccurately predicts the merger's probable effect on competition. *See JELD-WEN,* 988 F.3d at 703-04. To meet this burden, "the defendants may demonstrate unique economic circumstances that undermine the predictive value of the government's statistics." *Id.* The Court finds such "unique circumstances" are present here.

First, there is clear evidence, which the FTC does not appear to dispute, that Davis will close absent the transaction. CHS's President and Chief Financial Officer testified that CHS is currently losing $1 million a month operating Davis and would "move to shut it down immediately" if the sale to Novant does not go forward. Tr. 1575-77, 1622-23 (Hammons). Further, Mr. Hammons testified that CHS had looked unsuccessfully for potential buyers. *Id.* Consequently, the sale of Davis to Novant will maintain, not eliminate, competition (and services) that will be lost if the hospital closed.

Likewise, the future competitive landscape for LNR suggests that the hospital will not be able to sustain its current level of competition. CHS testified that "as we look at the horizon out over the next three to five years we really believe that the financial performance of LNR is in decline and, we believe, will continue to decline, particularly in light of the construction of the Atrium hospital just a couple of exits down." Tr. 1574 (Hammons). Another new external competitive threat to LNR is the change in North Carolina's CON which will increase competition for outpatient services, a primary source of LNR's revenue. (*See* Tr. 278, 992 (Littlejohn) (citing CON reform as "one of the greatest threats to Lake Norman")). Though LNR's competitive challenges also partially arise from CHS' earlier decisions to close lines of service and decline to make additional investments in LNR, the Court finds that those decisions are not a litigation-

related strategy or an attempt to artificially create economic woes to justify a profitable sale. LNR's competitive problems are real: they relate broadly to CHS's belief that the hospital lacks a sufficient physician practice network and other "access points of care" to justify investments among other better alternatives for scarce capital. And, significantly, these problems long pre-date CHS' decision to sell the hospital to Novant. *See* Tr. 1570-72 (Hammons). Therefore, competition from LNR will likely be substantially reduced in the future, if it even remains open given CHS' financial difficulties.

The FTC urges the Court to consider LNR's current and future competitive problems only through a rigid application of the rarely successful "weakened competitor" defense, which it dismisses as "the Hail-Mary pass of presumptively doomed mergers." *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 572 (6th Cir. 2014); *but see FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 153–57 (D.D.C. 2004) (case in which the weakened-competitor defense succeeded). Even assuming that new future external competitive circumstances are properly categorized as a "weakened competitor" defense (which seems ill-fitting), the Court finds that the FTC's cited cases are distinguishable. In *JELD-WEN*, the Fourth Circuit discussed the application of the "weakened competitor" defense, holding that it involved showing that the acquired company "would have been too weak to affect competition and that there were no competitively preferable alternatives to a merger with the acquiring company." *See JELD-WEN*, 988 F.3d at 714–16. More specifically, the Fourth Circuit cited as elements of the defense that "the acquired firm's weakness[ ] ... cannot be resolved by any competitive means" and "would cause that firm's market share to reduce to a level that would undermine the [plaintiff's] prima facie case." *Id*. (internal citations omitted).

The facts relied on by the court in *JELD-WEN* are different than this case. Unlike here, the selling company "had options besides merging with JELD-WEN that would have preserved

competition in the [] market. In particular, it could have sold itself to one of the two or three other bidders who made serious offers." *Id*. CHS had no other bidders for LNR or Davis despite reasonable efforts to sell the hospitals to others.[28] Accordingly, CHS' financial issues could not "have been 'resolved by' means that would've preserved competition." *Id*. Also, evidence in *JELD-WEN* indicated that absent the merger the selling company's market share would not have dropped below the level sufficient to sustain a prima facie case. Yet, as discussed above, it appears (based on the Court's view of what is likely to occur rather than what could be possible under different circumstances) that LNR's competitive position will further erode to the point where it will most likely close in the foreseeable future, fully eliminating it as a competitor capable of being the subject of a prima facie case. So, like in cases where the weakened-competitor defense has succeeded, CHS / LNR does not have "convincing prospects for improvement."[29] *See Arch Coal*, 329 F. Supp. 2d at 157; *JELD-WEN*, 988 F.3d at 715.

The FTC's other cited cases are similarly distinguishable. *See United States v. Greater Buffalo Press, Inc*., 402 U.S. 549, 555–56 (1971) (the alleged "failing company" was still actively pursuing expansion plans and had shown "a substantial increase in profits" in the year of the sale; also, numerous prospective purchasers had not been approached); *FTC v. Warner Commc'ns Inc.*,

---

[28] There is no evidence that additional efforts to sell LNR or Davis would fare any differently. The fundamental impediment to another bidder becoming interested – the difficulty and expense of competing against Atrium and Novant, especially with a hospital and network in which few investments have been made – would remain daunting to any new or previously solicited bidder.

[29] As noted by the FTC, "[a]ntitrust cases presume the existence of rational economic behavior" by "profit-maximizing compan[ies]." *In re Zetia (Ezetimibe) Antitrust Litig.*, 2022 WL 4362166, at *9 (E.D. Va. Aug. 15, 2022). Although CHS could theoretically make different decisions as to which of its hospitals to support when its financial position does not permit it to support them all, CHS' choice not to support LNR at a level which would allow it to meaningfully compete in the future as competitive circumstances worsen is, at a minimum, "rational economic behavior." Simply put, even though CHS "could" invest more in LNR, the evidence shows that it "won't."

742 F.2d 1156, 1164-65 (9th Cir. 1984) (declining to resolve the question of how much weight, if any, to give to the weak financial condition of a company where "failing company" defense not asserted; "we only hold that a company's stated intention to leave the market or its financial weakness *does not in itself justify* a merger." (emphasis added)); *United States v. UPM-Kymmene Oyj*, 2003 WL 21781902, at *11 (N.D. Ill. July 25, 2003) (noting that one of the defendants "decided to make its subsidiary into an ineffective competitor," rather than (as more applicable here) "the reasons the company is failing or ineffective are found in economic conditions or management errors made in the good faith attempt to do well"). In other words, the Court agrees with the FTC that a company cannot manufacture a "failing company" defense, ignore other available non-objectionable transactions or in other ways seek to game the process to pursue an anti-competitive merger. Only those bona fide economic difficulties which are so existential as to establish that the entity being acquired will no longer be a viable competitor in the absence of the proposed transaction may justify an otherwise unlawful loss of competition. Nevertheless, as discussed at length above, this is the "rare case" which meets that high threshold.

In summary, in these "unique economic circumstances," the sale of LNR to Novant is at least as likely to enhance competition as it is to reduce it. Although so-called general "quality" improvements or total cost savings are uncertain and/or are unlikely to have much competitive effect – other than the fact that the Novant brand is stronger in the public's mind – Novant will more importantly replace the lost lines of service and otherwise reinvigorate and support the hospital and its staff. Moreover, while Novant's acquisition of LNR and Davis is unlikely to have much effect on Atrium's system-wide negotiations with insurers,[30] operating LNR will put Novant

---

[30] Novant's expert testified that he expected that Atrium's negotiated rates with insurers would go down because of the transaction. *See* Tr. 1733-36 (Wu). Beyond the theoretical effect of Novant's

in a better competitive position versus Atrium for Lake Norman area patients. So, while the competition between Novant and LNR will be eliminated, there will still be vigorous competition for those patients from Atrium and, to a lesser extent, Iredell Health. Thus, the evidence of new future competitive circumstances "undermines the predictive value of the government's statistics," and Defendants will likely be successful in rebutting the FTC's prima facie case.

The FTC has not presented additional evidence in response to Defendants' rebuttal case not already discussed. Therefore, the Court concludes that the commercial realities suggest that the FTC is unlikely to be successful in establishing there may be a substantial lessening of competition as a result of CHS' sale of LNR and Davis hospitals to Novant.

### B.    Equities

In addition to assessing the FTC's likelihood of ultimate success, the Court must weigh the equities of enjoining the transaction pending the conclusion of the FTC administrative process. In doing so, the Court does not consider the effect of the injunction on the contracting parties (even though they may claim, as they do here, that an injunction will result in terminating the transaction). *See Food Town*, 539 F.2d at 1344. Instead, "[t]he Court considers whether the injunction, not the merger, would be in the public interest," *Jefferson*, 505 F. Supp. 3d at 538, in effect asking how will the public be better off and/or worse off if an injunction is entered? *Id*.

There are numerous equities that need to be considered. First, the FTC asks the Court to enter the injunction to prevent "immediate competitive harm." Such harm is often present where

_____

increased competition, Dr. Wu purportedly relied on his analysis of Atrium's "willingness to pay" in the three year period after Novant announced the opening of the Novant Mint Hill hospital. However, the Court finds this analysis unpersuasive because Dr. Wu presented no evidence of any causal link between any decline in Atrium's actual rates and the Novant Mint Hill hospital. And, notably, Novant did not ask any insurer to testify on the likely effect of Novant's purchase of LNR and Davis on Atrium's negotiated rates.

the FTC establishes a likelihood of success on the merits and is frequently cited as the grounds for granting injunction relief to the FTC. *See Heinz*, 246 F.3d at 726; *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1035 (D.C. Cir. 2008) (stating that, "the equities will often weigh in favor of the FTC, since the public interest in effective enforcement of the antitrust laws was Congress's specific public equity consideration in enacting [§ 13(b)]"). Second, the FTC argues that a preliminary injunction is critical to the Commission's ability to order effective relief, alleging that it would be "extraordinarily difficult to 'unscramble the egg'" if the transaction is later deemed unlawful. *See Hershey*, 838 F.3d at 352-53 & n.11.

Beyond its conclusion that, ultimately, the FTC is unlikely to be successful, the Court does not find that "immediate" competitive harm is likely. The principal competitive harms alleged by the FTC are the increase in prices paid by commercial insurers at LNR and Davis and the loss of LNR's competition for Lake Norman area patients. The Court accepts that the reimbursement rates paid by insurers at LNR and Davis are likely to rise substantially after those hospitals are integrated into Novant's insurance contracts, but Novant has committed (in testimony believed and credited by the Court) that it will not directly or indirectly increase prices at LNR or Davis for three years. Also, if LNR and Davis continue in operation then patients will likely have the opportunity to go to the same medical providers at LNR and Davis[31] if the transaction is allowed to proceed. Finally, there was no evidence presented that it would be any harder to sell LNR or Davis than it would be currently if a divestiture were later ordered. In fact, it seems reasonable that a sale might be easier if Novant improves the hospital as it has promised. Therefore, avoiding divesture problems in the

---

[31] Neither Novant nor the FTC explicitly presented evidence concerning whether the doctors and nurses currently working at LNR or Davis would be retained by Novant after the sale. However, Novant made repeated efforts to praise them and promised to support them going forward. Accordingly, the Court has inferred that the medical providers now practicing at LNR and Davis will generally continue to do so.

future does not appear to pose a significant concern. *See Fed. Trade Comm'n v. Microsoft Corp*., 681 F. Supp. 3d 1069, 1101 (N.D. Cal. 2023).

The FTC also points to the loss of millions of dollars in tax revenue to state and local governments that will result from Novant, a "non-profit" entity, purchasing LNR and Davis from CHS, a "for profit" company, as a public equity that favors an injunction. In response, Novant does not dispute that LNR and Davis will pay approximately $1.1 million less in real and personal property taxes, but explains that the hospitals will continue to pay state and county sales and use taxes at existing rates (because Novant is already using all its eligible tax exemptions for those taxes). *See* Doc. No. 214 at 36, n.8. Payroll and unemployment taxes will also be paid at the same rates. The Court agrees with the FTC that the loss of this tax revenue weighs in favor of an injunction.

With respect to public equities that disfavor an injunction, Davis will remain open rather than be shut down if the sale is allowed to proceed. Keeping Davis open is clearly in the public interest because its closure would eliminate critically needed inpatient psychiatric services. *See* Brianna Lombardi & Paul Lanier, *Responding to North Carolina's Behavioral Health Workforce Crisis*, UNC: CAROLINA ACROSS 100 (Oct. 3, 2023), https://carolinaacross100.unc.edu/responding-to-north-carolinas-behavioral-health-workforce crisis ("Almost 4 million people [in North Carolina] live in a mental health professional shortage area," including parts of Iredell County and Mecklenburg County). Also, as described at length above, Novant has committed to restoring medical services, adding staff, raising salaries, and making investments in equipment and infrastructure at LNR that will benefit patients and medical providers.

In sum, the Court finds that the equities that support denial of an injunction, particularly avoiding the immediate closure of Davis and the addition of medical services at LNR, outweigh the loss of tax revenue or other equities that weigh in favor of an injunction. Overall, the public interest is best served by Novant being permitted to own and operate LNR and Davis, pending the conclusion of the FTC administrative process.

## V.     ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

Plaintiff's Complaint for a Preliminary Injunction, (Doc. No. 1), is **DENIED.**

**SO ORDERED ADJUDGED AND DECREED**.

Signed: June 5, 2024

Kenneth D. Bell
United States District Judge